**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| WILDERNESS WORKSHOP, et. al.    ) | |
| ) | |
| Plaintiffs,    ) | |
| ) | |
| v.    ) | Civil Action No.  23-678-JMC |
| ) | |
| MERYL HARRELL, et al.,    ) | |
| ) | |
| Defendants    ) | |
| ) | |
| BERLAIMONT ESTATES, LLC    ) | |
| ) | |
| Intervenor-Defendant    ) | |
| ) | |
| ) | |

**<u>FIRST AMENDED COMPLAINT</u>**

**INTRODUCTION**

1.  By this lawsuit, Wilderness Workshop and Rocky Mountain Wild ("Plaintiffs") seek judicial review and remedy of legal errors, decisions made, and actions taken by the Defendants, Meryl Harrell, Under Secretary for Natural Resources and Environment ("Under Secretary"), U.S. Department of Agriculture ("USDA"); Chris French, Deputy Chief for the United States Forest Service; Tamara Angel, Objection Reviewing Officer for the United States Forest Service; Scott Fitzwilliams, Forest Supervisor for the United States Forest Service; Frank Beum, Regional Forester for the United States Forest Service; the United States Department of Agriculture; and the United States Forest Service (collectively "Forest Service").  Statutory decisionmaking authority is both retained and delegated by USDA and Forest Service Officials located in Washington D.C.

2.  The complaint involves the Forest Service authorization to issue special use permits to construct and use roads and utility corridors that cross the White River National Forest for whatever purposes the present and future owners of the Berlaimont Estates private parcel deem reasonable.  Since 1935, when the parcel was created, existing access supported reasonable uses. The special use permits involving unnecessary new road and utility access were authorized on March 10, 2023.

3.  The White River National Forest lands adjacent to and near the proposed Berlaimont Estates development provide important habitat for sensitive and protected plants and wildlife, including lynx, greenback cutthroat trout, greater sage grouse, sensitive bird species like the Brewers Sparrow, declining populations of deer and elk, and Harrington's Penstemon.  The area's wildlife populations, especially deer and elk, are in a crisis of decline.  Endangered Species Act protections are required for species impacted by the proposal.  Populations of deer and elk in and around the project area have dropped by 50% in recent decades.  State and federal biologists agree that increased pressure from development and year-round recreation are the primary causes for these declines.

4.  This Complaint involves Forest Service decisions regarding National Forest System lands in Western Colorado.  Defendants misapplied the mandatory access provisions of the Alaska National Interest Lands Conservation Act of 1980, 16 U.S.C. §§ 3101 *et seq*. ("ANILCA") instead of the discretionary access provisions in the Federal Land and Policy Management Act of 1976 ("FLPMA") that apply to federal public lands outside of Alaska, including National Forests.  43 U.S.C. § 1740 of 1976 ("Secretary of Agriculture, with respect to lands within the National Forest System, shall promulgate rules and regulations to carry out the purposes of [FLPMA]" when considering access requests.).  The National Forest Management

Act of 1976, 16 U.S.C. § 1600 *et seq*., ("NFMA") also applies to the National Forests, but because access issues were inadvertently omitted from NFMA, the access provisions involving National Forests were included in FLPMA.  Applying ANILCA's *Alaska-specific* provisions to an access request involving the National Forest in the Lower 48 States is contrary to the plain language of ANILCA and FLPMA.  16 U.S.C. § 3101(d).  ANILCA's Alaska-specific provisions are designed "to provide the opportunity for rural residents engaged in a subsistence way of life to continue to do so." *Id*. at § 3101(c).  The Berlaimont Estates' luxury home development proposal does not involve a subsistence way of life.

5.  The site-specific decisions were made based on an inadequate Environmental Impact Statement ("2020 EIS" or "FEIS").  Despite the agency finding the 2020 EIS was deficient in several ways in its resolution of pre-decisional objections, the Forest Service continued to rely on the 2020 EIS in issuing its Final Record of Decision ("FROD" or "2023 FROD").  Defendants deemed the 2020 EIS inadequate to inform the public and decisionmakers of the alternative agency actions available to Defendants when considering a proposal to grant private interests in National Forest lands for road and utility access to an end-of-the road development proposal known as "Berlaimont Estates."  Instead of resolving the deficiencies, the Forest Service FROD referenced an errata sheet that failed to meet statutory land management mandates.

6.  The claims in this Complaint are based on violations of several federal land management laws. The Forest Service failed to fulfill the "hard look" mandate, public disclosure, and informed decisionmaking duties under the National Environmental Policy Act. 42 U.S.C. §§ 4321 et seq. ("NEPA").  NEPA duties must be met when considering and before approving the Special Use Permits, utility easements, and other conveyances of federal public land ("ANILCA Proposal") that grant a right-of-way for road and utility access across National Forest System

lands connecting private land within the White River National Forest with Beard and Berry Creek Roads near the community of Edwards, Colorado.

7. This suit seeks to invalidate and set aside Defendants' legal interpretations and Defendants' actions and decisions that grant road and utility access across the National Forest. The developer's proposal for the Forest Service to grant additional, ANILCA-based access was initiated to enable development of a new upscale, luxury subdivision on an inholding within the National Forest. Road access to the homesteaded parcel created in 1935 remains adequate for rural and agricultural purposes and enjoys access similar to other homesteaded inholdings. In 2008, the project proponent, Berlaimont Estates LLC, purchased the property with full notice that the parcel enjoyed seasonal access on existing unpaved roads and no utility corridors, as is common for inholdings in Colorado National Forests. Like other inholdings in the area, there is wintertime access to the parcel via over snow vehicles, including snowcats and snowmobiles. Defendants have misconstrued federal law in a way that abdicated their duties to manage the National Forest. Often characterized as an "artful dodge" to avoid federal public lands laws, Defendants interpreted ANILCA as a mandate to approve the proposal to expand existing access to include residential road and utility corridors across National Forest lands to facilitate development of the proposed Estates. Granting expanded access pursuant to ANILCA's inapplicable provisions provides a windfall to the developer, at the expense of the National Forest System. The application of ANILCA in the Lower 48 is a question of nationwide importance and impact that is properly addressed by the D.C. District Court.

8. All Forest Service authority involved in the decisions and actions challenged in this Complaint was delegated, overseen, directed, reviewed, and approved by Defendants located in Washington D.C..

9.  Each National Forest is managed in accordance with a NFMA-mandated Forest Plan. In order to approve Berlaimont's proposal, the Forest Service must amend the Forest Plan to eliminate protections for wintering wildlife, abandon the seasonal closure, and permit paving and rerouting existing roads to allow development of the Estates and the hundreds of vehicle trips per day that it will take to support this luxury subdivision.  The White River National Forest Plan has not been amended in a way that accounts for the impacts of the Berlaimont proposal to the National Forest.  The 2020 EIS did not disclose and analyze the cumulative impacts of a Forest Plan Amendment.

10.  By granting Berlaimont's ANILCA Proposal based on the FROD and 2020 EIS, Defendants have taken final agency action to issue private interests in federal lands and granted expanded access for the purposes of constructing and utilizing road and utility infrastructure improvements based on a plan to build and occupy 19 new single-family mansions with 9 accessory units.  The Forest Service did so without considering or taking the steps necessary to disclose, reduce and eliminate impacts to the surrounding National Forest System lands.

11.  The Forest Service shielded difficult questions from scrutiny by manipulating the scope and structure of its ANILCA determination and NEPA analysis.  The Forest Service's consideration of this proposal was limited by avoiding FLPMA's discretionary provisions in an agency-wide effort to narrowly define the scope of federal power and authority over this and similar development proposals.

12.  Important factors and conclusions were excluded from the Forest Service's ANILCA determinations and NEPA analysis and disclosure to create the impression that the Forest Service is required to grant dramatically upgraded, paved, year-round access based on the developer's demands.  A full review of impacts and federal power to deny or condition approvals

in light of the Forest Service duties to manage federal land is likely to result in denial of the Berlaimont proposal.

13.    The FROD and NEPA analysis are based on the erroneous legal premise that the Forest Service lacked discretion to deny or condition approval of the request for expanded road and utility access.  Based on agency ANILCA interpretations, the agency did not impose binding mitigation measures or otherwise condition its authorizations in the manner that FLPMA requires and/or allows. The NEPA analysis assumed that the Forest Service was required to approve the request for dramatically expanded road access and a utility easement across the National Forest as demanded by the private developer regardless of the scope or intensity of the permanent impacts of the special use authorizations, and even though such access is not characteristic of most inholdings.  The Forest Service abdicated its duty to protect federal public lands by failing to consider the availability and effectiveness of a reasonable range of alternative means, terms, conditions, and mitigation measures that protect the National Forest.

14.    The statutory authority and process for authorizing the Forest Service to grant access across National Forest System lands outside Alaska was adopted in the FLPMA. 43 U.S.C. § 1740 ("Secretary of Agriculture, with respect to lands within the National Forest System, shall promulgate rules and regulations to carry out the purposes of [FLPMA].").  The Forest Service promulgated access regulations that "apply to access across all National Forest System lands." 36 C.F.R. 251.110; *see also* 36 C.F.R. § 251.114(a) ("[T]he authorized officer shall authorize only those access facilities or modes of access that are needed for the reasonable use and enjoyment of the land and that minimize the impacts on the Federal resources.").  FLPMA protections for federal public lands located in Colorado, was artfully dodged by the Forest Service in favor of an inapplicable ANILCA provision.  The only parcel the Forest

Service analysis identified as similar to the Berlaimont proposal is used and enjoyed through a FLPMA easement granted in November of 1997.

15.    The FEIS is unlawfully limited in scope because it failed to include a hard look analysis that considers a reasonable range of alternative courses of action and mitigation measures, as required by NEPA.

16.    Plaintiffs ask that the Court enter legal and factual findings necessary to declare unlawful, vacate, and set aside all of Defendants' decisions and actions taken in approving the 2020 EIS and 2023 FROD based on ANILCA-based access provisions that do not apply outside Alaska, and remand to Defendants for consideration of any further access proposals in compliance with all substantive and procedural requirements of federal law.

17.    Plaintiffs' requested relief includes an order that, (1) invalidates Defendants' FROD; (2) invalidates the 2020 EIS; (3) remands to the agency for completion of a single, comprehensive NEPA analysis that fully analyzes the Berlaimont Estates proposal, construction and development of Berlaimont Estates, and other connected actions; (4) orders that any environmental analysis begin anew and in compliance with NEPA; (5) orders that such NEPA analysis include a full range of reasonable alternatives; (6) declares that the Forest Service practice of applying ANILCA outside of Alaska is unlawful; and, (7) precludes Defendant from granting, authorizing, or allowing use of Forest Service lands for the construction or operation of the Berlaimont Estates proposal, or authorizing construction, improvement or use of new or existing road or utility access across Forest Service lands until Defendants have complied with Federal laws, including FLPMA's access provision.

18.    Each of Plaintiffs' claims, independently and in combination with other claims, provides a legal basis for granting the full relief requested.

**AGENCY ACTIONS AT ISSUE**

19.     The FROD is a final agency action that subjects the agency decisionmaking to Administrative Procedure Act ("APA") review by the District Court.  5 U.S.C. 701 *et seq.*  As part of the APA review, the 2020 EIS, 2023 FROD, NEPA analysis, and each agency action underlying or implementing the FROD are subject to APA-based judicial review.

20.     The FROD approved a private proposal for additional road access, utility corridors, and other private use and occupancy of federal lands contained in the National Forest System.  The FROD approves issuance of a special use authorization for Berlaimont Estates LLC to construct an access route across the White River National Forest for the purpose of constructing 19 luxury vacation homes on private lands within the National Forest System.

21.     The language of a specific easement, special use permit, and other documents that would accomplish the proposed ANILCA transaction were excluded from NEPA analysis.  The special use authorization was made without publicly disclosing or specifying the terms within the FROD. The scope of an easement, special use permit, or other document involving federal public lands cannot be analyzed absent specific language in a written document.

22.     The 2023 FROD approves utility and road access for the purpose of constructing, marketing, selling, and eventually operating the development known as the Berlaimont Estates. The FROD contains a list of contemplated authorizations, each of which are subject to APA review as distinct agency actions authorized by the FROD.  The FROD also approved an undisclosed array of Forest Service real estate actions that relinquish the federal government's ability to review, approve, mitigate, and control the impacts of the private development on the National Forest System lands.  The FROD authorized numerous actions and approvals that were not included in the Draft ROD.  The FROD authorized numerous actions that were not analyzed

in the FEIS.  The FROD authorizes numerous actions that were not analyzed in a Biological

Opinion or other Endangered Species Act analysis.

23.     The Forest Service's actions were based on the FROD issued on March 10, 2023.

Each named Defendant has legal duties and authority over the FROD, as well as the decisions

and actions leading up to and implementing the FROD, that were delegated and subject to final

approval by Meryl Harrell, Under Secretary for Natural Resources and Environment, U.S.

Department of Agriculture.

24.     Scoping for this proposal began in September of 2016.  The Draft Environmental

Impact Statement (DEIS) was released for public comment on January 26, 2018.  After the close

of the DEIS comment period, the Forest Service used non-NEPA procedures to alter various

project components.  These components were not subjected to NEPA notice and comment

procedures.

25.     The FEIS and Draft ROD were issued on September 25, 2020 and subject to a 45-

day objection period for persons who participated in the DEIS comment period.  Public notice of

the release was published in the local newspaper, but not in the Federal Register. Forty-two

formal objections were filed with the Forest Service.  Thirty-six formal objections were made

available for public review before January 7, 2020, when the Forest Service held an Objection

Resolution Meeting.  Sixteen objectors participated in the resolution meeting, including the

project proponent and fifteen individuals who objected to the agency's decision to authorize the

road and identified shortcomings in the agency's process and analysis.  Several other objectors,

all of whom opposed the agency's decision, could not attend the resolution meeting but asked

that formal statements be added to the record.  On January 22, 2021 the Forest Service's

Objection Reviewing and Deciding Officer, Tamara Angel, sent objectors a letter responding to

objections and providing instructions to Forest Supervisor, Scott Fitzwilliams, regarding steps

necessary to respond to objections.  On July 5, 2021, more than six months after conclusion of

the formal objection period, the Forest Service finally published notice of the FEIS in the Federal

Register. The FEIS was unaltered from the version released in September of 2020 despite

objections and instructions of the Objection Deciding Officer.  Unresolved deficiencies in the

2020 EIS were confirmed by an "errata" sheet attached to the 2023 FROD.

26.     The Forest Service published the FEIS notice in the local newspaper, rather than

the Federal Register, when it was first released in September of 2020.  By not publishing a notice

of availability in the Federal Register, the Forest Service foreclosed meaningful opportunity for

broader and fully-informed public engagement during the objection period.  Failure to publish

the FEIS in the Federal Register shielded the proposal and analysis from expert scrutiny of

Environmental Protection Agency ("EPA") staff and prevented formal and informal objections

from agencies with jurisdiction and expertise.  For example, the EPA which rated the DEIS as

"EC-2, Environmental Concerns – Insufficient Information," was not put on notice of the

analysis in the 2020 EIS until after the formal objection period had closed.  The State of

Colorado's Department of Natural Resources ("DNR") filed a critical letter, but not until after

the objection deadline had passed.  Withholding Federal Register publication of the FEIS

shielded Plaintiffs and Forest Service decisionmakers from information from these agencies and

others who did not receive notice during the critical period when objections were being drafted,

reviewed, and resolved.

27.     The Forest Service issued an Objection Response that identified significant

deficiencies in the FEIS analysis.  The Objection Response required additional analysis before a

decision could be reached.  The Objection Response said that the Forest Service's Biological

Assessment was inconsistent with the agency's analysis of impacts to federally listed lynx, and that further clarification was necessary regarding the current status of cutthroat trout. The instructions further directed the deciding officer to reconsider cumulative impacts to deer and elk with the inclusion of information that was not previously considered by the Forest Service; to address inholdings identified by objectors that were not included in its ANILCA determination; to provide additional rationale for dismissal of an unpaved alternative; to provide an explanation for why a partially paved alternative was not considered; to consider new information provided by Colorado Parks and Wildlife ("CPW") that the Forest Service failed to consider, as well as new information regarding deer and elk populations that were not considered. The Objections Reviewing and Deciding Officer was also instructed to limit the speed limit on the road to 20 miles per hour, though that condition was not considered in the FEIS. And, the Objections Reviewing and Deciding Officer explicitly said ANILCA does not authorize or require authorization of utilities, and instructed Scott Fitzwilliams to include additional clarification on how special use authorizations will be used for the road and utilities.

28.    A post-Objection analysis carried out and directed by persons in Defendants' Washington D.C. and Regional offices was the basis for the selection of the actions approved in the 2023 ROD. NEPA procedures were not followed during the post-Objection analyses. The 2023 ROD approved an alternative course of action that was not one of the four alternative routes analyzed in detail in the FEIS. Forest Service Officials in Washington D.C. provided detailed directions that resulted in a 2023 ROD that approved a modified road and utility alignment known as Alternative 2- Modified. The Alternative 2-Modified route was identified in the DEIS, but was eliminated from detailed consideration in the FEIS. An "errata sheet" was

attached to the 2023 FROD to justify the choice of an alternative that was not subjected to a NEPA process. The errata sheet was not subjected to NEPA disclosure, comment, or analysis.

29.     The Forest Service failed to take meaningful steps to comply with NEPA, inform the public, and to respond to public concerns by republishing an FEIS unchanged and issuing an errata sheet. The errata sheet and FROD confirm that additional NEPA procedures were required to correct errors in the FEIS. The errata sheet and FROD confirm that the objections had merit that necessitated additional consideration and analysis of impacts to wildlife, a more clearly defined cumulative effects analysis area, clarification on the agency's authority to permit utilities, and additional discussion related to dismissal of reasonable alternatives. The Forest Service decisionmaking process that culminated in the FEIS and FROD does not conform with NEPA's action-forcing duties.

## AREA AND NATIONAL FOREST

30.     This lawsuit involves a unique area of the White River National Forest, which provides habitat for iconic wildlife, as well as threatened and endangered species and sensitive, rare plants.

31.     The area currently provides some of the last best winter range, severe winter range, and winter concentration areas for deer and elk in the Eagle Valley. It represents an important migration corridor for the second largest migrating deer herd in the State of Colorado—a herd that has been in steep decline since the 1980s as a result of loss of winter range and habitat fragmentation from development and recreational impacts. Elk populations in the area have also been in steep decline for the same reasons. This project will increase the rate of decline by adding to the causes of that decline.

32.    The project will also destroy and degrade habitat for threatened, endangered, and sensitive species.  There are populations of greenback cutthroat trout in stream reaches that would be impacted by the proposed development.  The proposed project bisects occupied range for greater sage-grouse, and new homes would be built in lynx habitat.  Sensitive populations of Colorado River cutthroat trout, Brewer's sparrow, and populations of Harrington's Penstemon would all be directly and indirectly impacted by the development as well.

33.    These pictures accurately depict the surrounding National Forest and affected area's rich and diverse habitat, and provide a visual perspective on the unique public land values retained there. The existing roads do not create an entitlement to FLPMA-based access. Even if ANILCA does apply in Colorado, the roads in these four pictures provide existing and adequate access to the parcel for all ANILCA-recognized uses since the parcel was privatized in 1935.



This picture depicts a forested section of one existing access route to the parcel.



This picture depicts the existing access at lower elevations.



Picture of Forest Road 780, looking north toward the Berlaimont Parcel.



Existing segment of Forest Road 780.

34.     Local communities rely on commercial activities related to the National Forest and wildlife.  Berlaimont Estates will further reduce local wildlife populations, and forever change the character of this landscape.  Alternative 2- Modified will also put more people and expensive homes at the end of a long and winding road and utility corridor in a fire prone forest at a time when fires are becoming more severe and costly to fight.  The cost of fighting fire when it does come will fall on the Forest Service and local communities, neither of which can afford their existing obligations much less the added costs associated with Berlaimont Estates. The development will negatively impact the socioeconomic condition of these communities.

35.     The public has consistently and emphatically opposed this project since the proposal was publicly released.  The Forest Service received extensive comments and objections filed by local, regional and national individuals and organizations urging the agency to deny the

proposal. There have been consistent letters of opposition in local newspapers, and organized protests held in public.

36.     More than 90% of comments received by the Forest Service opposed authorization of the proposed road and Berlaimont Estates. The potential impacts to wildlife and wildlife habitat have been a prominent concern voiced by commenters at the local level, county government, as well as State and Federal elected officials.

37.     Retired Colorado Parks and Wildlife District Wildlife Managers with decades of experience managing wildlife in the area urged the Forest Service to "deny a paved road that will surely be the final cut to the herds of deer and elk that are suffering death by a thousand cuts." The District Wildlife Managers sent a letter explaining how the road would represent an "immense barrier to wildlife, bisecting the second largest migration area in the state." Wildlife experts also questioned the agency's decision to amend the existing Forest Plan and abandon protections for wintering deer and elk with population numbers down as much as 65%.

38.     Officials at the State of Colorado raised concerns "that the FEIS failed to sufficiently account for documented wildlife declines during the last decade vis-à-vis pressures stemming from rampant growth in residential development and outdoor recreation in the surrounding area in Eagle County."

39.     State legislators, Senator Kerry Donovan and Representative Dylan Roberts, who chaired the Committees that handle natural resources and wildlife issues in the Colorado General Assembly, voiced similar concerns related to wildlife in a November 10, 2020 letter: "We do not need to mince words – the project is unreasonable. It involves a huge public cost for no public benefit. It will pave sensitive public lands. It will eliminate seasonal closures intended to protect wintering wildlife at a time when wildlife populations are declining at an alarming rate."

40.    The Governor of Colorado, Jared Polis, underscored local concerns related to wildlife in a June 3, 2019 letter co-signed by U.S. Senator Michael Bennet and U.S. Representative Joe Neguse: "The community and local elected officials, including Eagle County Commissioners, have expressed significant concern about the effects that this proposal would have on wildlife habitat and recreational opportunities in the region.  The area is critical winter range for deer and elk, and contains important habitat for species such as lynx, cutthroat trout, sage grouse, and other sensitive wildlife."  The letter said "It is imperative that the Forest Service fully consider this local input."

41.    The same officials, joined by Senator John Hickenlooper, were unsatisfied with the Forest Service's consideration of these issues after publication of the FEIS in the Federal Register in 2021 and provided an August 11, 2021 letter stating: "The Berlaimont Estates proposal would compromise sensitive winter habitat necessary to sustain wildlife populations that are currently in decline.  It would also require the Forest Service to amend its Forest Plan to abandon wildlife habitat protections.  The community has raised this issue multiple times, but we do not believe these concerns have been fully acknowledged or considered."

42.    According to officials at the EPA, the Forest Service's analysis provided insufficient information on the proposal's impact on wetlands, riparian areas, and water resources, as well as the likelihood that Berlaimont Estates and the access road would increase fire danger. EPA is charged by statute to review draft and final EISs prepared by the Forest Service.  EPA was not provided with the 2020 Final EIS for review and comment.  EPA was not provided an opportunity to comment on the deficiencies confirmed by the 2023 FROD errata sheet.

43.     Other commenters shared EPA's concerns and added that the development of Berlaimont Estates would result in unacceptable costs to local communities, including the cost of putting people and expensive infrastructure deep inside a fire prone landscape with only one way in and out.  The husband of a local firefighter said: "Berlaimont Estates will put fire and EMS personnel knowingly and directly in harm's way.  I am opposed to Berlaimont for many reasons.  However, my top reason is that my wife is a firefighter…"  The author went on to say that "The reality of a fast-burning fire that could trap these firefighters in an area with little cover and no exit is very real."

44.     Commenters questioned the Forest Service's failure to consider reasonable alternatives.  For example, on July 7, 2021, Colorado DNR's Executive Director provided: "The Forest Service has not sufficiently explained its reasons for declining to consider an alternative(s) that could have further minimized anticipated impacts while still providing reasonable access to the private property, as required by law, such as through seasonal road closures or other measures."

45.     After initial release of the FEIS, officials from Eagle County asked the Forest Service "to engage in a more thorough analysis and vetting of Alternative 1, the 'no action' alternative, and to further examine whether Alternative 1 would provide adequate access and reasonably address Berlaimont's stated purpose and need…" The Forest Service dismissed Alternative 1 without meaningful consideration, saying it did not meet the purpose and need.

46.     Objectors and commenters also consistently questioned the Forest Service's application and administration of ANILCA.  For example, on November 9, 2020, Eagle County asked the Forest Service to "reevaluate its consideration of similarly situated parcels when determining what constitutes reasonable use and enjoyment of the Berlaimont property."  The

County specifically identified issues that the Forest Service omitted from its ANILCA determination, including potential impacts to sensitive deer and elk winter range, which many commenters asked to be considered among "other relevant criteria."

47.    A letter from the Colorado DNR to Under Secretary Harrell on July 7, 2021 similarly questioned the Forest Service's ANILCA determination which "rested on a precarious comparison with only one other project."  There were more than twenty other parcels in the analysis which looked nothing like the extravagant Berlaimont proposal.

48.    U.S. Senators Bennet and Hickenlooper, along with U.S. Representative Neguse and Colorado Governor Polis said in their August 11, 2021 letter: "The Forest Service has no obligation to grant dramatically improved road access to facilitate more attractive real estate development."  The elected officials raised additional concerns about the precedent this decision could set, which "would have far-reaching implications," and questioned the Forest Service's consideration of Berlaimont in light of other inholdings.

49.    Many commenters, including representatives of Colorado's congressional delegation, highlighted the fact that the developer already has access to this parcel, and that access—which is via seasonal dirt road—looks just like the access to most of the inholdings in the area and most of the inholdings that the Forest Service found for comparison.

50.    Commenters and objectors highlighted the arbitrary Forest Service decision to ignore the weight of evidence in the record suggesting that a more primitive use of this inholding would constitute reasonable use.

51.    Other objectors noted similarly situated inholdings that were completely ignored by the Forest Service in its analysis.  Retired wildlife managers wrote: "To support this errant use ANILCA [sic], the Forest Service bypassed comparable inholdings within the White River

19

National Forest — local treasures like Homestake Creek, Deep Creek, Piney Lake, Fulford, and Woods Lake, where wildlife thrives and people have winter access via snowmobile, cross-country skiing, and snowshoe.  Instead, the Forest Service found one case, not nearly as remote as Berlaimont, on the Routt Forest, and used this flimsy example as a reason to roll over for a developer."

52.    Commenters voiced strong concern and opposition to the Forest Service conclusion, primary to its ANILCA determination, that 19 mansions with 9 accessory units constitutes reasonable use and enjoyment of this parcel.  Retired wildlife managers said "'Reasonable use and enjoyment' do not equate to speculative development and profiteering in the millions of dollars, certainly not at the expense of sustaining wildlife on public lands."

53.    Elected officials at national and state levels also highlighted concerns that the Forest Service ignored public comments: "The Berlaimont Estates project has been the subject of broad local opposition from community members, the Governor, and local elected officials. Concerns have been expressed through letters, public comments, petitions, opinion pieces in local newspapers, and rallies opposing the project."  The August 11, 2021 letter noted that USDA Secretary, Thomas Vilsack, had been asked by the Senate Agriculture Committee to address the outstanding concerns from the community, and that the Secretary had committed to provide a response.  The letter confirmed that the public's concerns "remain unresolved."  The letter asked the Forest Service to "delay a final Record of Decision, reengage with the local community to address their concerns, and reassess the final EIS for this project."  Instead of reengaging with the community by using the NEPA process to correct the deficiencies in the FEIS, the FROD attached an "errata sheet" and approved Alternative 2-Modified, which had been eliminated from detailed NEPA analysis and consideration.

**JURISDICTION AND VENUE**

54.     This Court has jurisdiction to review agency actions and provide remedy pursuant

to 28 U.S.C. §§ 1331 (federal question); 1346 (U.S. as defendant); 1361 (Mandamus); 2201

(declaratory relief); 2202 (injunctive relief); and Administrative Procedure Act, 5 U.S.C. § 701 *et*

*seq.*  A present and actual controversy exists between the parties that can be remedied by setting

aside the 2020 EIS, FROD, and any other action taken to provide Berlaimont Estates with any

right in federal lands.  Under the APA, courts "shall" "hold unlawful and set aside agency

action" that is found to be arbitrary, capricious, contrary to law, or to violate other APA

standards of review set out in the statute.  5 U.S.C. § 706(2)(A).  APA-based vacatur of agency

action is the normal and appropriate form of relief granted by district courts.

55.     An actual, justiciable controversy exists between Plaintiffs and Defendants.  The

requested relief is proper under 28 U.S.C. §§ 2201-02 and 5 U.S.C. §§ 705 & 706.  Each

challenged agency action is final and subject to judicial review under 5 U.S.C. §§ 702, 704, and

706.

56.     Venue is properly vested in this Court pursuant to 28 U.S.C. §§ 1391(b)(2) and

1391(e)(1)(B).  The Under Secretary for Natural Resources and Environment, U.S. Department

of Agriculture ("Under Secretary") is located in Washington, D.C.. The Under Secretary

possessed and exercised authority over all determinations and actions, whether made or taken by

the USDA Office of General Counsel or the Forest Service.  Various officials in Washington

D.C. were directly involved in the Forest Service decisionmaking and actions under review.  The

project area at issue in this lawsuit is located within the National Forest System and within the

boundaries of the National Forest.  Legal interpretations and agency actions challenged in this

suit occurred in all four levels of the Forest Service organizational structure by persons located in

Washington D.C. and Colorado.  The federal land and wildlife at issue is enjoyed by persons

living throughout the United States, and visitors travel from all parts of the world to this region.

57.     Freedom of Information Act ("FOIA") litigation involving this matter was filed

on August 5, 2022. *Wilderness Workshop v USDA*, 21CV2108 (JMC)(Dist. D.C.).  Defendants

responded to the FOIA request and defended FOIA claims with declarations filed by Forest

Service personnel located in Washington D.C.. *Id*. at ECF Nos 19-3, 19-8, 25-1. Summary

judgment is fully briefed and awaiting resolution.  A second FOIA case is pending, and has been

scheduled for summary judgment briefing. *Wilderness Workshop v. USDA*, 22CV3606 (JMC).

The subject matter and evidence in the FOIA cases and the present case involve extensive

overlap.

**PARTIES**

58.     Plaintiff WILDERNESS WORKSHOP ("WW") was founded in 1967 and its

mission is to protect and conserve the wilderness and natural resources of the Roaring Fork

Watershed, the White River National Forest, and adjacent public lands.  WW is a non-profit

organization that engages in research, education, legal advocacy and grassroots organizing to

protect the ecological integrity of local landscapes and public lands.  Wilderness Workshop not

only defends pristine public lands from new threats, but also helps restore the functional

wildness of a landscape fragmented by human activity.  WW protects and preserves existing

wilderness areas, advocates for expanding wilderness, defends roadless areas from development

that would destroy their wilderness character, and safeguards the ecological integrity of all

federal public lands in its area of interest.  Wilderness Workshop has a long history of

participation in forest planning and advocating for the protection of imperiled wildlife species

and the habitat they depend upon, as well as imperiled plants and plant communities.

59.     Plaintiff ROCKY MOUNTAIN WILD is a Colorado non-profit organization with its mailing address at 1536 Wynkoop St., Suite #900, Denver, CO 80202.  Rocky Mountain Wild was created by the merger of two of Colorado's most trusted and effective conservation organizations, Center for Native Ecosystems and Colorado Wild.  Recognizing the need to stem dramatic losses of native species and habitat, these organizations joined forces to protect, connect and restore wildlife and wild lands throughout the Southern Rocky Mountain region of Colorado, southern Wyoming, eastern Utah, and northern New Mexico.  Rocky Mountain Wild, and its predecessor organizations, regularly review projects proposed on or affecting National Forest lands that might adversely affect wildlife, water quality, air quality, and other resources; comments extensively on proposed public land management decisions; and when necessary files administrative appeals and lawsuits.  Rocky Mountain Wild works to protect connectivity corridors through the Interstate 70 corridor and has focused much attention on the heavily impacted Eagle/Vail section that would be impacted by the Berlaimont development. Rocky Mountain Wild and its members have participated in the administrative processes regarding Berlaimont and have grave concerns about how it will impact the landscape and wildlife.

60.     Plaintiffs have participated throughout the NEPA process underlying the FROD.

61.     In 2009, Plaintiffs submitted scoping comments in response to the Forest Service's original Notice of Intent to provide access to developers of Berlaimont Estates.  Rocky Mountain Wild is a successor organization to scoping commenter Colorado Wild.

62.      When the project was rescoped in 2016, Plaintiffs again submitted scoping comments.

63.     In December of 2017, Plaintiff Wilderness Workshop filed a FOIA request with the Forest Service seeking information related to the proposal to inform its comments and the

public. The FOIA request sought agency records about the impacts of the proposed road through important wildlife habitat that will negatively affect Colorado's second largest migrating deer herd, as well as federally listed threatened and endangered species and their habitat, and federal public lands generally.  Plaintiffs also sought information related to the Defendants' interpretation of its obligations under ANILCA, as well as lobbying efforts undertaken by the proponent.

64.     Plaintiffs timely submitted detailed comments on the March 2018 DEIS. Plaintiffs were still awaiting receipt of documents responsive to Wilderness Workshop's 2017 FOIA request when the comment period closed, and did not have the benefit of relying on those public documents to inform comments on the DEIS.

65.     Litigation was required to gain access to the requested agency records necessary to develop and file informed and supported DEIS comments.  *Wilderness Workshop v. USFS*, 2018-cv-887-RGB.  In April of 2018, Plaintiff Wilderness Workshop filed a complaint in Federal Court challenging the Forest Service's failure to timely release information sought in Plaintiff's December 2017 FOIA request. *Id*.  The complaint charged that the Forest Service's decision to withhold documents to which the public was entitled, harmed Plaintiff's ability to participate in the NEPA process, and impacted Plaintiff's ability to fully understand the direction Defendants were pursuing for the Berlaimont proposal.  Wilderness Workshop's participation in the agency's administrative processes for the Berlaimont Estates access route was significantly hindered when Defendants refused to provide prompt FOIA access to agency records during the public comment period.

66.     In August of 2018 the Forest Service proposed changes to the project that were not disclosed or considered in the DEIS.  Plaintiffs participated in public meetings sponsored by the Forest Service, and filed supplemental comments during the same month.

67.     On March 5, 2019 the Forest Service and Plaintiff, Wilderness Workshop, agreed to settle the FOIA litigation.  The Forest Service agreed to carry out a thorough search for agency records, to release additional agency records, and to justify any withholdings with a *Vaughn* index.

68.     On March 16, 2019, members of the Plaintiff organizations participated in "Buck Berlaimont" a rally for wildlife in Edwards, Colorado.  The rally included a physical protest and an informational meeting that was attended by hundreds of people and was "standing room only."  Speakers at the informational meeting included local hunters and residents, young engaged students, wildlife managers, and elected officials.

69.     In May of 2019, a group of hunters and concerned citizens presented Defendant Scott Fitzwilliams, with a petition opposing the paved access road proposed by Berlaimont Estates LLC.  The petition was originally presented with 2,400 signatures, and later resubmitted to the agency with more than 4,000 signatures—which is nearly 10 percent of the population of Eagle County, where the project is located.

70.     In June, 2019 and September, 2020, Plaintiff, Wilderness Workshop filed follow-up FOIA requests seeking additional records from agency officials in the local offices, the regional office, and the Washington office.  The agency records sought by the FOIA requests were, and remain, necessary to inform objections and meet the requirement of the Forest Service regulation that objections must be supported with documentary or other support.

71.     Plaintiffs timely submitted formal objections to the FEIS in November, 2020.
The FEIS was not provided to EPA for publication in the Federal Register, as required by the
Clean Air Act Section 309 policy and procedures. See 42 U.S.C.§ 7609, 40 C.F.R.§§ 1506.l0-11.
In November 2020, Plaintiffs were still awaiting receipt of documents responsive to Wilderness
Workshop's 2020 FOIA request, and did not have the benefit of relying on those public
documents to inform objections.

72.     In early January 2021, Plaintiffs participated in a formal objection resolution
meeting with other objectors.  The proponent was the only objector that did not oppose the road
altogether.  The proponent asserted that the Forest Service's analysis and proposed decision
failed to comply with applicable law and regulation.

73.     In late January 2021, the Forest Service's Objections Deciding Officer and
Defendant, Tamara Angel, confirmed objections and identified significant deficiencies in the
FEIS.  Instructions were directed to Deciding Officer, Scott Fitzwilliams, to remedy deficiencies.
Mr. Fitzwilliams received additional directions from Defendants' Washington D.C. and Regional
Offices regarding the FEIS deficiencies.

74.     NEPA procedures were not used to correct the FEIS deficiencies. The FEIS
deficiencies identified by Defendant Angel have not been corrected.

75.     The FEIS was published in the Federal Register on July 9, 2021.  Plaintiffs, and
their members, were not provided an opportunity to comment on any NEPA documents issued
after the September 2020 release of the FEIS.  The predecisional objections were not NEPA
comment opportunities.  The predecisional objections were not administrative appeals of an
agency action.  The Forest Service decisionmaking process did not involve an opportunity to
administratively appeal the 2023 FROD.

76.    On July 29, 2021, Plaintiffs filed a new FOIA request seeking records related to the Berlaimont proposal to the White River National Forest, the Forest Service's Rocky Mountain Regional Office, the Forest Service's Washington, D.C. Office, the Secretary's Office at the USDA, and the Office of General Counsel in Washington, D.C. Among other documents sought by this request, Plaintiffs requested correspondence and records between the affiliates of the project proponent and agency officials in Washington, D.C.

77.    In August 2021, Wilderness Workshop challenged the Forest Service's failure to timely respond to its 2020 FOIA request in this Court. *WW v. USDA*, 2021-cv-02108-JMC.

78.    Defendants failed to carry out a FOIA search of its Washington D.C. personnel, including the Forest Service Chief's Office and the Under Secretary to whom the Chief reports.

79.    In November of 2022, Plaintiffs challenged the Forest Service's failure to timely respond to its 2021 FOIA request in this Court. *WW v. USDA*, 2022-cv-3606.

80.    The Forest Service issued the FROD on March 10, 2023.  The FROD was issued in response to pressure applied via a voluntarily dismissed lawsuit filed by the project proponent, who has now intervened in the present lawsuit. *Berlaimont Estates, LLC v. U.S. Forest Service*, 22-cv-02300 (Dist. Colo.).  The lawsuit was dismissed without an answer and without judicial involvement, after the FROD was reviewed by the project proponent. *Id*. at ECF 19-21.  The interactions between the project proponent and Defendants during the now-dismissed lawsuit have not been publicly released.  All communications, and records of communications, between the project proponent and Defendants – and their agents and attorneys - must be included in the administrative record for the present lawsuit.

81.    Plaintiffs have standing to address the Forest Service's failure to adhere to procedures required by law and to seek remedy for the harms done to its members.

82.     Each Plaintiff and their members use, enjoy, and plan to continue to use and enjoy on a regular basis, the public lands and natural resources adjacent to the proposed Berlaimont Estates, including the use of easements for public access to National Forest lands over private land where the Estates is proposed.  The use and enjoyment involve many health, recreational, moral, scientific, spiritual, professional, educational, aesthetic and other purposes that would be degraded by the development that the Defendants' project approval makes possible.  Plaintiffs' members enjoy hiking, camping, hunting, bike riding, wildlife viewing, dog walking, and cross-country skiing on the public lands surrounding the Berlaimont parcel. Plaintiffs and their members benefit from the intact ecosystem of the area as it exists today. Plaintiffs and their members will be adversely affected by Defendants' approval of the Berlaimont Estates access route across Forest Service land.  This project will harm the biological integrity of the area which they strive to protect and the aesthetics of the area.  It will lead to the direct mortality of sensitive wildlife.

83.      The decisions and actions contained in the 2020 EIS and 2023 FROD are causing, and continue to cause direct, immediate, and irreparable informational and procedural injury to Plaintiffs' interests by denying them and their members the right to informed decision making and full disclosure required by NEPA.

84.     Unless the relief prayed for herein is granted, Plaintiffs and their members will continue to suffer ongoing and irreparable harm and injury to their interests, including their future use and enjoyment of the National Forest.

85.     Defendant MERYL HARRELL is the Under Secretary for Natural Resources and Environment, U.S. Department of Agriculture, who possesses and exercised authority over all

other Defendants, including the USDA Office of General Counsel. Ms. Harrell's offices are located in Washington, D.C. and she is sued in her official capacity.

86.     Defendant CHRIS FRENCH is the Deputy Chief for National Forest Systems at U.S. Forest Service is Washington, D.C.. Mr. French was directly involved in decisions and communications related to this project, and communicated directly with the project proponent.

87.     Defendant SCOTT FITZWILLIAMS is the Forest Supervisor of the White River National Forest who approved the NEPA analysis and challenged decisions herein at the direction of his superior officials, and, in that official capacity, is jointly responsible for implementing and complying with federal law, including the federal laws implicated by this action.

88.     Defendant TAMARA ANGEL is the Objections Reviewing and Deciding Officer who served as the responsible official that oversaw and directed SCOTT FITZWILLIAMS and other the Forest Service employees who carried out day-to-day implementation of the challenged agency actions. Deputy Regional Forester Angel did not act as an administrative law judge. Deputy Regional Forester Angel failed to satisfy the Forest Service's responsibilities and the duty of a responsible official to follow basic principles of fairness and due process in resolving the objections.

89.     Defendant FRANK BEUM in his official capacity as Regional Forester for the Forest Service's Rocky Mountain Region, exercises delegated authority and is supervised by the Under Secretary and the Chief, and served as a direct supervisor to Tamara Angel and Scott Fitzwilliams.

90.     Defendant UNITED STATES FOREST SERVICE is a federal agency operating as part of the Defendant U.S. DEPARTMENT OF AGRICULTURE, also a federal agency of

the United States.  The Forest Service is responsible for activities on National Forest System lands, including the White River National Forest.  The Forest Service is responsible for overseeing and administering National Forest lands, and use and access by the public. The Forest Service manages and controls the public lands surrounding the Berlaimont parcel.  The Forest Service's national headquarters is located at 201 14th Street, SW, Washington, D.C. 20090.

91.    Information gleaned through FOIA requests confirms that Forest Service officials in Washington, D.C. directed regional and local officials who participated in this decisionmaking.  A pending FOIA lawsuit was filed, in part, to remedy the D.C. Officials' failure to conduct a search for responsive records.  *WW v. USDA*, 2022-cv-3606.  Discovery may be required to identify agency officials who took part in the decisionmaking and to obtain relevant portions of the administrative record in the possession of all relevant officials in Washington, D.C. who carried out official duties involving the Berlaimont proposal via means such as text message, social media, and cell phone calls that were not sought as part of the FOIA searches.

92.    The proponent and beneficiary of the unlawful federal action under review is Berlaimont Estates, LLC, which has intervened, but is not a required party to this lawsuit.  The present suit does not impede the ability of Berlaimont Estates, LLC to protect its financial interests in other forums or to make highest and best use based on existing access.  The District Court does not have jurisdiction to address the developer's potential contract, quiet title, takings, or access claims against Defendants, which may be brought, if at all, in the Court of Claims.

## STATUTORY AND REGULATORY BACKGROUND

### National Environmental Policy Act

93.     Congress enacted NEPA to "promote efforts which will prevent or eliminate damage to the environment."  42 U.S.C. § 4331.  To fulfill this stated goal, NEPA requires federal agencies to analyze the environmental impacts of a particular action before proceeding with that action. *Id.* at § 4332(2)(C).  In addition, federal agencies must notify the public of proposed projects and allow the public to comment on the fully-disclosed environmental impacts of a proposed action.

94.     The Forest Service elected to apply the NEPA regulations that were in effect when the agency began scoping the Berlaimont Estates proposal.

95.     A proposal exists at the stage in the development of an action when an agency has a goal and is actively preparing to make a decision on one or more alternative means of accomplishing that goal, and the effects can be meaningfully evaluated.  40 C.F.R. § 1508.23.

96.     NEPA contains "'action-forcing' provisions to make sure that federal agencies act according to the letter and spirit of the Act." 40 C.F.R. § 1500.1(a).  The NEPA process is based on an interdisciplinary analysis of the purpose and need of the agency action, alternative courses of action, direct, indirect and cumulative impacts of the action and connected actions, and mitigation measures.  Only after adequately completing the NEPA process may an agency take action.  *See* 42 U.S.C. § 4332.

97.     The first goal of NEPA is to ensure informed decisionmaking.  NEPA sets forth specific procedural requirements federal agencies must follow, "to the fullest extent possible," as they carefully gather and evaluate relevant information about the potential impact of a range of alternative courses of proposed agency action on the environment. 42 U.S.C. §§ 4332, 4332(2).

NEPA's second goal is to ensure "that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process" and revealed available alternatives, thereby guaranteeing that the public is involved in and aware of agency processes. *Id*., 40 C.F.R. §§1500.1(b); 1500.2(d); 1506.6.

98.    The cornerstone of NEPA is the environmental impact statement ("EIS") that federal agencies must prepare and circulate for public review and comment.  An EIS is required for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(c); 40 C.F.R. § 1501.4.

99.    Federal agencies must prepare an EIS prior to initiating any major federal action significantly effecting the human environment to ensure the environmental impacts are considered and disclosed to the public during the decision-making process. 40 C.F.R. §§ 1501.2, 1502.5.  In this document, the federal agency must identify direct, indirect, and cumulative impacts of the proposed action, consider alternative actions (including a "no action" alternative) and their impacts, and identify all irreversible and irretrievable commitments of resources associated with the action. 42 U.S.C. § 4332(2).  This requirement is commonly referred to as the agency's duty to take a "hard look" at the environmental impacts of its proposed action.

100.    Federal agencies are also required to consider three types of impacts, or effects:

> **Direct effects**, which are caused by the action and occur at the same time and place.  40 C.F.R. 1508.8(a) (emphasis added).  Direct effects of privatizing public lands via a land exchange include the proposed development.
> **Indirect effects**, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable.  Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems.  40 C.F.R. § 1508.8(b) (emphasis added).

**Cumulative impacts**, which are the impact on the environment that results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time. 40 C.F.R. § 1508.7 (emphasis added).

101. NEPA requires federal agencies to consider three types of actions in an EIS; connected, cumulative, and similar. 40 C.F.R. § 1508.25. Connected actions are closely related actions that the Forest Service must discuss in the same impact statement. 40 C.F.R. § 1508.25(a)(l). Connected actions are those that: (i) Automatically trigger other actions which may require environmental impact statements; (ii) cannot or will not proceed unless other actions are taken previously or simultaneously; or (iii) are interdependent parts of a larger action and depend on the larger action for their justification. *Id.* at § 1508.25(a)(1)(i-iii).

102. Cumulative actions are those which "when viewed with other reasonably foreseeable or proposed actions have cumulatively significant impacts" should also be considered in the same impact statement. *Id.* at § 1508.25(a)(2).

103. The federal agency must also identify and evaluate the effectiveness and feasibility of any mitigation measures adopted to alleviate identified impacts from the proposed action. 40 C.F.R. §§ 1502.14(t); 1502.16(h).

104. NEPA requires disclosure and analysis of reasonable terms and conditions of granting expanded access to a private landowner. NEPA requires disclosure and analysis of reasonable reservations of rights and interests, including easements and special use permit restrictions that may be imposed upon any approval of private access that involves the National Forest System.

### National Forest Management Act of 1974

105. In enacting NFMA, Congress stated that "the new knowledge derived from

coordinated public and private research programs will promote a sound technical and ecological base for effective management, use, and protection of the Nation's renewable resources." 16 U.S.C. § 1600(4).

106.    Further, Congress stated that the "Forest Service . . . has both a responsibility and an opportunity to be a leader in assuring that the Nation maintains a natural resource conservation posture that will meet the requirements of our people in perpetuity." 16 U.S.C. § 1600(6).

107.    Through NFMA, Congress established a two-step process for managing the National Forests.  The first step is for the Forest Service to prepare and implement comprehensive "land and resource management plans," i.e., "Forest Plans" for each National Forest.  16 U.S.C. § 1604(a).  The second step is for the Forest Service to ensure that site-specific management projects within a National Forest are consistent with the Forest Plan. *See* 16 U.S.C. § 1604(i).

### The Federal Land Policy and Management Act of 1976
### Regulations Applicable to National Forest System Lands (36 C.F.R. 251.110)

108.    FLPMA, enacted in 1976, – two years after NFMA, – confirmed that the "Secretary of Agriculture, with respect to lands within the National Forest System, shall promulgate rules and regulations to carry out the purposes of this Act." 43 U.S.C. § 1740.

109.    The Forest Service promulgated access regulations that "apply to access across all National Forest System lands." 36 C.F.R. 251.110; *see also* 36 C.F.R. § 251.114(a) ("[T]he authorized officer shall authorize only those access facilities or modes of access that are needed for the reasonable use and enjoyment of the land and that minimize the impacts on the Federal resources.").  Interpretations of the Forest Service access regulations to apply ANILCA standards outside of Alaska are precluded by the plain language and purposes of FLPMA and ANILCA.

110.    The regulations applicable to public lands outside Alaska confirm that granting additional access to parcels with adequate access is not mandatory. 36 CFR 251.110(g) ("Where there is existing access or a right of access to a property over non-National Forest land or over public roads that is adequate or that can be made adequate, there is no obligation to grant additional access through National Forest System lands.").  It is undisputed that access to the Berlaimont property currently exists.  Access is via natural surface dirt/gravel roads, and it is limited seasonally to cars and trucks.  In the wintertime, access is via snowmobile or other over-snow vehicle.  Such access is typical of inholdings.  Such access is what the Berlaimont developer purchased.

111.    The regulations define "access" and "adequate access:"

*Access* means the ability of landowners to have ingress and egress to their lands.  It does not include rights-of-way for power lines or other utilities.

*Adequate access* means a route and method of access to non-Federal land that provides for reasonable use and enjoyment of the non-Federal land consistent with similarly situated non-Federal land and that minimizes damage or disturbance to National Forest System lands and resources.

36 C.F.R. § 251.111.

112.    The regulations set out a number of criteria, terms and conditions the Forest Service must address in granting an access application. 36 C.F.R. § 251.114.  The regulations provide considerable power and control to ensure protection of the National Forest System lands.

**Alaska National Interest Lands Conservation Act of 1980**
**16 U.S.C. § 3210**

113.    ANILCA was enacted in 1980 for the purpose of addressing unique issues created by Alaskan Statehood, indigenous claims, and federal public lands in Alaska.  In doing so, Congress recognized that Alaska is different and carved out numerous Alaska-specific exceptions to further that purpose.  In one exception to FLPMA's inholding access standards,

ANILCA grants landowners in Alaska, including those within the National Forest System in Alaska, a statutory right to secure access to a private inholding via a right-of-way over National Forest lands.   The plain language and purposes of ANILCA are specific to and limited to the "public lands in Alaska." 16 U.S.C. § 3101.

> Congress clearly articulated this purpose:
> "(a) In order to preserve for the benefit, use, education, and inspiration of present and future generations certain lands and waters in the *State of Alaska* that contain nationally significant natural, scenic, historic, archeological, geological, scientific, wilderness, cultural, recreational, and wildlife values, the units described in the following titles are hereby established.
> . . . .
> "(d) This Act provides sufficient protection for the national interest in the scenic, natural, cultural and environmental values on the public lands in Alaska, and at the same time provides adequate opportunity for satisfaction of the economic and social needs of the *State of Alaska* and its people; accordingly, the designation and disposition of the public lands in Alaska pursuant to this Act are found to represent a proper balance between the reservation of national conservation system units and those public lands necessary and appropriate for more intensive use and disposition, *and thus Congress believes that the need for future legislation designating new conservation system units, new national conservation areas, or new national recreation areas, has been obviated thereby.*"
> ANILCA § 101, 16 U. S. C. § 3101 (emphasis added).

*Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 549 n.17 (1987) (italics added by Supreme Court)*).*   There is no legislative history pre-dating the adoption of ANILCA to suggest any Congressional purpose or intent to apply any ANILCA provision to the National Forest System or other federal interest in land outside of Alaska.

114.     Under ANILCA's access provisions, which only apply to Alaska, the Secretary of Agriculture "shall provide such access to non-federally owned land within the boundaries of the National Forest System as the Secretary deems adequate to secure the owner *the reasonable use and enjoyment thereof.*" 16 U.S.C. § 3210(a) (*emphasis added*).   Nothing in the language, purpose, or structure of ANILCA suggests an intent to apply the language of this provision

outside of Alaska.  ANICLA's access provision provides "the opportunity for rural residents engaged in a subsistence way of life to continue to do so." *Id*. at § 3101(c).

115.    When applying ANILCA, the agency must determine what constitutes reasonable use and enjoyment of the lands, what access is adequate to allow for those reasonable uses and what, if any, terms and conditions should be placed on that access to meet other statutory and regulatory obligations and goals of ANILCA. 16 U.S.C. § 3210(a).  NEPA compliance is mandatory for all aspects of an ANILCA-based agency action.

116.    ANILCA-based access decisions require NEPA analysis of a range of reasonable alternative reservations of land and interests that restrict the use of easements, special use permits or other devices that provide for subsistence and traditional use of National Forest Land in Alaska.

117.    ANILCA does not allow the Forest Service to provide utility access.

118.    ANILCA regulations applicable to private access, even if they were to apply to the Berlaimont Estates request, do not preclude NEPA analysis of the terms and conditions which may be imposed upon access or the uses to be made of the land being accessed.

**Southern Rockies Lynx Amendments**

119.    Lynx protection has been regulated on Forest Service land by the provisions in the Southern Rockies Lynx Management Direction ("SRLMD").  SRLMD at 1.

120.    The SRLMD outlines the objectives, standards, and guidelines that must be met within all Forest Plans in the Southern Rockies.  In the SRLMD, USFWS identified maintenance of suitable habitat and habitat connectivity as critical measures necessary for the lynx's continued survival.

121.    Standard ALL S1 mandates that "New or expanded permanent developments and

vegetation management practices and activities must maintain habitat connectivity." The FROD confirmed that the development will affect functional habitat used by Canada lynx, but did not rely on any NEPA analysis of habitat connectivity impacts. The FROD attempted to remedy the deficient analysis of impacts to Canada lynx and its habitat by including an updated Biological Evaluation as an Appendix to the Errata Sheets. The Biological Evaluation was not subjected to NEPA or ESA procedures.

## FACTUAL AND PROCEDURAL BACKGROUND

122.    The facts in this case will be established and the case resolved based on APA review of the whole Administrative Record considered by the agency decisionmaker(s), as supplemented pursuant to relevant case law.

123.    Plaintiffs' Statement of Facts depends heavily on documents which should be contained in the Administrative Record in this case, but to which Plaintiffs lack access.

124.    The Forest Service has not reviewed or sought to obtain the full Administrative Record created or obtained by third party contractors and subcontractors on the agency's behalf. The contractor records were considered, directly and indirectly, by Defendants. The Forest Service must obtain the contractors' records for inclusion in the Administrative Record.

125.    The Administrative Record considered by Defendant Fitzwilliams when signing the FROD does not include thousands of pages of emails and documents gathered by agency persons in Washington D.C. that were withheld pursuant to decisions made by Washington D.C. personnel in ongoing FOIA litigation. The Administrative Record considered by Defendant Fitzwilliams when signing the FROD does not include thousands of pages of emails and documents created and obtained by the Forest Service contractors.

126.    The Administrative Record considered by Defendant Angel while serving as objection "reviewing officer" does not include thousands of pages of emails and documents released (and withheld) by the Forest Service in ongoing FOIA litigation.  The Administrative Record considered by Defendant Angel in resolving the objections does not include thousands of pages of emails and documents created and obtained by the Forest Service contractors.

127.    Defendants' Washington D.C. FOIA personnel and agency attorneys have already completed significant work toward compiling and reviewing documents which should be included in the Administrative Record as defined by the APA and relevant case law.  Defendants can easily assemble and certify the Administrative Record on the same date as it files its Answer.

128.    The Administrative Record relied upon by Defendants' decisionmakers does not include emails and communications showing the full extent to which the project proponent unduly influenced the NEPA analysis.

129.    The USDA Office of General Counsel possesses agency records that must be included in the Administrative Record and supplements thereto.  As a member of the NEPA team, USDA Office of General Counsel attorneys carried out duties unrelated to providing legal advice to the Defendants and their decisionmakers.  Defendants' decisionmakers have a practice of involving agency attorneys in NEPA analyses to unlawfully shield agency records from public and judicial review.  USDA Office of General Counsel attorneys who worked on the Berlaimont proposal are located in Denver, Colorado and Washington D.C..

130.    On information and belief, Defendants did not prepare and archive its Administrative Record when releasing the Draft ROD.

131.    On information and belief, Defendants did not prepare and archive its Administrative Record when publishing the DEIS.

132.    On information and belief, Defendants did not prepare and archive its Administrative Record when releasing the 2020 EIS.

133.    On information and belief, Defendants did not prepare and archive its Administrative Record when releasing the Objection Response.

134.    On information and belief, Defendants did not prepare and archive its Administrative Record when releasing the FROD.

135.    The Forest Service does not have an administrative appeal process that would generate a record similar to that created by an administrative law judge.

136.    Defendants did not maintain and prepare a contemporaneous Administrative Record required by basic principles of fairness and due process, and their decisions cannot survive judicial review based on an administrative record that must be created in the district court.

### Physical and Geographic Characteristics

137.    The 680-acre Berlaimont parcel was homesteaded for agricultural purposes in 1935.  To this day, it retains the wild, undeveloped character of land that has been used for grazing and maintained as wildlife habitat rather than developed.

138.    The parcel itself is shaped like an "n."  It is completely surrounded by public lands administered by the Forest Service.  Elevations generally descend from north to south.  The top of the "n" occupies rolling forestland, meadows of grass and sage, and the headwaters of several small creeks.  The legs of the "n" occupy ridgelines and steep hillsides.

139.    Northern portions of the parcel are higher, reaching elevations around 9,500 feet, while the legs of the "n" extend south to elevations closer to 7,500 feet.  The parcel is not far

from Interstate 70 as the crow flies, but due to dramatic elevational relief those areas the developer has slated for residential development at the north end of the parcel are a world apart.

140.    The parcel is remote.  The challenges of development confirm its remoteness. Portions of the parcel closest to the Interstate are steep and deeply incised with creeks.  Portions of the parcel targeted for residential development are accessed by winding roads that climb thousands of feet in elevation.  The entire area is surrounded by sensitive wildlife habitat, and closed to cars and trucks in the winter months.  While recreational use is high below the Berlaimont parcel, that use diminishes as elevations climb.  There is very little activity on public lands surrounding the northern portions of the Berlaimont parcel due to the challenging climb to get there.  Most use occurs in the fall, during hunting seasons.  The area maintains its phenomenal habitat value largely because of its remoteness and the absence of human activity and disturbance.

141.    Under the current conditions, without any agency action, Berlaimont Estates has vehicular access to the private parcel via Forest Service Roads 774 and 780.  Reasonable use and enjoyment of the parcel is available based on current access.  Berlaimont Estates does not seek access for subsistence or traditional activities.

142.    Colorado Parks and Wildlife officials pointed out in 2016: "There are numerous similarly situated non-federal lands within the White River National Forest that do not require a paved all-season road for reasonable use and enjoyment.  Some examples would be Fulford, Homestake Creek, Tigiwon Road, Piney Lake, and Carbonate."  Other commenters and objectors made the same point throughout the process.

143.    The Berlaimont private property lies to the north of the community of Edwards, Colorado, and is accurately depicted on the following maps:





**Proposed Berlaimont Estates Development**

144.    Due to the effective remoteness of the Berlaimont parcel, as well as the steep and challenging terrain, the parcel remains much as it did in the 1930s when it was privatized through a federally issued land patent.

145.    In 2008, the current owners purchased the parcel. Shortly thereafter they asked the U.S. Forest Service for approval of an ANILCA easement across public lands so they could build an exclusive subdivision.

146.    In 2009, the Forest Service released a proposal to approve an easement across public lands for access to this inholding.  During this initial scoping process, it became evident that Eagle County land use regulations require dual access for remote parcels like Berlaimont. The dual access requirements are intended to protect residents and first responders during events that frequently happen in Colorado's backcountry, including wildfires.  Putting people and infrastructure deep in a fire prone landscape with only one way in and one way out is dangerous.

147.    Forest Service officials indicated to Berlaimont representatives that they could not approve two access roads to the property across sensitive public lands in the area.  The proponent subsequently withdrew the application to the Forest Service.

148.    In 2011, the developer replatted the parcel into 19 35-acre parcels to circumvent applicability of Eagle County's subdivision regulations.

149.    In 2013, the developer applied for variances from Eagle County's road improvement standards, including the dual access requirement, requirements for emergency vehicle turnarounds, and other specific road design standards.

150.    In 2014, the County granted variances.  The County has made clear multiple times that its consideration and approval of these variances was purely technical, based on engineering criteria, and should not be considered an endorsement of the proposal or an indication that the County considers Berlaimont Estates to be a reasonable use.

151.    In 2015, Berlaimont Estates submitted an SF299 Project Proposal to the Forest Service, noting variances granted by the County, and asking the agency to begin environmental review of a year-round access route to the choicest portions of the property.

152.    In 2016, the Forest Service initiated this process by releasing the proposal for public comment.  The proposal included construction of more than 5 miles of new road, largely

on public land, to access the new subdivision called Berlaimont Estates. The developer sought a permanent easement across National Forest for permanent, year-round access.

153.    Berlaimont Estates would include 19 large homes with 9 accessory units. The developer and the Forest Service anticipate that it would take 215 vehicle trips per day to maintain these luxury homes. The development also requires utility service to provide natural gas and electricity, a water storage and treatment facility, and a waste water treatment plant resulting in discharge into the Colorado River watershed. The Forest Service did not use NEPA to analyze the veracity of claims that the development could be built with individual water wells and septic systems or the impacts on National Forests.

154.    Development alternatives depend on the scope and location of the access that may be approved by the Forest Service. Development of the proposed Berlaimont Estates would require paving and opening year-round National Forest land that supports varied economic and recreational activities, and that is relied upon by sensitive wildlife. The new subdivision would put people and homes, as well as all the impacts of a high-end residential subdivision in the middle of a National Forest that is currently closed as a refuge for wintering wildlife many months of the year.

155.    The proposed Estates will dramatically increase the flow of traffic on local roads, including increasing traffic on National Forest roads surrounding the Berlaimont parcel by more than 200% during winter months.

156.    The proposed road, subdivision, and the associated traffic and connected actions will directly and indirectly destroy and degrade habitat for sensitive deer and elk, including bisecting an important migration corridor for the second largest migrating mule deer herd in the State of Colorado. The Forest Service said: "Both elk and mule deer would experience road

45

construction effects, habitat impacts, restricted movements, reduced habitat effectiveness, road and highway mortality, road use and private residential development effects, and displacement from recreational trail corridors under the action alternatives." These populations of deer and elk are already in staggering decline due to increased development and recreation in the Eagle Valley.

157.    The project will destroy and degrade habitat for threatened, endangered, and sensitive species, including streams that sustain populations of greenback cutthroat trout, occupied range for greater sage-grouse, and lynx habitat. Sensitive populations of Colorado River cutthroat trout, Brewer's sparrow, and populations of Harrington penstemon would all be directly and indirectly impacted by the development as well.

158.    Paving the Berlaimont access route would also result in a loss of important trails and soft surface roads that provide recreational opportunities for hikers, bikers, cross-country skiers, snowshoers, dog walkers, dirt bikers, and numerous other groups. The area is utilized by residents of nearby neighborhoods and people from up and down the Eagle Valley. These resources are increasingly important and becoming scarcer as growth continues to eat up the area's open space.

159.    The development and access route also pose health and safety risks, and economic liabilities for local communities related to climate change and wildland fire. The reality of climate change is that fires are becoming more severe and more costly to fight. This proposal would put a high-end residential subdivision deep within a fire-prone national forest. The development would put more people and property at risk, and increase damages when fire does rage through the area. The mitigation plan considered by the U.S. Forest Service is elaborate, but it only underscores the potential costs and dangers of this proposed development.

**County Land Use Planning**

160.     The Forest Service has a duty to analyze and make decisions based on the Property Clause power and its duty to protect National Forests.

161.     In this case the agency relied on strategic advice and materials presented by the developer and tried to rely on County land use policy to justify its conclusions and decision. This ignored the fact that the project proponent purposely sought to avoid Eagle County's subdivision authority by subdividing the 680-acre parcel into 35-acre lots, which are exempt from County subdivision regulation under State Law.

162.     The developer, after receiving a variance from Eagle County in 2014, presented that to the Forest Service as a rationale to support the conclusion that Berlaimont Estates would be a reasonable use under ANILCA.

163.     The Forest Service embraced the developer's approach and chose to emphasize Eagle County's 2014 variance to support its reasonable use conclusion in its EIS.  The agency also suggested the proposal would be reasonable under County zoning regulations.

164.     The County responded with a sharp correction: "the County conditionally approved a request from Berlaimont for a variance from the improvement standards contained in the Eagle County Land Use Regulations pertaining to dual access, emergency vehicle turnaround areas and certain road improvement standards, including those for turn radii. The standards for approval of this variance are technical in nature; consequently, the County did not have the opportunity to consider the social and environmental impacts of a permanent access road to the Berlaimont property."  The County went on to say "the road variance approved by Eagle County should not be interpreted as approval for this type of land use as suggested in the DEIS. The

variance simply dictates the standards that a road would need to meet if the proponents of Berlaimont were to develop the parcels as proposed."

165.    The County also submitted comments during the objection period with additional critique of the Forest Service's reasonable use determination, and highlighting substantial regulations that Berlaimont developers would still have to comply with before construction could occur, "including, but not limited to, building permits, grading permits, and waste water system permits."

166.    The County's clear and consistent push back on the Forest Service's reasonable use determination undermines the agency's conclusion.  But the County's comments have also consistently emphasized the "critical need in Eagle County to preserve the quality of public lands and natural resources, including wildlife habitats."

167.    The County's comments remind the Forest Service of its own duty to analyze and make decisions based on the Property Clause power and its duty to protect National Forests, which the agency has subverted to approve the developer's proposal.

### Proposed Action and Alternative Courses of Action

168.    The Forest Service examined four alternatives to the federal action requested by Berlaimont Estates; a No Action alternative, and three Action Alternatives.  All three action alternatives assumed construction would proceed regardless of whether and how the Forest Service granted additional access.  In the FROD, the agency chose "Alternative 2-Modified," which was considered in the DEIS but eliminated from detailed analysis.

169.    Reasonable alternatives were excluded from detailed analysis, including acquisition of the private parcel, increased conservation measures (e.g., maintaining seasonal

wildlife closures and restricted seasonal access), limited development, dirt road access, and others.

170.     The Highest and Best Use based on existing access is commonly identified in professional appraisals.  The Highest and Best Use based on existing access was not analyzed as a viable alternative course of action.  The public and decisionmakers were not informed of the relative merits of denying the request for expanded access.

171.     The 2020 EIS failed to disclose and analyze a genuine No Action Alternative. The Forest Service describes the No Action alternative as being included in the analysis only to meet its requirements under NEPA, but not an available choice for the decisionmaker.  Where Defendants have no obligation under ANILCA to provide enhanced access to the private parcel with adequate access, a no action alternative is a real and viable alternative that must undergo NEPA analysis.  The Forest Service did not consider approval of the proposal pursuant to the substantive standards set forth in FLPMA.

172.     Where the applicant's purpose is to use National Forest lands to access and provide amenities to its development, not providing the expanded access request is the correct no action alternative to analyze.  The public and the decisionmakers were presented with a legally erroneous argument that the no action alternative could not be chosen.

173.     The 2020 EIS does not consider alternatives that would mitigate the use of the National Forest System land to access the development proposal.  Various forms of federally enforceable mitigation alternatives were precluded by legal theories promoted by the developer and its allies in the USDA Office of General Council, Forest Service Regional Office, and Forest Service Washington Office.  For example, the Forest Service refused to analyze an alternative maintaining seasonal closures in the existing Forest Plan.

174.    Defendants did not use the 2020 EIS to provide detailed evaluation or consideration of alternatives involving mitigation measures and ANILCA terms and conditions. Comments submitted by Plaintiffs and others identified a wide range of potential mitigation, terms, and conditions that did not receive detailed analysis or inclusion in the 2020 EIS alternatives.

**Improper Influence Over the Forest Service's Decisionmaking Process**

175.    The 2020 EIS and 2023 FROD are based on bias and undue influence on Forest Service decisionmakers located in Washington D.C..

176.    The Forest Service allowed contractor bias and undue influence to undermine the public interest in an objective and fair NEPA process.

177.    The Forest Service failed to limit the Proponent's participation and interference with the NEPA process.

178.    The Forest Service failed to request and review portions of the administrative record that was maintained by third-party contractors.

179.    The Forest Service has not searched for or released relevant Washington Office documents requested by the pending FOIA requests, which are subject to ongoing litigation in this Court.

180.    The role of other state and federal agencies were diminished or eliminated by failing to publish the FEIS in the Federal Register before the objection period.  Failing to publish the FEIS in the Federal Register avoided review by local, state, and federal agencies with jurisdiction and special expertise.  The omission of Federal Register FEIS publication swept difficult issues under the rug and avoided NEPA disclosure and analysis.

181.    Documents released pursuant to two FOIA requests, and after the public comment periods closed, confirm additional NEPA deficiencies that could not be raised during comments or objections.

182.    A FOIA request was submitted to the Forest Service in September of 2020 to inform objections on the 2020 EIS and Draft ROD.  The Forest Service has engaged in numerous dilatory tactics to withhold responsive agency records that are not subject to a FOIA Exemption. The FOIA matters are being litigated in the D.C. District Court.  *WW v. USDA,* 2021-cv-02108-JMC.

183.    The same pattern repeated itself with regard to the objections period, necessitating yet another FOIA suit in 2022. *WW v. USDA,* 2022-cv-3606.

184.    The Forest Service has a practice of delaying production of agency records involving controversial projects until compelled by court order. See *Id*. at ECF No. 20.

185.    Emails released in the FOIA matter confirm that the Washington Office played a significant role in the decisionmaking process and possesses agency records that must be included in the administrative record.

186.    Defendants' employees and agents have a practice of using various means, including FOIA violations, to conceal their communications in order to avoid public scrutiny and to exclude materials from the administrative record for APA review.

## CLAIMS FOR RELIEF

### CLAIM ONE
### Alaska National Interest Lands Conservation Act
*The Forest Service conclusion that ANILCA requires enhanced road access is contrary to law*

187.    Plaintiffs repeat and incorporate by reference the allegations in all paragraphs of this Complaint.

188.    Pursuant to ANILCA's Alaska-specific purpose, language, and design, the Secretary of Agriculture "shall provide such access to non-federally owned land within the boundaries of the National Forest System as the Secretary deems adequate to secure the owner the reasonable use and enjoyment thereof." 16 U.S.C. § 3210; *see also* 36 C.F.R. § 251.114(a)("[T]he authorized officer shall authorize only those access facilities or modes of access that are needed for the reasonable use and enjoyment of the land."). ANILCA was adopted to address peculiar questions involving Alaskan lands, including Alaskan inholdings created at statehood.

189.    The stated purpose of ANILCA is to "provide[] sufficient protection for the national interest in the scenic, natural, cultural and environmental values on the public lands in Alaska, and at the same time provide[] adequate opportunity for satisfaction of the economic and social needs of the State of Alaska and its people…" 16 U.S.C. § 3101(d). ANILCA's Alaska-specific provisions are designed "to provide the opportunity for rural residents engaged in a subsistence way of life to continue to do so." *Id*. at § 3101(c).

190.    Application of ANILCA to National Forest System lands outside of Alaska is precluded by the plain language of the statute. All judicial interpretations applying ANILCA outside of Alaska are based on post-enactment legislative history. The D.C. Circuit has not addressed the plain language and purpose of ANILCA, and has not directly ruled on the

application of ANILCA outside of Alaska. The Ninth Circuit has applied ANILCA outside of Alaska based on post-enactment legislative history. Other circuits have been critical of opinions adopting the Ninth Circuit interpretations of ANILCA as contrary to plain language and statutory purposes. *See United States v. Srnsky*, 271 F.3d 595, 602-03 (4th Cir. 2001).

191. A series of U.S. Supreme Court opinions have reversed Ninth Circuit interpretations of ANILCA's language, structure and purposes and confirmed that Congress adopted ANILCA to address the unique situations presented by Alaskan statehood. Applying ANILCA to the Berlaimont Estates access request is contrary to law. Statutory interpretation of ANILCA's purposes and plain language presents an issue of nationwide application to National Forest management that is properly addressed by the D.C. District Court.

192. Alternatively, even where ANILCA is applicable, the agency has the power to deny or condition approval of a private access request. ANILCA provides "Where there is existing access or a right of access to a property over non-National Forest land or over public roads that is adequate or that can be made adequate, there is no obligation to grant additional access through National Forest System lands*." 36 C.F.R. § 251.110(g). Existing roads to Berlaimont Estates provide adequate access for rural residents engaged in a subsistence way of life. Berlaimont Estates' development proposal does not involve rural residents engaged in a subsistence way of life.

193. According to the Forest Service regulations relied upon in the FROD, any access authorization must be "consistent with [the access provided for] similarly situated non-Federal land and that minimizes damage or disturbance to National Forest System lands and resources." 36 C.F.R. § 251.110-114.

194.     There are dozens of other similarly situated inholdings on the White River National Forest for which access is provided via dirt or gravel roads and snowmobile access during winter.  Properties with similarly limited access enjoy "reasonable use and enjoyment," via summer roads and winter over-snow-access.  The Forest Service ignored the weight of evidence in the record showing that seasonal access on dirt roads is adequate for reasonable use.  Instead, the agency embraced reasoning and rationale provided by the developer and used select similarities with one, outlier parcel in the record to suggest the proposed use of the developer's parcel may be reasonable.  In so doing the agency arbitrarily ignored critical differences, as well as the weight of the record.

195.     The Forest Service ignored its independent authority and the weight of evidence in the record to adopt a reasonable use determination and conclusions on similarly situated parcels that mirror the developers' legal arguments and the SF 299 application submitted by developers.  The Forest Service's evaluation of other inholdings was arbitrary and capricious.  The agency followed the weight of evidence to an illogical conclusion and ignored consideration of critical factors that undermine its ultimate conclusion.

196.     As a matter of law and fact, there is no basis for the conclusion that Berlaimont developers have any ANILCA entitlement to expand the access that currently exists.  Defendants' ANILCA conclusions are not subject to deference.  Defendants' deliberations regarding ANILCA were not maintained in a manner that supports any assertion of privilege.  ANILCA does not apply in Colorado or to a parcel that has existing access.

197.     The 2020 EIS and FROD, and resulting decisions are therefore arbitrary and capricious, not in accordance with law, and without observance of procedure required by law under the APA and other Federal Statutes. 5 U.S.C. §§ 701-706.

## CLAIM TWO
## National Environmental Policy Act
*The EIS and NEPA process are based on an unlawfully narrow designation of Federal Action and an unreasonably narrow purpose and need statement*

198.    Plaintiffs repeat and incorporate by reference the allegations in all paragraphs of this Complaint.

199.    A "major federal action significantly affecting the human environment" triggers the agency duty to prepare an EIS. 40 C.F.R. § 1502.3.  The "NEPA process" used to prepare the EIS is defined to "mean[] all measures necessary for compliance with the requirements of section 2 and Title I of NEPA." 40 C.F.R. § 1508.21.

200.    Once a "major federal action" triggers the NEPA process, an agency cannot define the project's purpose and need in terms so narrow as to make the NEPA analysis a mere formality.  The NEPA process requires a purpose and need statement that "shall provide full and fair discussion of significant environmental impacts and shall inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1.

201.    Here, the "major federal action significantly affecting the human environment" is the request for access for the purpose of constructing Berlaimont Estates.

202.    The 2020 EIS is the NEPA document being relied upon for the FROD.  The process and scope of analysis used in the 2020 EIS are arbitrary, capricious, and contrary to law.  Reliance on the 2020 EIS violates NEPA.

203.    The 2020 EIS is based on an improperly narrow "Purpose and Need."  There is no NEPA analysis of the easements, special use permits, and other devices to provide ANILCA-based access to this parcel, which is located outside of Alaska.

204.    The scope of the 2020 EIS relies on the legally erroneous determination that federal law requires expanded access.  Defendants ignored the plain language and judicial interpretations of federal statutes and regulations when determining the adequacy of existing access.  Defendants unlawfully adopted Berlaimont developers' argument that existing access is inadequate.

205.    By adopting a scope of review based on the erroneous conclusion that Berlaimont developers are entitled to expanded access, Defendants excluded "reasonable alternatives that would avoid or minimize adverse impacts or enhance" the environment from disclosure and analysis in the NEPA process. 40 C.F.R. § 1502.1.

206.    By limiting the disclosure and interdisciplinary analysis of alternatives, direct impacts, and mitigation measures of the "federal action" to the effects of the ANILCA access, the 2020 EIS violated NEPA.  By narrowly defining the "federal action" and "purpose and need" to eliminate existing uses of the parcel, reasonable uses short of the developers' plan, and various connected actions associated with development of the parcel, the Forest Service unlawfully avoids taking a hard look at the direct impacts of the proposed Berlaimont Estates development, reasonable alternatives, and mitigation measures, as required by NEPA. 42 U.S.C. §§ 4332(2)(A-E, F-H).

207.    The Forest Service violated NEPA by approving the access and utility corridor across National Forest lands in the 2020 EIS and FROD which were based on an improperly narrowed "federal action" and "purpose and need statement."

208.    The 2020 EIS, NEPA process, and agency actions based on the FEIS and NEPA process were arbitrary and capricious, not in accordance with law, and without observance of procedure required by law under the APA and other Federal Statutes. 5 U.S.C. §§ 701-706.

**CLAIM THREE**
**National Environmental Policy Act**
*Range of Alternatives considered is unlawfully narrow*

209.    Plaintiffs repeat and incorporate by reference the allegations in all paragraphs of this Complaint.

210.    A federal agency must "rigorously explore and objectively evaluate all reasonable alternatives," before deciding on a course of action. 40 C.F.R. § 1502.14(a); *see* 42 U.S.C. § 4332 (2)(C)(iii), (E).  The alternatives analysis is designed to define the issues sharply and to provide a "clear basis for choice among options by the decision maker and the public." 40 C.F.R. § 1502.14.  The alternatives considered by the Forest Service include a No Action Alternative that the agency said it could not adopt, and three action alternatives that would give the proponent a paved, year-round road to facilitate development of Berlaimont Estates.  The 2020 EIS did not include a detailed examination of any other alternative courses of action.

211.    The FEIS did not include a detailed examination of the course of action – Alternative 2-Modified – that was authorized in the FROD.  Alternative 2-Modified was eliminated from detailed analysis in the FEIS during the NEPA process.

212.    The FEIS failed to consider other reasonable alternatives in detail.  Reasonable alternatives not considered in detail in the FEIS include:  (1) returning the Berlaimont parcel to the  National Forest System lands by acquisition of the non-federal land; (2) providing seasonal access and maintaining wildlife protections in the existing Forest Plan; (3) approving improved access on dirt or partial pavement; and (4) conditioning expanded access for construction and operation of Berlaimont Estates based on enhanced mitigation measures, reservations of rights, restrictions on exchanged lands, and ANILCA terms and conditions.

213.     The Forest Service has violated NEPA by failing to consider a reasonable range of alternatives in the challenged 2020 EIS and FROD. 40 C.F.R. § 1502.14(a); *see* 42 U.S.C. § 4332 (2)(C)(iii), (E). The Forest Service violated NEPA by failing to analyze Alternative 2-Modified in the 2020 EIS.

214.     The resulting 2020 EIS and decisions were therefore arbitrary and capricious, not in accordance with law, and without observance of procedure required by law under the APA and other Federal Statutes. 5 U.S.C. §§ 701-706.

## CLAIM FOUR
### National Environmental Policy Act
*Denial of Berlaimont's expanded access request was inappropriately excluded from the alternatives*

215.     Plaintiffs repeat and incorporate by reference the allegations in all paragraphs of this Complaint.

216.     NEPA alternatives analysis is the heart of the NEPA process and is designed to define the issues sharply to provide a "clear basis for choice among options by the decision maker and the public." 40 C.F.R. § 1502.14.

217.     The 2020 EIS provided a muddled and legally erroneous set of choices.

218.     The "no action" alternative does not present the public and decisionmaker with the choice of denying Berlaimont's request for expanded access for purposes of constructing and operating an exclusive new subdivision in the middle of sensitive National Forest lands that provide critical winter range for declining wildlife populations.

219.     The action alternatives do not present the public and decisionmaker with the choice of denying Berlaimont developers' request for expanded access for purposes of constructing and operating this exclusive new subdivision.

220.    The "no action" alternative assumes no construction or operation of Berlaimont Estates could occur if the developers' access applications were denied.

221.    The "no action" alternative does not inform the public and decisionmaker of the impacts and effects of construction and operations that could take place if Defendants denied the developers' request for expanded access. Defendants acted on the erroneous premise that additional access was required for construction, and therefore the "no action" alternative concealed denial as a viable choice among alternatives.

222.    The range of choices among alternatives presented to the public and decisionmakers was based on an inaccurate interpretation of ANILCA and federal law promoted by Berlaimont Estates developers and its allies within the Forest Service.

223.    Based on the above facts and legal obligations, the Forest Service violated NEPA by failing to inform the public and decisionmaker that it could choose a "no action" alternative denying expanded access and resulting in development limited by existing access. 40 C.F.R. § 1502.14(d).

224.    The FEIS and resulting decision was therefore arbitrary and capricious, not in accordance with law, and without observance of procedures required by law under the APA and other Federal Statutes. 5 U.S.C. §§ 701-706.

**CLAIM FIVE**
**National Environmental Policy Act**
*Forest Service failed to involve cooperating agencies*

225.    Plaintiffs repeat and incorporate by reference the allegations in all paragraphs of this Complaint.

226.    Consistent with NEPA's "one EIS" requirement, agencies of the federal government are required to cooperate in the analysis of a federal action to ensure a

comprehensive and efficient analysis of the impacts on the environment from the perspective of present and future generations. 42 USC §§ 4331(a), 4332(2).

227.    NEPA regulations implement the mandate that Federal agencies prepare NEPA analyses and documentation "in cooperation with State and local governments" and other agencies with jurisdiction by law or special expertise.  40 CFR §§ 1501.6, 1508.5.

228.    Failure to invite and include cooperating agencies in the NEPA process violates NEPA.

229.    "Upon request of the lead agency, any other Federal agency which has jurisdiction by law shall be a cooperating agency." 40 C.F.R. § 1501.6.  Whether the lead agency fails to invite agencies or the "other Federal agency" is not included as a cooperating agency, the absence of cooperating agencies violates the "one EIS" requirement and serves to segment the NEPA analysis of the "major federal action." 40 CFR §§ 1501.6, 1508.5.

230.    The Forest Service did not include any cooperating agencies with jurisdiction over the Berlaimont Estates proposal. The Forest Service did not include any cooperating agency with special expertise over the Berlaimont Estates proposal.

231.    Numerous federal, state and local agencies have jurisdiction and special expertise over the wildlife, wetlands, water, and other resources impacted by the Berlaimont Estates proposal that were not invited or included as cooperating agencies in the NEPA process.

232.    The Forest Service violated NEPA by unlawfully excluding all cooperating agencies from NEPA process.

233.    The resulting 2020 EIS and decisions were therefore arbitrary and capricious, not in accordance with law, and without observance of procedure required by law under the APA and other Federal Statutes.  5 U.S.C. §§ 701-706.

**CLAIM SIX**
**National Environmental Policy Act**
*FEIS fails to identify and analyze the effectiveness of available mitigation measures*

234.    Plaintiffs repeat and incorporate by reference the allegations in all paragraphs of this Complaint.

235.    NEPA documents must: (1) "include appropriate mitigation measures not already included in the proposed action or alternatives," and (2) "include discussion of . . . [m]eans to mitigate adverse environmental impacts (if not already covered under 1502.14(f))." 40 C.F.R. § 1502.14(f); 40 C.F.R. § 1502.16(h).

236.    NEPA defines "mitigation" as a way to avoid, minimize, rectify, or compensate for the impact of a potentially harmful action. 40 C.F.R. § 1508.20 (a)-(e).  NEPA documents must analyze the effectiveness of mitigation measures in context of the proposed action and proposed alternatives. 40 C.F.R. § 1502.14(f).

237.    The 2020 EIS unlawfully narrowed the proposed action and available alternatives to providing paved, year-round expanded access to the existing Berlaimont Estates parcel.  Narrowing the scope of the proposed action excluded NEPA disclosure and analysis of mitigation measures available to address impacts of the construction and operation of Berlaimont Estates based on existing access.

238.    The 2020 EIS does not inform the decisionmaker and the public that Defendants have a wide range of powers, duties, and discretionary authority to impose mitigation measures on the future use of the special uses authorized by the FROD.

239.    The 2020 EIS erroneously avoids analysis of mitigation by stating that Eagle County would address mitigation of development resulting from Forest Service approval of the Action Alternatives.  The Forest Service ignores federal authority by asserting that the Forest

Service does not regulate development on private land.  The 2020 EIS asserts that mitigation is the responsibility of other federal, state, and local agencies.

240.    The Forest Service did not consider terms and conditions based on federal authority to impose conditions on the expanded access, utility infrastructure, and development that would not go forward but for expanded road access.

241.    The FEIS does not disclose or discuss mitigation measures that may be imposed by asserting direct federal control and authority over a development proposal with impacts on the National Forest System that could not be built but for the expanded access across the National Forest.

242.    ANILCA contains mandatory approval language that does not apply outside Alaska.  Alternatively, ANILCA limits on Forest Service power, control, and authority when addressing access disputes do not apply to the Berlaimont parcel.  Alternatively, the Berlaimont parcel was obtained with access sufficient to satisfy ANILCA's statutory purposes.

243.    ANILCA does not allow Defendants to rubber stamp the expanded access and ignore uses and development plans announced by Berlaimont.  ANILCA contemplates the Forest Service will only provide access that "the Secretary deems adequate to secure to the owner the reasonable use and enjoyment" of the property. 16 U.S.C. § 3210(a).  Impacts flowing from a grant of ANILCA access must be mitigated by "such terms and conditions as the Secretary of Agriculture may prescribe." *Id*.  Consideration of ANILCA access necessarily involves NEPA disclosure and analysis of available mitigation that may be imposed via terms and conditions on the proposed access (and alternatives) to meet other statutory and regulatory obligations and goals. *Id*.

244.    Forest Service access regulations clarify Defendants' duty to limit the access and impose terms and conditions "that minimize the impacts on the Federal resources." 36 C.F.R. § 251.114(a).  Before issuing any access authorization, an officer must ensure that "[t]he route is so located and constructed as to minimize adverse impacts on soils, fish and wildlife, scenic, cultural, threatened and endangered species, and other values of the Federal land." 36 C.F.R. § 251.114(f)(2).

245.    The 2020 EIS does not disclose or analyze any binding terms and conditions on the proposed ANILCA-based access expansion.  The Forest Service based its 2020 EIS and decisions on the erroneous conclusion that it lacks power to mitigate the impacts of operation of the Berlaimont Estates by imposing terms and conditions on expanded ANILCA access.

246.    Instead of analyzing mitigation measures available for adoption by the decisionmaker, the 2020 EIS lists non-binding best management practices to guide construction and operation of the Berlaimont Project.

247.    Even where the Forest Service proposes mitigation, the 2020 EIS does not analyze the effectiveness of mitigation measures or best management practices.  This subverts the agency's obligations under NEPA.

248.    The 2020 EIS and FROD are based on the NEPA process that was arbitrary and capricious, not in accordance with law, and without observance of procedure required by law under the APA and other Federal Statutes.  5 U.S.C. §§ 701-706.

**CLAIM SEVEN**
**National Environmental Policy Act**
*Consideration of connected actions is inadequate*

249.    Plaintiffs repeat and incorporate by reference the allegations in all paragraphs of this Complaint.

250.     In addition to the major federal action, NEPA requires federal agencies to consider three types of actions in an EIS; connected, cumulative, and similar. 40 C.F.R. § 1508.25.  Connected actions are closely related actions that the Forest Service must discuss in the same impact statement. 40 C.F.R. § 1508.25(a)(l).  Connected actions are those that: (i) Automatically trigger other actions which may require environmental impact statements; (ii) cannot or will not proceed unless other actions are taken previously or simultaneously; or (iii) are interdependent parts of a larger action and depend on the larger action for their justification. 40 C.F.R. § 1508.25(a)(1)(i-iii).

251.     Construction and operation of Berlaimont Estates is part of the major federal action subject to full NEPA analysis.

252.     The FEIS and FROD failed to provide detailed interdisciplinary analysis of the direct and indirect impacts of the following connected actions: (1) electric power supply needs/ upgraded or expanded utility corridors; (2) offsite air-quality impacts from expanded electricity generation, as well as from wood burning stoves and fireplaces; (3) diesel emissions from construction; (4) mosquito spraying; (5) natural gas transport; (6) communications infrastructure; (7) greenhouse gas emissions; (8) ground disturbance and water-related impacts of water storage reservoirs and large water tanks; (9) housing development in lynx habitat; (10) wildlife impacts from a new proposed snowmobile trailhead; and (11) other reasonably foreseeable impacts.

253.     By failing to identify and analyze impacts from "connected" actions, or as "cumulative impacts" within the FEIS, the Forest Service's NEPA analysis improperly narrowed the scope of the 2020 EIS, and pre-empted the development of appropriate mitigation measures proportionate to the environmental impacts caused by the proposed and connected actions, and cumulative impacts, as required by NEPA. 40 C.F.R. § 1508.25(a)(1).

254.    The resulting decision was therefore arbitrary and capricious, not in accordance with law, and without observance of procedure required by law under the APA. 5 U.S.C. §§ 701-706.

**CLAIM EIGHT**
**National Environmental Policy Act**
*The FEIS failed to provide the public and decisionmaker with a Hard Look at direct, indirect, and cumulative impacts of the agency action*

255.    Plaintiffs repeat and incorporate by reference the allegations in all paragraphs of this Complaint.

256.    Before taking action, agencies must comply with NEPA's "hard look" requirement by providing an interdisciplinary analysis of "direct effects" (40 C.F.R. § 1508.8(a)), "indirect effects," (40 C.F.R. § 1508.8(b)), and "cumulative impacts." (40 C.F.R. § 1508.7).

257.    The resolution of the above claims will resolve the categorization of impacts and effects into direct, indirect and cumulative categories.

258.    Regardless of categorization, the 2020 EIS failed to provide the mandated "hard look" for issues raised by Plaintiffs' comments and objections.  The deficiencies include, but are not limited to, the following:

- The Forest Service failed to take a hard look at the cumulative impacts to deer and elk populations from the continuing trend of development sprawl north of the I-70 corridor.

- The Forest Service failed to both identify and evaluate the impacts to lynx habitat on the Berlaimont inholding and identify and evaluate the impacts from Berlaimont's development to national-forest lynx habitat.

- The Forest Service failed to take a hard look at impacts to wildlife that would result from the existence of an isolated, year-round residential community.

- The Forest Service also failed to take a hard look at impacts to greater sage-grouse and potential mitigation measures that could minimize these impacts.

- The Forest Service failed to take a hard look at impacts to cutthroat trout, and the agency ignored standards and guidelines related to cutthroat in its Forest Plan.

- Forest Service failed to take a hard look at impacts associated with developing and operating water infrastructure for the Berlaimont inholding.  The Forest Service also failed to consider the feasibility of the developer's water supply plans.

- The Forest Service failed to take a hard look at the unreasonable risks to health and safety and the unreasonable economic costs associated with wildfire risks associated with the Berlaimont proposal.  The agency also failed to take a hard look at how increased threat of wildfire from Berlaimont Estates will affect the National Forest.

- The Forest Service failed to take a hard look at mitigation measures by deciding to incorporate mitigation strategies into its action alternatives without examining their effectiveness.

- The Forest Service failed to take a hard look at new information and changed circumstances related to wildlife, habitat values, and climate change.

- The Forest Service failed to take a hard look at impacts of moving a snowmobile trailhead on public lands and wildlife.

259.    The NEPA analysis, and resulting decision was therefore arbitrary and capricious, not in accordance with law, and without observance of procedure required by law under the APA.  5 U.S.C. §§ 701-706.

**CLAIM NINE**
**Administrative Procedure Act, National Environmental Policy Act, Federal Records Act, Freedom of Information Act**
*Agency Action was taken without compliance with the overlapping NEPA public involvement purpose, Federal Records Act, and Freedom of Information Act mandates*

260.    Plaintiffs repeat and incorporate by reference the allegations in all paragraphs of this Complaint.

261.    Under the APA, courts "shall" hold unlawful and set aside agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §§ 706; 706(2)(A).  Vacatur of agency action is a common form of relief granted by district courts presented with violations of APA, NEPA and similar laws designed to ensure federal agencies engage in open and informed decisionmaking.

262.    NEPA requires that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process, thereby guaranteeing that the public is involved in and aware of agency processes. 40 C.F.R. §§1500.1(b); 1500.2(d); 1506.6.

263.     NEPA requires that agencies "[m]ake diligent efforts to involve the public in preparing and implementing their NEPA procedures." 40 C.F.R. §1506.6(a).

264.     NEPA ensures that all agencies shall make available through Freedom of Information Act the "environmental impact statements, the comments received, and any underlying documents available to the public pursuant to [FOIA], without regard to the exclusion for interagency memoranda where such memoranda transmit comments of the Federal agencies on the environmental impact of the proposed action." *Id.* at 1506.6(f).

265.    The Forest Service has acted in numerous ways that have interfered with the Plaintiffs' and the public's ability to understand and participate in the NEPA process, including but not limited to: (1) FOIA violations such as failing to timely respond to Plaintiffs' requests and illegally withholding documents; (2) failing to provide meaningful opportunity for comment on aspects of the project, and changing the key elements of the project after critical comment periods; (3) failing to publish notice of the FEIS in the Federal Register prior to the objection period; and, (4) failing to consider substantive comments.

266.    The Federal Record Act imposes a duty to "make and preserve records" to document agency decision making. 44 U.S.C. § 3101 ("The head of each Federal agency shall make and preserve records containing adequate and proper documentation of the [. . .] decisions [. . .] of the agency and designed to furnish the information necessary to protect the legal and financial rights of the Government and of persons directly affected by the agency's activities.").

267.    The Federal Records Act's purpose ensures that agencies make adequate administrative records documenting its land management decisions and mandates that the agencies retain those records.

268.    For agency decisions subject to the APA, agencies are required to make and maintain an administrative record that consists of all documents and materials directly or indirectly considered by the relevant agency decisionmakers.  There is no practical way to meet the agency's APA and Federal Records Act duties without assembling the Administrative Record at the time the agency action is taken.

269.    Defendants recognized the federal recordkeeping mandate early in the current NEPA process, but did not implement the mandate by making and keeping a contemporaneous administrative record.

270.    The Forest Service has a practice of failing to implement internal controls and procedures to make and maintain a viable administrative record that conforms to basic notions of fairness and due process. *Rocky Mountain Wild v. United States Forest Service*, 14-CV-02496-WYD-KMT; Dkt. 28, Exh. 3, ¶10 (documents were "not retained"); *see also Colorado Wild Inc*., 523 F.Supp.2d 1213, 1230 (D.Colo. 2007) (Forest Service "failed to collect and to investigate these communications and include them in the administrative record so it and the public could assess whether the [proponent/contractor] relationship had violated the integrity of the NEPA and decision-making process.").

271.    Where federal law and internal procedures were ignored in making the Administrative Record and the Forest Service has not released or otherwise made a full Administrative Record available to objectors or the public, the FEIS and agency actions taken by the Forest Service should be invalidated.

## REQUEST FOR RELIEF

FOR THESE REASONS, Plaintiffs respectfully request that this Court enter judgment providing the following relief:

A.  Determine and declare that the Defendants have violated the Federal Land and Policy Management Act of 1976 by applying the mandatory access provisions of the Alaska National Interest Lands Conservation Act of 1980 instead of the discretionary access provisions that apply to federal public lands outside of Alaska.

B.  Determine and declare that the Defendants have violated the National Environmental Policy Act, and its statute's implementing regulations, by relying on the 2020 EIS, and that Defendants' actions are arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law, under the Administrative Procedure Act.

C. Determine and declare that Defendants relied on erroneous interpretations of federal law when issuing the FROD approving Berlaimont's expanded access application and related agency actions involving Berlaimont's development plan.

D. Vacate and set aside the FROD, and all underling analysis and remand to the Defendant agency to begin anew the processes required to comply fully with NEPA, that statute's implementing regulations, and this Court's findings and orders.

E. Enter such orders that confirm Defendants are precluded from granting, authorizing, or allowing Berlaimont Estate's use of Forest Service lands for the construction or operation of the development, or authorizing construction, improvement or use of new or existing access roads across Forest Service lands until Defendants have complied with NEPA, FLPMA, ESA, and all other applicable provisions of federal law.

F. Award Plaintiffs the costs of litigation (including reasonable attorney, witness, and consultant fees) under the Equal Access to Justice Act, 28 U.S.C. § 2412 and Fed. R. Civ. P. 54(d), and/or under any other authority of the Court; and

G. Award such other relief as this Court deems appropriate, just, and proper.

RESPECTFULLY SUBMITTED April 18, 2023:

s/ Travis E.  Stills
**Travis E.  Stills, D.C. Bar #C00101**
Energy & Conservation Law
227 E.  14th St.  #201
Durango, Colorado 81301
(970) 375-9231
stills@eclawoffice.org

**Peter Hart D.C. Bar # CO0111**
Wilderness Workshop
PO Box 1442/520 S. 3rd St, Suite 27
Carbondale, CO 81623
(970) 963-3977 x12
peter@wildernessworkshop.org

**Matthew Sandler, D.C. Bar #CO01105**
Rocky Mountain Wild
1536 Wynkoop St.  Suite 900
Denver, CO 80202
303-579-5162
Matt@rockymountainwild.org

*Attorneys for Plaintiffs*