**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| WILDERNESS WORKSHOP, et. al. | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )    Civil Action No.  23-678-JMC |
| | ) |
| MERYL HARRELL, et al., | ) |
| | ) |
| Defendants, | ) |
| | ) |
| Berlaimont Estates, LLC | ) |
| | ) |
| Intervenor-Defendant | ) |
| | ) |

**PLAINTIFFS' PARTIAL MOTION FOR SUMMARY JUDGMENT**

Plaintiffs, through counsel, move for partial summary judgment on the limited question of whether or not the access sub-section of Title XIII - Administrative Provisions, contained in the Alaska National Interest Lands Conservation Act of 1980 ("ANILCA") applies to National Forests outside of Alaska. P.L. 96-487, 94 Stat. 2371 Section 1323 codified at 16 U.S.C. § 3210.

**ACRONYMS**

ANILCA -    Alaska National Interest Lands Conservation Act

APA -    Administrative Procedure Act

DEIS –    Draft Environmental Impact Statement

DROD –    Draft Record of Decision

ECF –    Electronic Case Files

EIS –    Environmental Impact Statement

ESA -    Endangered Species Act

FEIS –    Final Environmental Impact Statement

FOIA –    Freedom of Information Act

FROD –    Final Record of Decision

FLPMA –    Federal Land Policy and Management Act

NEPA –    National Environmental Policy Act

NFMA –    National Forest Management Act

NFS –    National Forest System

ROD –    Record of Decision

SOF –    Statement of Facts

WRNF –    White River National Forest

## TABLE OF CONTENTS

ACRONYMS ................................................................................................................... 2

I.   INTRODUCTION AND FACTUAL BACKGROUND ........................................... 4

II.  STANDING AND JURISDICTION ...................................................................... 10

III. STANDARD OF REVIEW .................................................................................... 19

IV.  ARGUMENT ......................................................................................................... 21

    A.   In 1976, Congress Resolved Access Requests in the National Forests by Enacting FLPMA ........................................................................................................ 24

    B.   ANILCA's Text is Limited to Alaska ................................................... 27

    C.   Nothing in ANILCA's Text, Purpose, or Structure Supports Weakening FLPMA by Extending ANILCA beyond Alaska ........................................ 30

    D.   There is no Basis in Legislative History to Extend ANILCA beyond Alaska ........ 33

    E.   Federal Interests Prevail over State and Local Concerns ......................... 35

V.   ADMINISTRATIVE PROCEDURE ACT RELIEF ............................................ 37

    A.   The Remedy for Agency Action that is Not in Accordance with Public Land Laws is to Vacate the EIS, FROD, and Require the Agency to Start Anew on a Clean Slate. ....................................................................................................... 37

    B.   Should Plaintiffs Prevail, there is no Equitable Basis to Leave the EIS and FROD in Place ........................................................................................................ 38

VI.  CONCLUSION ...................................................................................................... 42

## I.    INTRODUCTION AND FACTUAL BACKGROUND

As alleged in the Amended Complaint (ECF 15-1), and admitted throughout the Answers (ECF 19, 20), the underlying decisionmaking process involving the White River National Forest in Colorado was based on an access provision that Congress included in the Administrative Provisions title of ANILCA. 16 U.S.C. § 3210.  The Supreme Court has held that administrative provisions in ANILCA Title XIII are specific to federal public lands in Alaska. *Amoco Production Co. v. Village of Gambell*, 480 U.S. 531 (1987).  Plaintiffs respectfully requests that the Court find the challenged agency actions are "otherwise not in accordance with law" and therefore must be held "unlawful and set aside."  5 U.S.C. § 706(2)(A).

Berlaimont Estates is a controversial road and development project in Colorado. The Chief of the Forest Service recognized the controversial nature of pulling a provision out of an Alaska-specific statute, ANILCA, to limit agency discretion and analysis of the development proposal, which would not go forward but for the expanded road and utility access across the National Forest System lands. *See* ECF 18 at 2 (citing agency records, many of which are not contained in the preliminary version of the administrative record).  By doing so, the Forest Service used a provision intended to provide subsistence access to private inholdings within Alaskan federal public lands, to enable a luxury home development outside of Alaska with no connection to ANILCA's intent or purpose.  The Forest Service's reliance on outdated case law is incorrect in light of more recent Supreme Court rulings.

This partial motion requests an order based on a discrete question of statutory construction that, if resolved in Plaintiffs' favor, sets aside and vacates Defendants' actions and decisions granting road and utility access across sensitive National Forest lands based on improper application of ANILCA's access provision outside of Alaska. 16 U.S.C. § 3210.

By 1980, when ANILCA was adopted to address specific federal public land management issues unique to Alaska, Congress had already established the standards and procedures for private use of the National Forests for access in the Lower 48 states through discretionary access provisions in the Federal Land and Policy Management Act of 1976 ("FLPMA"). 43 U.S.C. § 1740 ("Secretary of Agriculture, with respect to lands within the National Forest System, shall promulgate rules and regulations to carry out the purposes of [FLPMA]" when considering access requests.).

The impacts of the agency's decision on Plaintiffs' interests in wildlife, recreation and other aspects of National Forest System management are summarized in the Amended Complaint. ECF 15-1 at ¶¶2-7.  The Statement of Facts relies on the preliminary Administrative Record[1] and agency records not yet contained in the Administrative Record, but obtained from the agency through previous and ongoing FOIA litigation.[2] The documentary evidence, supplemented with Plaintiffs' standing declarations, confirm that agency personnel widely questioned the use of ANILCA to weaken, and even eliminate, federal agencies' authority and ability to protect the National Forest System from an array of threats, particularly those connected to luxury development schemes that rely on amenities provided by the National Forests. The key undisputed material facts supporting partial summary judgment are:

    a.   The proposed action involves National Forest lands in Colorado. SOF ¶1.

---

[1] Pursuant to LCvR 7(n)(1),(2) Plaintiffs will confer with Defendants and Intervenors to create an appendix of documents cited within the memorandum.

[2] Plaintiffs partial summary judgment does not require resolution of the upcoming administrative record conferral/motions practice or resolution of Claim Nine, which turns on the inability to access agency records during administrative comment and objection periods, despite having filed timely FOIA requests. ECF 15-1 at ¶¶ 263-5, 271 (failure to provide timely FOIA access "interfered with the Plaintiffs' and the public's ability to understand and participate in the NEPA process").

b. Unspecified statutory interpretations from unnamed persons in the Office of General Counsel and the project proponents regarding ANILCA were treated by the Defendants, including the Forest Service Chief, as binding. SOF ¶¶20-22 *citing e.g.* ECF 18-1 at 222 (ANILCA "applies to all National Forest System lands").

c. The Final Environmental Impact Statement ("FEIS") accepted the notion that post-enactment legislative history can overcome the statutory language and purpose to export the ANILCA access standards from Alaska to Colorado. SOF ¶18 *citing* FS-004152-3.

d. Berlaimont Estates LLC's request for access for a luxury development does not involve "the opportunity for rural residents engaged in a subsistence way of life to continue to do so." 36 U.S.C. § 3101(c). SOF ¶1, 4 (description of proposal)

e. Road access to the Berlaimont property exists. SOF ¶¶ 15.

f. Alternative access routes, including those that involve private lands, were not pursued as a means to minimize impacts to, and use of, the National Forest. SOF ¶25.

g. The agency conducted a pre-National Environmental Policy Act ("NEPA") [42 U.S.C. §§ 4321 et seq.] determination using ANILCA that limits the Forest Service authority to protect public lands when considering a private access application. SOF ¶ 21.

h. Plaintiffs were not afforded an opportunity to comment on the Addendum to the FEIS, which is the first articulation of the legal basis for granting utility access in the FEIS completed in 2020. SOF ¶18.

i. The Forest Service interpretation of ANILCA was used to limit the protections available under the National Forest Management Act ("NFMA"), FLPMA, Endangered Species Act ("ESA"), and other public lands laws that protect Plaintiff's interests in the White River National Forest. Ex. 1-7 (Plaintiffs' standing declarations).

Plaintiffs' review of the Administrative Record (Index filed at ECF 27[3]) confirms that conferral and perhaps motions practice will be required. *Minute Order 6/23/2023* adopting ECF 25 (schedule for AR conferral and motions). For example, the Index contains no documents generated when Berlaimont Estates' litigation counsel and other agents interacted with the Forest Service regarding the proposal to use National Forests for access, even though the transfer motion alerted Defendants to calls, emails, and other correspondence between Intervenors and Defendants' Washington D.C. Offices. ECF 23 (Order denying transfer motion) at 3 ("Berlaimont's counsel sought out multiple meetings with D.C. officials to plead Berlaimont's case, ECF 18-1 at 1, 207–08, 216, 218, and later corresponded with those same officials to agitate for the release of the FROD ["Final Record of Decision"], ECF 18-9 at 51–61"), *see also Berlaimont Estates v. FS*, 1:22-cv-02300-REB (Dist. Colo. – Dismissed) (ECF 1 and attachments).  Indeed, the only documents in the Administrative Record Index filed with this Court that post-date mid-2021 are the FROD, a Biological Evaluation that was prepared after all public comment and objection periods had closed, and two documents compiling objections with their exhibits. ECF 27-1. Therefore, whatever cross motion the Agency and Berlaimont Estates bring must be limited to the evidence in pleadings, and limited to issues that do not require a fully-developed Administrative Record.

---

[3]Much of the Administrative Record provided to undersigned counsel was provided as images and are  not searchable.  These and other issues will be addressed during conferral period.

The Forest Service Objection Response confirmed that agency personnel remained unclear as to the use of ANILCA and the analyses required, in part, because FLPMA already addresses requests that involve both road and utility access. FS-007270 ("the authorized utilities, including the legal authority, are not discussed in the final EIS or draft ROD.").

**Conclusion**

The regulation is clear, ANILCA does not authorize or require authorization or utilities. FLPMA does allow the Responsible Official to authorize utilities, but it does not mandate them. I find that the analysis needs to provide clarity on the statutes and authorities that the Forest Service uses to authorize use and occupancy of National Forest System lands.

**Instruction**

The Responsible Official will include additional descriptions of ANILCA, NEPA, FLPMA, and how special use authorizations will be used for the road and for utilities.

*Id*.  Yet, the NEPA analysis was not updated or supplemented to correct legal errors or to include the required analysis and public comment. ECF 15-1 at ¶25. Instead, an errata sheet was attached to the FROD. *Id*. FS-007149 ("Additional descriptions of ANILCA, NEPA, FLPMA and how special use authorizations will be used is documented on page 5 of this ROD, and in Appendix A, Errata page A-2.").  The errata sheet, for the first time, stated that the Forest Service authorized utility access via the FLPMA access provisions. FS-007154. The cobbled together result in the FROD and Addendum confirms that FLPMA, not ANILCA, achieves the results Congress intended in the Lower 48 when developers seek to use National Forests for road and utility access needed for large scale luxury developments. The statutory construction issues with the Berlaimont Estates proposal stretch back to at least the 2009 Federal Register Notice (SOF at ¶6) and continued through 2018 Draft ANILCA Determination, which is not contained in the Administrative Record. Ex. 9. (released during FOIA litigation as Bates 18-CV-887-29476).

The Forest Service held tight to the less protective provision in ANILCA to abdicate its duties to protect National Forests in Colorado. *Id*., *Rocky Mountain Wild v. Dallas*, 2017 WL

6350384 at *11 (D. Colo 2017).  Three Colorado District Court judges did not squarely reach the ANILCA geographic applicability issue, but each set aside ANILCA-based utility and access decisions.  *Rocky Mountain Wild v. Dallas, 2022 WL 11733139 at *3-7 (D. Colo 2022)* (describing history and rulings in Village at Wolf Creek access litigation that set aside agency action).  An "inferior court's" reluctance to engage in statutory interpretations that may contradict *dicta* and therefore risk reversal, particularly when another resolution is possible, is understandable in light of the Tenth Circuit's particularly strong view on following a controlling court's dicta. *United States v. Serawop*, 505 F.3d 1112, 1122 (10th Cir. 2007) ("We are bound by Supreme Court dicta almost as firmly as by the Court's outright holdings, particularly when the dicta is recent and not enfeebled by later statements.") (quotations omitted).[4]  Instead of ruling squarely on statutory interpretation of ANILCA's geographic reach, the Colorado District Court examined other statutory duties to conclude the Forest Service abdicated its NEPA, NFMA, and ESA duties, in part, by applying ANILCA to knee-cap the agency's own authority to protect the National Forest.

Here, Forest Service personnel recognized the same disconnect between FLPMA-based access regulations and the plain language of ANILCA, which does not explicitly state "minimization of impacts."  Ex. 9 at Bates 18-CV-887-29468, 29476.  Instead of resolving one of the disconnects that flow from applying ANILCA outside Alaska, the Forest Service, under pressure from the developer's agents and attorneys, accepted the notion that ANILCA diminishes the authority found in FLPMA and the access regulations when applied in Colorado.

---

[4]The D.C. Circuit precedent takes a more typical approach to *dicta* by treating it as potentially persuasive, but not binding. *Murray Energy Corp. v. EPA* 936 F.3d 597, 627 (D.C. Cir 2019) (declining to find *dicta* persuasive and confirming that "[*d*]icta is never binding on any court") citing *Glus v. Brooklyn E. Dist. Termina*l, 359 U.S. 231, 235 (1959).

A judicial finding on ANILCA's geographic application pursuant to the binding canons of statutory interpretation would eliminate the false choice faced by Forest Service resource specialists, state wildlife agencies, and the public when high-level Forest Service officials shoehorn Alaska-based access provisions into the Lower 48 land management scheme Congress had previously enacted. *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2364 (2019) (when the statute "yields a clear answer, judges must stop" and not muddy the issue with legislative history). Plaintiffs respectfully submit that full relief requested can be granted by resolving a portion of Claim One and finding that ANILCA does not apply outside Alaska.

## II.    STANDING AND JURISDICTION

Plaintiffs proffer 7 declarations, and 4 agency records obtained from the Forest Service with the statement of facts. Exs. 1-11. Plaintiffs' proffer contains the required evidence to show Article III standing, a jurisdictional perquisite routinely contested by federal agencies seeking to avoid judicial review and relief of claims brought by community and conservation organizations. *Id*. Plaintiffs are non-profit organizations that may establish standing based on having suffered an injury in their own right, and alternatively, establish "standing solely as the representative of its members." *Students for Fair Admissions, Inc. v. President,* 2023 U.S. LEXIS 2791, at *24 (June 29, 2023) *quoting Warth* v. *Seldin*, 422 U. S. 490, 511 (1975).

"To have standing to bring a lawsuit in federal court, a plaintiff must establish that: (1) he has suffered a concrete and particularized injury that is actual or imminent, not conjectural or hypothetical; (2) there is a causal relationship between his injury and the defendant's conduct; and (3) it is likely that a victory in court will redress his injury." *Ark Initiative v. Tidwell,* 64 F. Supp. 3d 81, 92 (D.D.C. 2014) *applying Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Representative standing is established for a Plaintiff where, "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane

to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Id. quoting Hunt* v. *Washington State Apple Advertising Comm'n*, 432 U. S. 333, 343 (1977).  Although both Plaintiffs establish standing under both tests, the case may go forward if only one plaintiff establishes standing under either test. *Id. quoting Rumsfeld v. Forum for Acad. & Inst. Rights*, 547 U.S. 47, 52 n.2 (2006) ("the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement," the Court need "not determine whether the other plaintiffs have standing.") (citation omitted).

In resolving a standing issue, Courts must start from the premise that the plaintiff will prevail on its merits argument. *Sierra Club v. EPA*, 926 F.3d 844, 849 (2019) *see also Sierra Club v. EPA*, 699 F.3d 530, 533 (D.C. Cir. 2012) (granting standing based on relief available if environmental plaintiff prevailed).  The Supreme Court has long held that, "[w]hile generalized harm to the forest or the environment will not alone support standing, if that harm in fact affects the recreational or even the mere esthetic [sic] interests of the plaintiff, that will suffice." *Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009) *citing Sierra Club v. Morton*, 405 U.S. 727, 734-736 (1972) ("interest alleged to have been injured 'may reflect 'aesthetic, conservational, and recreational' as well as economic values.'") *quoting Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 154 (1970).  The Supreme Court recently confirmed that "when a statute affords a litigant "a procedural right to protect his concrete interests," the litigant may establish Article III jurisdiction without meeting the usual "standards for redressability and immediacy." *Dep't of Educ. v. Brown*, 2023 U.S. LEXIS 2792, at *15 (June 30, 2023).

The case at bar, and the partial summary judgment motion in particular, involves Plaintiffs' cognizable harms that are traceable to Defendants' violation of substantive and

procedural rights afforded by the Administrative Procedure Act, National Environmental Policy

Act, Freedom of Information Act, Federal Land and Policy Management Act, and the National

Forest Management Act, as well as their implementing regulations. ECF 15-1.  Both Plaintiffs

identify cognizable environmental and procedural harms that are fairly traceable to Defendants'

reliance on post-enactment legislative history expanding ANILCA's Alaska-specific access

provisions to approve road and utility access required for a development project in Colorado,

rather than relying on canons of statutory interpretation confirming that FLPMA provides the

appropriate authority to consider access requests on National Forests outside of Alaska. *See*

*Montana Wilderness Ass. v. U.S. Forest Service,* 655 F.2d 951, 945 (9th Cir. 1981) (applying

post-enactment legislative history instead of "[t]he natural interpretation" of ANILCA's text and

structure that supports "the presumption that [3210(a)] was meant to apply [only] to Alaska as

well [as 3210(b)]" *accord United States v. Srnsky*, 271 F.3d 595, 602-03 (4th Cir. 2001)

(agreeing with the 9th Circuit's statutory interpretation that ANILCA does not apply outside

Alaska, but declining to issue an opinion that would create a potential circuit split on the

geographic scope of ANILCA).

Seven years after the Ninth Circuit's *Montana Wilderness* case expanded ANILCA's

reach, the Supreme Court issued a holding on ANILCA's geographic limitations. *Amoco*

*Production Co. v. Village of Gambell*, 480 U.S. 531 (1987).  The Supreme Court rejected the

Ninth Circuit's application of another provision of the ANILCA outside Alaska. *Id*. *analyzing* 16

U.S.C. § 3120. In so doing, the Supreme Court concluded that the "ANILCA's primary purpose

was to complete the allocation of federal lands in the State of Alaska."  *Id.* at 549 (emphasis

added).  Explicitly citing ANILCA Title XIII  (which contains the Section 3210 access provision

the Forest Service construed here to apply nationwide) the Supreme Court concluded that the

"provisions of ANILCA . . .  need not be extended beyond the State of Alaska in order to

effectuate their apparent purposes." *Id*. at 550; *see also id*. at 550 n.19 (construing ANILCA Title XIII). The Supreme Court determined that Congress did not intend for <u>any</u> provision of ANILCA, including the administrative provisions of Title XIII, to apply outside Alaska. *See id*. at 550 & n.19.

Recent Supreme Court interpretations of ANILCA's text and purposes discussed in the Argument section below must be followed, and the results should be given weight because, even though none specifically addressed the access provision in Section 3210, ANILCA's purpose and structure were part of each holding. *See e*.g. *Yellen v. Confederated Tribes of the Chehalis Reservation*, 141 S. Ct. 2434, 2438 (2021) ("The 'simple truth' reflected in those prior cases is that "Alaska is often the exception, not the rule.") (citations omitted). *Yellen*, and the other reversals of the Ninth Circuit's broad ANILCA interpretations, at a minimum, constitute "carefully considered language of the Supreme Court, [that] even if technically dictum, generally must be treated as authoritative." *Sierra Club v. EPA*, 322 F.3d 718, 724 (D.C. Cir. 2003) (citations omitted). As discussed below, the Supreme Court's analysis of ANILCA is not *dicta*.

In short, Plaintiffs' harms are traceable to the Forest Service decisions to apply ANILCA as the inholding access rule outside Alaska. *Id*. This Court's ability to remedy these harms is not constrained or controlled by outside circuit court decisions from a "bygone era of statutory construction" that is irreconcilable with subsequent Supreme Court holdings construing the same statute. *Food Mktg. Inst*. at 2364 (quotation omitted). Instead, Supreme Court precedent (and dicta) confirms that relief is available to remedy Plaintiffs' harm.

The challenged agency actions that analyze and approve road and utility access are based on an FEIS that accepted the discredited notion that post-enactment legislative history can overcome the statutory language and purpose to export ANILCA's exception to FLPMA's access standards from Alaska to Colorado. FS-004152-3. Defendants' statutory interpretation of

ANILCA is contrary to law, may be remedied by the relief requested, and is therefore final and ready for review. *See e.g.* ECF 15-1 at ¶10 (Defendants have taken final agency action to issue private interests in public lands without considering or taking the steps necessary to disclose, reduce and eliminate impacts); *accord* Ex. 1 Roush Decl. at ¶¶20.c., d. (adequate access already exists to the Berlaimont parcel), ¶29 ("The agency's decision fails to take meaningful action to protect the natural resources that the agency is charged to protect"), ¶¶30-34 (Defendants' decision was based on a faulty reasonable use determination that "necessitates a complete do over").

Each element of standing plead in the Complaint is supported by evidence admissible at summary judgment. *See e.g.* ECF 15-1 at ¶¶3-7 (agency decisions), ¶¶81-84 (harms to Plaintiffs and Plaintiffs' members' interests). Moreover, Defendants admit many of the harms Plaintiffs plead in the Complaint. *See e.g.* ECF 15-1, 20 at ¶¶152-159. Except for denying that habitat would be *destroyed,* Defendants admitted habitat degradation:

> The project will destroy and degrade habitat for threatened, endangered, and sensitive species, including streams that sustain populations of greenback cutthroat trout, occupied range for greater sage-grouse, and lynx habitat. Sensitive populations of Colorado River cutthroat trout, Brewer's sparrow, and populations of Harrington penstemon would all be directly and indirectly impacted by the development as well.

ECF 15-1, ECF 20 at ¶157, *Id*. at ¶159 ("Federal Defendants admit that the proposal will impact deer and elk and bisect a mule deer migration corridor.").

> More than 90% of comments received by the Forest Service opposed authorization of the proposed road and Berlaimont Estates. The potential impacts to wildlife and wildlife habitat have been a prominent concern voiced by commenters at the local level, county government, as well as State and Federal elected officials.

ECF 15-2, ECF 20 at ¶36, see also SOF at ¶8 citing 74 FR 2991-2992, (January 16, 2009).

(access request "inconsistent with" federal elk and deer protections).

Federal Defendants failed to properly respond[5] to a number of allegations regarding comments submitted by Plaintiffs, and government experts that establish the harms to Plaintiffs that would flow from the project if road and utility access for nineteen proposed luxury vacation homes through a National Forest in Colorado were approved pursuant to ANILCA's subsistence-based access provisions. *See e.g.* ECF 15-2, ECF 20 at ¶¶37-56. Although a completed Administrative Record will contain additional documents supporting each of Plaintiffs' standing allegations, documents do not speak for themselves and, like legal conclusions, must be addressed in Answers in record review cases. *Gulf Restoration Network v. United States EPA*, 2018 U.S. Dist. LEXIS 183166, at *8 (E.D. La. Oct. 25, 2018).  The repeated failure of both Answers to admit, deny, or state a lack of knowledge regarding allegations generally, and standing allegations in particular, may be remedied by deeming the allegation admitted or by other means. *Id.* (ordering Department of Justice to replead their answer); Fed.R.Civ. Pro. 8(b)(6).  Plaintiffs request all responses asserting that documents speak for themselves or stating that legal conclusions do not require a response be treated as admissions. *Id.*  Alternatively, Plaintiffs request that all non-compliant responses be treated as admissions for purposes of partial summary judgment, accompanied by an opportunity for the revision and refiling of the Answers within 14 days of any order on partial summary judgment. *Id.*

In addition to the pleadings, Plaintiffs also may "carry [their]burden of production by citing any record evidence relevant to [their]claim of standing and, if necessary, appending to [their] filing additional affidavits or other evidence sufficient to support [their] claim." *Sierra Club v. EPA*, 292 F.3d 895, 900-01 (D.C. Cir 2002).  Although the schedule for conferring on

---

[5]Stating a document speaks for itself, even in record review cases, is not a valid pleading. *Gulf Restoration Network v. United States EPA,* 2018 U.S. Dist. LEXIS 183166, at *8 (E.D. La. Oct. 25, 2018) (ordering Department of Justice to replead their answer).

Administrative Record omissions and supplementation will occur after partial summary judgment is resolved, documents from the initial record and Plaintiff's proffers establish standing.

Each Declarant is a member of one or both Plaintiff organizations that has deep and longstanding interests in the public lands and public land values affected by Defendants' approval decision. *See* Ex. 2 Andree Decl. at ¶¶3, 5, 8 (decades spent managing wildlife in the area for the State of Colorado, including the project area, and participating in the Berlaimont decisionmaking process), 9 (decades studying elk in the area), 10 (tagging black bears, mountain lions and sage grouse in the area to document population levels and habitat use), 17 (years spent watching wildlife, hiking, horseback riding, hunting, and fishing in the area); Ex 3 Heicher Decl. at ¶¶6 (32 years of professional experience managing wildlife in the Eagle Valley), 9 (long personal and professional history studying wildlife in the Eagle Valley), 10 (long studied elk and mule deer use of the project area), 11 (use and enjoyment of the project area professionally and "to hunt, fish, observe nature & wildlife and to enjoy an area that is relatively undisturbed"), 12 (participation in the process); Ex 4 Wolf Decl. at ¶¶7, 10 (wildlife watching); Ex 5 Leavitt Decl. at ¶¶6 (hiking, mountain biking, and hunting in the project area), 7 (participation in the process); Ex. 6 Wiessner Decl. at ¶¶2, 6 (conservation interests in project area), 3, 4 (hiking), 4 (photography and wildlife viewing) Ex. 7 Singer Decl. at ¶¶4 (Elk issues in Eagle Valley), 5 (lynx conservation), 10 (work to preserve connectivity).

Declarants' affidavits make clear that their interests will be injured by Defendants' approval decision. *See* Ex 2 Andree Decl. at ¶¶22 ("impacts from this proposal would result in significant loss of mule deer habitat resulting in the reduction of available habitat and reduction in the deer population"), 23 ("increased human activities in elk calving areas do have a negative impact on calf survival"), 26 (Berlaimont road will pave habitat for sage grouse, brewer's

16

sparrow, and sensitive plants), 28 (Berlaimont road will increase fragmentation, cause roadkills

and potential blockages to important migratory route), 30 (road will increase recreation "which

also has a huge and detrimental impact on wildlife"), 36 (Defendants are eliminating wildlife

protections in the Forest Plan to approve this development); Ex 3 Heicher Decl. at ¶¶14

(Defendants' decision fails to protect wildlife), 18 (Berlaimont's road is the "equivalent of

building giant cliffs throughout a migratory path. The result will be death and carnage"), 23 ("the

Forest Service is creating a sacrifice zone in Edwards for development and recreation"), 26 ("a

paved road to Berlaimont Estates will surely be the final cut to the herds of deer and elk that are

suffering death by a thousand cuts"), 27 ("If the road is built, I'm not sure I'll return. We've

already lost so much, losing this too may be more than I could bear"); Ex. 4 Wolf Decl. at ¶¶14

(roads in wildlife habitat spook animals and result in roadkills), 15-16 (Berlaimont will destroy

winter range and result in loss of wildlife), 23 (Berlaimont will destroy "a safe and needed

haven" for wildlife); Ex 5 Leavitt Decl. at ¶¶6 ("development would accelerate an already

critical decline in this magnificent resource for both the wildlife and those who benefit from the

recreational opportunities"), 10, 19 (Defendants' failed to give adequate consideration to public

opposition, as well as public input), 10 (Defendants' approval eliminates wildlife closures that

are more necessary now than ever before), 17 (Defendants' have ignored wildlife science "to

facilitate spawl in the backcountry"), 20 (Berlaimont proposal could impair continued use and

enjoyment); Ex 6 Wiessner Decl. at ¶¶5 (Berlaimont's road will lead to direct mortality and

dispersal of wildlife), 14 ("Allowing pavement all the way to Berlaimont's land will ruin the

current hiking/mountain biking experience up Berry Creek and beyond, and will disrupt perhaps

the best elk and deer winter range left on the north side of the Interstate"), 14, 16 (gathered

thousands of petition signatures that were ignored by Defendants), 18 (allowing use of any road

in winter will lead to the further demise of the deer and elk herds"); Ex 7 Singer Decl. at ¶¶ 17 (harmed by lack of mitigation measures), 18 (harm to RMW members' interests).

Declarants' also make clear that relief sought, including invalidating Defendants' ANILCA determination and approval, is necessary to redress harms caused by the challenged decision. *See* Ex 2 Andree Decl. at ¶¶29-36 (Berlaimont proposal not a reasonable use and Defendants failed to minimize impacts), 37, 38 (denying the proposal is necessary to restore public trust); Ex 3 Heicher Decl. at ¶¶16 ("the proposed development is an overreach of the ANILCA intention"), 17 (Defendants' comparison of comparable inholdings was arbitrary), 19 (wildlife protections in the Forest Plan are needed now more than ever, but Defendants' decision eliminates them), 24 (Forest Service must choose the "no action" and "adequate access exists on this parcel for reasonable use"); Ex 4 Wolf Decl. at ¶¶18, 19 (Berlaimont Estates is not a reasonable use and denial of the proposal is necessary); Ex. 5Leavitt 10, 19 (Defendants ignored public comments and criteria considered in ANILCA determination was inadequate), 11-20 (use of ANILCA was improper); Ex. 6 Wiessner Decl. at ¶¶8, 12 (Defendants' decision fails to minimize impacts), 9 (existing access is adequate), 10 (there is no legal or equitable reason to amend the Forest Plan), 11-13 (Defendants' consideration of similarly situated parcels was arbitrary), 14 (Defendants ignored the public), 17 (Forest Plan should not be amended); Ex. 1 Roush Decl. at ¶35 ("issues we've identified in comments require the ROD and FEIS to be set aside, and an order requiring the agency to start anew based on a new application and unbiased analyses."); Ex. 7 Singer Decl. at ¶17 (lawful process and possibility of a different outcome would remedy harm).

In short, one or both Plaintiffs readily establish standing and Article III jurisdiction of this Court to grant meaningful relief to address the actual case and controversy Plaintiffs set forth

in the Amended Complaint in general, and this limited motion for partial summary judgment in particular.

## III.    STANDARD OF REVIEW

Under Rule 56, a movant must show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that "might affect the outcome of the suit under the governing law," and a dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Steele v. Schafer*, 535 F.3d 689, 692 (D.C. Cir. 2008) (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248. (1986)). The movant bears the burden of demonstrating that there is no genuine dispute of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, (1986).  If the moving party meets this burden, the nonmoving party must identify "specific facts showing that there is a genuine issue for trial." *Id.* at 324 (*quoting* Fed. R. Civ. P. 56(e)).

Evaluating motions for partial summary judgment involves the same considerations as full summary judgment. Fed.R.Civ.Pro 56(a). The Court must review all evidence in the light most favorable to the nonmoving party and draw all inferences in the nonmoving party's favor. *See Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014) (per curiam). A genuine issue for trial must be supported by affidavits, declarations, or other competent evidence. *See* Fed. R. Civ. P. 56(c). If the nonmoving party's evidence is "merely colorable or is not significantly probative, summary judgment may be granted" to the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

 "A court reviewing a question of law on cross-motions for summary judgment decides the legal issues presented and grants summary judgment to the party who, based on the court's conclusions, is entitled to judgment as a matter of law." *Comm. on the Judiciary v. McGahn*, 415 F. Supp. 3d 148, 154 (D.D.C. 2019) (reversed and remanded on other grounds).  Partial summary

judgment is the proper vehicle to resolve a longstanding statutory interpretation question as to

the geographic application of a statute such as ANILCA, as "it is 'emphatically' the role of the

Judiciary to say what the law is." *Id*. (*quoting Marbury v. Madison*, 5 U.S. 137, 177 (1803)).

Opinions that do not faithfully apply statutory interpretation canons are not persuasive, and in

some circumstances, such opinions may not even be binding in the circuit where the opinion was

issued. *Food Mktg. Inst*, 139 S. Ct. at 2364 (rejecting statutory interpretations of Freedom of

Information Act Exemption 4).

Rule 56 standards apply to APA cases in the same manner as in any other civil action.

*Celotex*, 477 U.S. at 327 *quoting* Fed.R.Civ.P. 1 ("Summary judgment procedure is properly

regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal

Rules as a whole, which are designed "to secure the just, speedy and inexpensive determination

of every action."). Judicial inquiry focuses on the agency decisions made and methods used, not

*post hoc* litigation explanations of what may have been done, because allowing "[p]ermitting

agencies to invoke belated justifications […] can upset 'the orderly functioning of the process of

review,' […] forcing both litigants and courts to chase a moving target." *Dep't of Homeland

Sec. v. Regents of the Univ. of Cal*., 140 S. Ct. 1891, 1909 (2020) *quoting SEC v. Chenery Corp*.,

318 U. S. 80, 94, (1943).

As the case is currently postured, the only questions properly before the Court on partial

summary judgment involve statutory interpretation. The Supreme Court has provided canons that

apply generally, and specifically to statutory construction involving public lands statutes.

Generally, "[i]n statutory interpretation disputes, a court's proper starting point lies in a careful

examination of the ordinary meaning and structure of the law itself." *Food Mktg. Inst*., 139 S.

Ct. 2356, 2364 (2019) *citing Schindler Elevator Corp. v. United States ex rel. Kirk*, 563 U. S.

401, 407, (2011). Where, as here, that examination yields a clear answer, judges must stop." *Id.* *citing Hughes Aircraft Co. v. Jacobson*, 525 U. S. 432, 438 (1999).

Second, when construing a statute that contains ambiguities regarding federal lands and the Property Clause of the U.S. Constitution, such statutes are "also subject to the general rule of construction that any ambiguity in a grant is to be resolved favorably to a sovereign grantor – 'nothing passes but what is conveyed in clear and explicit language'" *Great N. R. Co. v. United States*, 315 U.S. 262, 272 (1942) *quoting Caldwell v. United States*, 250 U.S. 14, 20-21 (1919). This canon is applied broadly to public land laws involved with the present case, including ANILCA, FLPMA, and the Stock-Raising Homestead Act of 1916 used to patent the Berlaimont Estates parcel in 1935. SOF at ¶3, *Watt v. W. Nuclear*, 462 U.S. 36, 60, 103 S. Ct. 2218, 2231 (1983) ("we would have to turn the principle of construction in favor of the sovereign on its head to conclude that gravel is not a mineral within the meaning of the [Stock-Raising Homestead Act of 1916 ]").

Application of the ANILCA's provision to the facts of the present case, and any other issues that turn on agency policy choices or otherwise go beyond canons of statutory construction, are not yet ripe for summary judgment without upcoming resolution of the contents of the Administrative Record. However, if the Court finds that ANILCA is not applicable outside Alaska, the presumptive relief pursuant to the Administrative Procedure Act, as set forth below more fully in Section V *infra*, is to enter judgment setting aside the agency actions.

## IV. ARGUMENT

The Court has acknowledged that "the threshold issue in this case is the interpretation of a federal statute—a legal question with the potential to affect the administration of national forests throughout the country." ECF 23 at 7. Based on the agreement of the parties, the Court entered a partial summary judgment schedule to address statutory interpretation questions of

nationwide importance, namely, whether the Forest Service determination that ANILCA applies outside of Alaska is contrary to law. *Minute Order 6/23/2023*.

Although confusion swirled during the administrative proceedings, no judicial order that binds any Court outside the Ninth Circuit was offered to support the Forest Service conclusions on ANILCA's geographic reach. ECF 18-1 at 222 (U.S. Forest Service Chief, Randy Moore communicated directly with interested citizens, noting "The Berlaimont project presents a difficult and controversial issue. The core challenge with the project is interpretation of the Alaska National Interest Conservation Act (ANILCA) [sic].")

On the preliminary Administrative Record, it appears that high level Forest Service officials, faced with questionable agency statutory interpretations, simply accepted the recommendations of the developer and unidentified Office of General Counsel attorneys. Ex 8-11, ECF 18-1 at 1, 207–08, 216, 218, ECF 18-9 at 51–61"), *see also Berlaimont Estates v. FS*, 1:22-cv-02300-REB (Dist. Colo. – Dismissed) (ECF 1 and attachments).   However, these documents are not included in the Administrative Record proffer and there is no basis to withhold them.[6] The Declaration certifying the administrative record is "insufficient to conclude that the documents withheld were sent for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding." *In re Grand Jury*, 475 F.3d 1299, 1304 (D.C. Cir. 2007) (internal quotation marks omitted).  Even if

> a document was shared with or by an attorney does not magically render a communication privileged. [The agency] must, at the very least, (1) describe with sufficient particularity the nature of the legal issue or issues for which advice was sought; (2) explain whether the communications sought legal advice, conveyed legal advice, or both; and (3) provide evidence that the communications were confidential.

---

[6] Similar refusals to produce these records are before the Court. *Wilderness Workshop v. U.S. Dept. of Agriculture, U.S. Forest Service, 21-cv-2108 (fully briefed); Wilderness Workshop, et. al. v. U.S. Dept. of Agriculture, et. al., 22-cv-3606 (briefing yet to commence).*)

*Ctr. for Biological Diversity v. United States EPA*, 279 F. Supp. 3d 121, 152 (D.D.C. 2017). The agency records offered at ECF 18 and here confirm that some, and likely a significant number of, agency records have been improperly omitted from the Administrative Record.

Should the agency convince the Court that geographic reach of ANILCA (Alaska statute) and FLPMA (Lower 48 with limited application in Alaska) is ambiguous, before questions regarding the agency's administrative construction or application to Berlaimont Estates' request, Plaintiffs are entitled to access the full administrative record(s).[7]

Although not at issue in this partial summary judgment, Plaintiffs anticipate that subsequent summary judgment on the remaining claims, based on a completed Administrative Record, will show that the Forest Service did not faithfully apply ANILCA or FLPMA in reviewing and responding to Berlaimont Estate's road and utility access request. Instead of compliance, the Forest Service issued a FROD and an "errata sheet" that applied less protective Alaska-specific provisions to approve road and utility access. *See* 36 CFR § 251.11 (ANILCA "access means the ability of landowners to have ingress and egress to their lands. It does not include rights-of-way for power lines or other utilities."); FS-007154 (explaining in the errata sheet that "ANILCA serves as an enabling statute, not an authorizing statute. It does not

---

[7] Courts applying ANILCA outside Alaska have concluded that the standards and procedures for access requests are found in "regulations [that] provide [the] criteria for considering whether to grant a special use authorization for access to non-federal lands..." *Breaker v. United States*, 977 F. Supp. 2d 921, 939 (D. Minn. 2013) (applying ANILCA in Minnesota) *quoting* 36 C.F.R. § 251.114(a). Importantly, *Breaker* denied a landowner's demand for "motorized access to the Property [that] did not exist historically," and instead remanded for the Forest Service to apply its special use permit regulations pursuant to federal land management laws. *Id*. at 944. Other courts have similarly reversed or set aside ANILCA-based access requests as misconstruing and overstating the limitations ANILCA places on Forest Service discretion. *Dobbs v. United States Forest Serv.*, 2017 U.S. Dist. LEXIS 211728 at *6 (E.D. Okla.) *applying* 36 C.F.R. § 251. The U.S. Tax Court has confirmed that ANILCA-based denial is one of the "risks property owners must accept and deal with if they lack a deeded easement and must cross [Forest Service] property to reach their land." *Estate of Giovacchini v. Commissioner,* 2013 Tax Ct. Memo LEXIS 29, at *86-87 (T.C. Jan. 24, 2013*) (collecting cases denying access requests).

authorize or require the authorization of utilities.").  The conclusion contained in the errata sheet (FS-004156) - that ANILCA applies to the road access and FLPMA applies to utility access – is articulated for the first time in the errata sheet, and not found the FEIS, Draft ROD, or other documents discussing alternatives, impacts, or mitigation measures that were subject to public comment. It is absurd for the Forest Service to disavow FLPMA's application to inholdings that it says must be addressed under ANILCA, while the agency also relies on FLPMA to grant utility access to the same inholding. *Silver State Land, LLC v. Schneider*, 145 F. Supp. 3d 113, 130 (D.D.C. 2015) (discussing absurd result canon).

In short, if the Court finds that ANILCA is inapplicable to the Berlaimont Estates request for road and utility access to build a luxury housing development near Edwards, Colorado, the agency's proceeding and actions are contrary to law and are properly set aside.[8] *See* Section V *infra*.  The only question properly before the Court on the limited partial summary judgment involves canons of statutory interpretation.

A.    **In 1976, Congress Resolved Access Requests in the National Forests by Enacting FLPMA**

This limited motion is based on statutory interpretation of language in public lands statutes similar to the "*Monongahela Decision*" that remedied longstanding Forest Service violations of the plain language in the Forest Service's Organic Act of 1897 that resulted in the prohibition on clearcutting trees in the Monongahela National Forest that presented issues of national importance. *West Virginia Division of the Izaak Walton League v. Butz*, 367 F.Supp. 422 (N.D. W. Va. 1973), aff'd 522 F.2d 945 (4th Cir. 1975).  The 4th Circuit opinion turned on interpretations of the plain statutory text Congress adopted in 1897 to promote preservation of the National Forests that had been readily ignored by the Forest Service in favor of production

---

[8]Relief is addressed more fully in Section V *infra*.

policies. *Id.* The Forest Service sought deference to agency practices and what amounted to an agency rewrite of Organic Act provisions that made clear cutting impossible and other techniques such as thinning more difficult. *Id*.

The 4th Circuit rejected the Forest Service position, enforced the statutory text prohibiting clear cutting, and confirmed that if the Forest Service wanted to change the statute, "the appropriate forum to resolve this complex and controversial issue is not the courts but the Congress." *Id*. at 955. In response, Congress passed the National Forest Management Act ("NFMA"), which allowed some previously prohibited practices, "while imposing new procedural and substantive restraints on the Forest Service." *Sierra Club v. Espy*, 38 F.3d 792, 795 (5th Cir. 1994).

In the Congressional haste, NFMA omitted provisions addressing standards and procedures addressing requests for access across public lands, and two years later, while adopting the Federal Land Policy and Management Act of 1976 ("FLPMA"), Congress adopted access provisions in Title V that apply broadly to federal public lands. 43 U.S.C. §§ 1761–70. Congress imposed the same procedural and substantive restraints on the federal public lands managed by the Forest Service. 43 U.S.C. § 1761(b)(3). Applying FLPMA's access provisions to cover the NFMA gap was meant to protect the National Forest System from nearly a century of unlawful and unrestrained Forest Service actions. *See Sierra Club v. Espy*, 38 F.3d 792, 795 (5th Cir. 1994).

The legislative history confirms that Congress enacted FLPMA, in part to "provide[] uniform and comprehensive authority to the Secretary to grant rights-of-way on the national resource lands for such purposes as roads, trails, canals, and powerlines." 122 Cong. Rec. 4046 (1976) (statement of Sen. Haskell). FLPMA Title V gives the Secretary of Agriculture the discretionary authority to grant rights-of-way over national-forest lands. 43 U.S.C. § 1761(b)(3).

By FLPMA's own terms, this authority is exclusive: "[N]o right-of-way … shall be granted, issued, or renewed over, upon, under, or through such lands *except under and subject to [FLPMA's] provisions, limitations, and conditions*." *Id.* § 1770 (emphasis added). FLPMA's access provision places procedural and substantive restraints that, like NFMA, ensures the Forest Service has ample authority to protect the National Forest System when private parties seek access across the National Forest.[9] *Id.*

Congress made clear in the statutory text that FLPMA was the singular authority regarding rights-of-way by explicitly repealing thirty other public land law statutes that included their own limited right-of-way provisions. *See* 90 Stat. 2786- P.L. 94-579—OCT. 21, 1976, Title VII—Effect on Existing Rights; Repeal of Existing Laws; Severability, codified at 43 U.S.C. § 1701 (codification notes).

In short, FLPMA fixed the gap involving private road and utility access across National Forest System lands that Congress overlooked when passing NFMA. There was no legislative need when ANILCA was later adopted, and no statement in the legislative history that anything in ANILCA would apply outside Alaska. Indeed, the lack of Forest Service ANILCA authority to grant Berlaimont Estate's ANILCA-based road <u>and</u> utility access request confirms that applying ANILCA outside Alaska generates an absurd result that is avoided by applying FLPMA's access provisions to National Forests outside Alaska, including the National Forests located in Colorado.

---

[9] It is undisputed that ANILCA contains no language that would provide utility access to a development such as Berlaimont Estates. Also, the Forest Service relied upon FLPMA to grant access to the only parcel it found similarly situated to the Berlaimont proposal. *See* FS-004090, FS-003386-003403.

**B. ANILCA's Text is Limited to Alaska**

ANILCA is designed to "provide[] sufficient protection for the national interest in the scenic, natural, cultural and environmental values on the public lands in Alaska" with no application to public lands outside Alaska. *Sturgeon v. Frost*, 139 S. Ct. 1066, 1075 (2019) (concluding that "Congress set aside extensive land for national parks and preserves—but on terms different from those governing such areas in the rest of the country."); *Amoco Prod. Co. v. Vill. of Gambell,* 480 U.S. 531, 549-550 (1987) (reversing Ninth Circuit's expansive reading of ANILCA to apply outside of Alaska). Interpretations of ANILCA are squarely rejected when the statutory language is "plausible in the abstract, but it is ultimately inconsistent with both the text and context of the statute as a whole. *Sturgeon v. Frost*, 577 U.S. 424, 438 (2016) ("ANILCA repeatedly recognizes that Alaska is different"). "The 'simple truth' reflected in [ANILCA] cases is that 'Alaska is often the exception, not the rule.'" *Yellen v. Confederated Tribes of the Chehalis Reservation,* 141 S. Ct. 2434, 2438 (2021).

The Forest Service reverses the simple truth by applying ANILCA as the rule governing access to inholdings, not the exception.

> 94 STAT. 2488          PUBLIC LAW 96-487—DEC. 2, 1980
>
> ACCESS
>
> Nonfederally
> owned lands.
> 16 USC 3210.
> SEC. 1323. (a) Notwithstanding any other provision of law, and subject to such terms and conditions as the Secretary of Agriculture may prescribe, the Secretary shall provide such access to nonfederally owned land within the boundaries of the National Forest System as the Secretary deems adequate to secure to the owner the reasonable use and enjoyment thereof: *Provided,* That such owner comply with rules and regulations applicable to ingress and egress to or from the National Forest System.
>
> (b) Notwithstanding any other provision of law, and subject to such terms and conditions as the Secretary of the Interior may prescribe, the Secretary shall provide such access to nonfederally owned land surrounded by public lands managed by the Secretary under the Federal Land Policy and Management Act of 1976 (43 U.S.C. 1701-82) as the Secretary deems adequate to secure to the owner the reasonable use and enjoyment thereof: *Provided,* That such owner comply with rules and regulations applicable to access across public lands.

94 Stat. 2488, P.L. 97-487, § 1323. ANILCA's access provision is surrounded by administrative provisions that have never been construed to carry out a wholesale change to federal public lands law outside of Alaska. *Jarecki v. G. D. Searle & Co.*, 367 U.S. 303, 307 (1961) (construing statutory text "by the company it keeps" (*nosciur a sociis*) can "avoid the giving of unintended breadth to the Acts of Congress").  Indeed, each provision subjugates ANILCA's access to the nationwide rules and regulations currently in effect when ANILCA was passed. *Id*.  ANILCA's text, structure, and purpose provide no reason to insert ANILCA into the Lower 48.

    This interpretation is supported by ANILCA's dual purposes: to protect federal lands while also providing "adequate opportunity for satisfaction of the economic and social needs of the State of Alaska and its peoples." 16 U.S.C. § 3101. Nothing in ANILCA supports any intent or need to revisit an issue regarding the National Forests that FLPMA resolved four years earlier. 43 U.S.C. § 1701 note (explicitly revoking and amending statutes).

Instead of statutory interpretation that is protective of the National Forests, the Forest Service follows a Ninth Circuit decision of questionable remaining viability that finds, contrary to the rest of ANILCA and based on post-enactment legislative history, that one ANILCA provision, Section 3210(a) could be applied outside Alaska. *Montana Wilderness Ass. v. U.S. Forest Service*, 655 F.2d 951 (9th Cir. 1981). In *Montana Wilderness*, the Ninth Circuit recognized, "[t]he natural interpretation is that [3210(a) and (b)] were meant to have the same effect, one on [Alaskan] lands controlled by the Secretary of Agriculture, and the other on [Alaskan] lands controlled by the Secretary of the Interior. Since we assume that [section 3210(b)] … applies only to Alaskan land, we face a presumption that [3210(a)] was meant to apply [only] to Alaska as well." *Id.* at 954. The Ninth Circuit's plain language interpretation (but not the result) is consistent with Fourth Circuit conclusions. *United States v. Srnsky*, 271 F.3d 595, 602-03 (4th Cir. 2001) (noting that there is a "strong presumption" that 3210(a) applies only to national forests in Alaska because it must be read *in pari materia* with 3210(b)). No other appellate court other than the Ninth Circuit has conducted the full statutory language and purpose analysis or directly issued a holding that would extend ANILCA's reach. *See, e.g.*, *United States v. Jenks*, 22 F.3d 1513, 15 n3 (1994); *Srnsky*, 271 F.3d at 602-03.

No appellate court's examination of ANILCA's plain language and purposes identifies any textual or structural basis to extend ANILCA beyond the unique conditions involving federal public lands in Alaska. *Food Mktg. Inst.,* 139 S. Ct. at 2364 (when the statute "yields a clear answer, judges must stop" and not muddy the issue with legislative history). Instead, and without analysis, post-enactment legislative history is used to avoid the Ninth Circuit's preliminary conclusion that ANILCA's statutory text and purposes are limited to Alaska. *See e.g. United States v. Jenks*, 22 F.3d 1513, 1516 n.3 (10th Cir. 1994) (using a footnote to expand ANILCA based on post-enactment legislative history "implying that 3210(a) applies outside of Alaska").

In short, the binding rejection by *Food Mktg. Inst* of a bygone era of statutory interpretation prevents courts today from using post-enactment legislative history to avoid the textual analysis in *Montana Wilderness* that cabined ANILCA to Alaska. Interpreting the statute, with no D.C. Circuit Opinion to constrain this Court, in light of the *Montana Wilderness* interpretation of ANILCA's text and purpose that remains consistent with Supreme Court precedent on statutory construction and ANILCA's reach, the only reasonable conclusion is that the geographic reach of ANILCA Section 3210(a) is limited to the unique access exigencies involving federal public lands in Alaska.

### C. Nothing in ANILCA's Text, Purpose, or Structure Supports Weakening FLPMA by Extending ANILCA beyond Alaska

As set out in the previous section, Congress used ANILCA to explicitly alter and limit FLPMA and other federal public land laws to the unique circumstance found in Alaska. However, no provision of ANILCA expressly limits FLPMA or any other federal public land law as they apply outside of Alaska. At most, the Tenth Circuit identified, in a footnote, post-enactment history "implying that 3210(a) applies outside of Alaska." *United States v. Jenks*, 22 F.3d 1513 ,1516 n.3 (10th Cir. 1994) (emphasis supplied). However, the Supreme Court has rejected statutory interpretations that would impliedly negate other laws, noting that "[i]t is, of course, a cardinal principle of statutory construction that repeals by implication are not favored." *Radzanower v. Touche Ross & Co*., 426 U.S. 148, 154 (1976). Similarly, "amendments by implication[] are not favored." *United States v. Welden*, 377 U.S. 95, 103 n.12 (1964) ("Amendments by implication, like repeals by implication, are not favored."). In order to effectuate a repeal, "the intention of the legislature to repeal must be clear and manifest." *Posadas v. Nat'l City Bank*, 296 U.S. 497, 503 (1936).

The Forest Service's erroneous interpretation of ANILCA as including a nationwide application of Section 3210(a) would amend FLPMA by implication to *require* access instead of the discretionary grant contemplated by FLPMA. FS-004152.[10]  FLPMA Title V gives the Secretary discretion in deciding whether to grant rights-of-way over Forest Service land, 43 U.S.C. § 1761(a), but the Forest Service carried out its decisionmaking based on the erroneous conclusion that ANILCA diminished that discretion by requiring only that the Secretary "shall" allow access to inholdings. 16 U.S.C. § 3210(a) *cited at* FS-004152 (providing erroneous quotation). This interpretation, therefore, would be an impermissible amendment of FLPMA by implication. Importing ANILCA into Colorado reduces (but does not eliminate) federal control and authority over the proposal.

Further, it would be absurd to conclude that Congress explicitly enacted a sweeping national policy in a statute otherwise devoted to Alaskan federal lands that contains no other provision or indication of nationwide applicability—including the subsection (b) of § 3210. As the Supreme Court has stated, Congress does not "hide elephants in mouseholes." *Whitman v. American Trucking Ass'n*, 531 U.S. 457, 468 (2001). Likewise, Congress would not bury a nationally significant provision in one part of an act that otherwise applies only to Alaska, especially considering that there was no suggestion during the floor debate that section 3210(a) was intended to have a nationwide impact. *See Montana Wilderness Ass'n*, 655 F.2d at 955-56 & n.7. I n contrast, the Supreme Court focused on ANILCA's purpose when it interpreted the statute. *Sturgeon v. Frost I*, 577 U.S. 424, 438 (2016) (ANILCA "repeatedly recognizes that

---

[10] Of course, ANILCA contains no such requirement, but if ANILCA is held to apply, questions involving misapplication of ANILCA's terms to limit discharge of the agency duties under NEPA, NFMA, and other federal laws are beyond the scope of the present motion, which is limited to the question of statutory construction. See *Rocky Mt. Wild v. Dallas,* ____F.Supp___2022 U.S. Dist. LEXIS 191790, at **7-11, 13-20 (D. Colo. Oct. 20, 2022)

Alaska is different.").  There is no indication, aside from post-enactment legislative history, that

ANILCA was designed to alter FLPMA as applied outside of Alaska.

When it enacted ANILCA, Congress gave no indication that it meant to amend or repeal

FLPMA's regime for determining access and utility rights-of-ways in the National Forest.

Congress enacted ANILCA to protect and manage fish and wildlife in a manner that permits

those Alaska residents who are "engaged in a subsistence way of life to continue to do so." 16

U.S.C. § 3101(c). Nevertheless, the Forest Service has used ANILCA to weaken its land

management duties in Colorado and states other than Alaska, in large part, in response to

developers' efforts to tie the Forest Service's hands when considering luxury development

proposals via an ANILCA *requirement* for the Forest Service to provide access across NFS lands

to private inholdings. FS-004506 ("The applicant asserts, and the WRNF agrees, that the agency

is legally obligated to provide access to the Berlaimont property across NFS lands. More

precisely, Section 1323(a) of the Alaska National Interest Lands Conservation Act of 1980

(ANILCA) requires the Forest Service to provide access to private inholdings...").  Instead of

fidelity to the public land laws or asking Congress to change FLPMA - as it had done in response

to the *Monongahela Decision* - the Forest Service has sided with developers at every turn.

Since ANILCA did not expressly claim to amend or repeal any part of FLPMA, however,

the Forest Service's determination must be based on the notion that ANILCA *implicitly amended*

FLPMA, even though "amendments by implication[] are not favored." *United States v. Welden*,

377 U.S. 95, 103 n.12 (1964).  However, to effectively amend existing laws, Congress must

manifest an intent for the new legislation to amend the previous law. *Id*. Here, that did not

happen.

The Forest Service therefore committed legal error when it applied ANILCA outside

Alaska because FLPMA Title V governs such questions involving road and utility access outside

Alaska, and there is no basis for ANILCA to implicitly amend or revoke FLPMA. A wider range of alternatives, as required by NEPA, would emerge from a proper analysis and public comments on access options permissible under FLPMA. Ex. 9. Access options available under FLPMA could reduce impacts to sensitive values on the National Forest, but those options were not considered in the FEIS.

     **D.**    **There is no Basis in Legislative History to Extend ANILCA beyond Alaska**

     In order to expand ANILCA beyond Alaska, the Ninth Circuit also abandoned ANILCA's pre-enactment legislative history in favor of a post-enactment statements by legislators. *Montana Wilderness Ass'n*, 655 F.2d at 953-57. District Courts looking at the statute today, without persuasive or binding impact of a Circuit Court opinion, would stop after assessing the plain language and purpose of ANILCA. *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2364 (2019) (when the statute "yields a clear answer, judges must stop" and not muddy the issue with legislative history). But, as Justice Gorsuch noted, "[e]ven those of us who sometimes consult legislative history will never allow it to be used to 'muddy' the meaning of 'clear statutory language.'" *Id*. (overturning statutory interpretations that strayed from statutory language). *Montana Wilderness* did not stop, and instead muddied the water as to the geographic reaches of FLPMA and ANILCA when it comes to considering private use of National Forests to access private lands.

     The conflicting holdings and *dicta* of the Fourth, Ninth, and Tenth Circuits are readily resolvable by the D.C. District Court, which is not bound by D.C. Circuit precedent on the ANILCA applicability issue, but is bound by the Supreme Court's ANILCA interpretations and canons of statutory interpretation. ECF 16 at 18. Simply put, this Court is not constrained by a "bygone era of statutory construction" that *Montana Wilderness* relied upon. *Food Mktg. Inst*. at 2364 (quotation omitted).

ANILCA's legislative history supports Alaska-only application. First, as *Montana Wilderness* recognized, the pre-enactment legislative history of section 3210(a) gives no indication that it was intended to apply outside of Alaska. Indeed, "[t]here are numerous occasions [during the floor debates] when one would expect a change in current laws of access of the magnitude of the [nationwide interpretation] to be discussed, mentioned, or at least alluded to." *Montana Wilderness Ass'n*, 655 F.2d at 955-56 & n.7. It is irrelevant that outspoken Western legislators may have preferred the result that Congress reached when adopting ANILCA, instead of the result Congress reached when adopting FLPMA.

Even if the post-enactment legislative history cited by *Montana Wilderness* was properly considered, it is unpersuasive. The Ninth Circuit pointed to statements in a conference report suggesting that Congress deleted an inholding-access provision in a Colorado wilderness bill because it thought that issue had been clarified by ANILCA. House-Senate Conference Rep. on the Colo. Wilderness Act, H.R. Rep. No.1521, 96th Cong. 2d Sess. (1980). But a conference report is not legislation—members of Congress do not vote on the report, only the subsequent bill. A statement or misstatement by one legislator does not create law. Further, the fact that the House considered including an inholding-access provision in a Colorado-focused statute supports the conclusion that the House, at least, believed that FLPMA and the Wilderness Act[11] had already addressed this issue, and another state-specific access provision such as ANILCA was not needed in the Colorado Wilderness Act.

*Montana Wilderness* relied on two contemporaneous Supreme Court cases that approved of, albeit with reservation, the use of post-enactment legislative history as a tool of statutory interpretation. *Montana Wilderness Ass'n*, 655 F.2d at 957 (*citing Consumer Product Safety*

---

[11] The Wilderness Act would have been relevant to the Colorado Wilderness Act, though it is not applicable to Berlaimont's proposal here.

*Comm'n*, 447 U.S. 102, 118 n.13, 120 (1980) and *Seatrain Shipbuilding Corp. v. Shell Oil Co.*, 444 U.S. 572 (1980)). Since *Montana Wilderness* was decided, however, the Supreme Court has severely criticized the use of post-enactment legislative history. *Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 241-42 (2011).  In *Bruesewitz*, for example, the Court stated that "[p]ost-enactment legislative history … *is not a legitimate tool of statutory interpretation*." *Id*.  Legislator's utterances and legislative actions taken after the enactment of ANILCA are accordingly irrelevant when interpreting section 3210(a), even for jurists such as Justice Gorsuch who sometimes find legislative history helpful. *Food Mktg. Inst.*, 139 S. Ct. at 2364).

      **E.**    **Federal Interests Prevail over State and Local Concerns**

      Under federal law, all issues of private access across federal lands are resolved pursuant to federal land law statutes and Congressional intent, not easement rules or state common law. *Missouri, Kan. and Tex. Ry. v. Kansas Pac. Ry*., 97 U.S. 491 (1878).  State common law is irrelevant in determining the scope of Forest Service authority over special use requests, "because persons seeking access across the National Forest, in all likelihood will still have a statutory right of access under ANILCA and FLPMA, or some other federal statutory scheme, albeit subject to reasonable government regulation." *United States v. Jenks*, 129 F.3d 1348, 1353-54 (10th Cir. 1997). The Fourth Circuit agreed that federal statutes preclude application of state common law to modern access applications, while rejecting the Ninth Circuit's legislative history analysis and declining to "decide the geographic scope of ANILCA." *United States v. Srnsky*, 271 F.3d 595, 602-33 (4th Cir. 2001) *criticizing Jenks* and *Montana Wilderness*.

      In a strongly worded opinion, the late Judge Match rejected similar efforts by the Forest Service to defer to a county's determination regarding the Forest Service land management duties.

In a patent effort to circumvent its obligation to protect the natural environment of the Forest, the decision relied on ANILCA as requiring it to provide access considered to be adequate for the reasonable use and enjoyment of the property. <u>The Forest Service expressly disclaimed any authority to limit the development ceding that authority to Mineral County and finding that there would be only indirect effects on the public lands</u>.

The legal conclusion that the agency cannot control the use of the land conveyed in a land exchange is a clear error of law. It also resulted in the Forest Service failing to consider an important aspect of the decision before it. A conveyance to meet the access obligation of ANILCA must meet the requirement that it be for the reasonable use and enjoyment of the private owner of the inholding property. <u>What use is reasonable is to be determined by the Forest Service</u>. It exercised authority over the use of the original parcel by imposing the scenic easement on the 300 acres. LMJV acknowledges that those restrictions still apply to 123 acres of the original parcel but there are no federal restrictions on the newly acquired 205 acres.

<u>The Forest Service cannot abdicate its responsibility to protect the forest by making an attempt at an artful dodge of its responsibility using ANILCA as a shield.</u>

*Rocky Mt. Wild v. Dallas*, 2017 U.S. Dist. LEXIS 231942, at *4-5 (D. Colo. Sep. 14, 2017).

Therefore, even if this Court finds that ANILCA applies in Colorado, the statutory interpretation question presented by the present motion will inform later proceedings, if any, that address whether the Forest Service again abdicated its duties through artful dodges that defer public land management duties to local governments, while approving Berlaimont Estates' ANILCA request for utility and road access. *See Rocky Mt. Wild v. Dallas, ____F.Supp___2022 U.S. Dist. LEXIS 191790, at *7-11, 13-20 (D. Colo. Oct. 20, 2022), Wolf Creek Ski Corp. v. Bd. of Cty. Comm'rs*, 170 P.3d 821, 825 (Colo. App. 2007) (upholding invalidation of Colorado county's approval and confirming that "access across Forest Service lands would be "controlled by compliance with federal laws, rules and regulations.'").

V.    **ADMINISTRATIVE PROCEDURE ACT RELIEF**

A.    **The Remedy for Agency Action that is Not in Accordance with Public Land Laws is to Vacate the EIS, FROD, and Require the Agency to Start Anew on a Clean Slate.**

Should the Court find that statutory construction used to apply ANILCA outside of Alaska is contrary to law, the APA's plain language mandates that District Courts set aside agency actions that are contrary to law. 5 U.S.C. § 706(2)(A). "[T]he Supreme Court and the D.C. Circuit have held that vacatur is the presumptive remedy for this type of violation." *City of Duluth v. Nat'l Indian Gaming Comm'n*, 7 F. Supp. 3d 30, 41 (D.D.C. 2013) citing *In re Polar Bear Endangered Species Act Listing and § 4(d) Rule Litigation*, 818 F.Supp.2d 214, 238 (D.D.C. 2011), *Federal Election Comm'n v. Akins*, 524 U.S. 11, 25, (1998) ("If a reviewing court agrees that the agency misinterpreted the law, it will set aside the agency's action and remand the case.").  Presumptive APA relief applies even stronger when the agency action rests on legal error that cannot be fixed on remand by additional explanation. *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1084, 348 U.S. App. D.C. 77 (D.C. Cir. 2001) ("If an appellant has standing . . . and prevails on its APA claim, it is entitled to relief under that statute, which normally will be vacatur of the agency's  order."), *AFL-CIO v. NLRB*, 57 F.4th 1023, 1049 (D.C. Cir. 2023) ("We also reverse the district court's ruling that [a regulatory provision] is not contrary to law and thus vacate that provision as well.").

As set forth in detail in Section II *supra*, Plaintiffs establish standing through declarations and other evidence showing specific harms that flow from the legal error. It is possible that "Plaintiff may not ultimately prevail if the Court vacates the Administrator's decision, but it 'cannot prevail unless [the Court] do[es] so,' which is sufficient to satisfy the redressability requirement for constitutional standing." *American Petroleum Tankers Par*ent, LLC v. United States, 943 F.Supp.2d 59, 66 (D.D.C. 2013) *quoting Power Co. of Am., L.P. v. Fed. Energy*

*Regulatory Comm'n*, 245 F.3d 839, 842 (D.C. Cir. 2001)). The reasoning confirms that judicial economy is not served by speculation on whether or not the agency would reach the same conclusion regarding road and utility alignments, mitigation measures, and other matters of public lands laws if FLPMA's access standards that were deemed inapplicable from the beginning of the administrative procedures were applied to Berlaimont Estates' application for ANILCA access. Similarly, the showings of harms and redressability that confirm standing above, also establish that that the APA's "harmless error" rule plays no role in the present case. *Supra* Section II and exhibits.

Under the APA's plain language, courts must "hold unlawful and set aside" a decision that is "otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

**B.      Should Plaintiffs Prevail, there is no Equitable Basis to Leave the EIS and FROD in Place**

Although a court has discretion to depart from the presumptive APA remedy of vacatur, "the availability of that discretion does not shift the burden for showing whether [departure from vacatur] is warranted, which remains on the Defendants." *Friends of the Earth v. Haaland*, 583 F. Supp. 3d 113, 157 (D.D.C. 2022), *vacated as moot,* 2023 WL 3144203 (D.C. Cir. Apr. 28, 2023). A court may, under limited circumstances, leave the agency action in place while the decision is remanded for further explanation. *Standing Rock Sioux Tribe v. United States Army Corps of Eng'rs*, 985 F.3d 1032, 1051 (D.C. Cr 2021) (citations omitted).

The discretion is guided by *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Commission*, 988 F.2d 146 (D.C. Cir. 1993), which sets forth the two factors governing that decision:

> The decision whether to vacate depends on the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed.

*Id*. at 150-51 (internal quotation marks omitted). The "seriousness" of a deficiency, is determined at least in part by whether there is "a significant possibility that the [agency] may find an adequate explanation for its actions" on remand. *Id. quoting Williston Basin Interstate Pipeline Co. v. FERC*, 519 F.3d 497, 504, (D.C. Cir. 2008).

Although the burden is on the party opposing vacatur, should the Court rule that ANILCA does not apply outside Alaska, the legal error is not "relatively minor." *Friends of Animals v. Culver*, 610 F. Supp. 3d 157, 172 (D.D.C. 2022) (declining to vacate when legal error is minor and easily remedied through explanation). The seriousness factor is readily satisfied here, because the agency action "falls outside the [agency's] statutory authority […] and is predicated on an interpretation of the [statute] that is contrary to the statute's purpose." *Humane Soc'y of the United States v. Jewell,* 76 F. Supp. 3d 69, 137 (D.D.C. 2014) (vacating challenged agency action where "disruption is not so substantial as to outweigh the serious substantive errors"). Where there is no question that the agency has violated the law and absolutely no possibility of the [agency action's] survival on remand — the D.C. Circuit has suggested that the rule ought to be vacated." *Conservation Law Found. v. Pritzker*, 37 F. Supp. 3d 254, 271 (D.D.C. 2014) ("absent compelling circumstances, the Court sees no reason to allow agency action in excess of its statutory authority to remain intact"), *citing Nat. Res. Def. Council v. EPA*, 489 F.3d 1250, 1261 (D.C. Cir. 2007)).

The Forest Service use of the wrong statute to process Berlaimont Estates' access application could not present a more serious or irreparable deficiency. *Id*. Adequately explaining a decision to grant private use of public land based on the wrong statute is simply not possible, should the Court rule that FLPMA, and not ANILCA, applies to the Berlaimont Estates proposal because it is located outside Alaska.

Second, Plaintiffs respectfully submit that Defendant and Intervenor will not be able to meet the burden to identify any "disruptive" effect that would overcome vacatur. *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Commissio*n, 988 F.2d 146 150-51 (D.C. Cir. 1993) (vacatur may be avoided based on "disruptive consequences of an interim change that may itself be changed"). Berlaimont Estates, and the Forest Service, knew that application of ANILCA in Colorado was controversial and the Colorado District Court had set aside multiple attempts to use ANIILCA to avoid the agency's public land duties. *Rocky Mt. Wild v. Dallas,* ____F.Supp___2022 U.S. Dist. LEXIS 191790, at *7-11, 13-20 (D. Colo. Oct. 20, 2022) (on appeal). Judge Arguello avoided the ANILCA controversy and vacated the agency actions "in light of the Scenic Easement and history related to granting the initial land exchange, the Court found that USFS had certain powers to control development on the inholding." *Id*. at *29. Despite Judge Arguello's decision, Berlaimont Estates continued to "agitate for the release of the FROD," in part based on the September 7, 2022 suit Berlaimont Estates filed to force a Forest Service decision. ECF 23 at 3 citing 18-9 at 51–61, see also *Berlaimont Estates v. FS,* 1:22-cv-02300-REB (Dist. Colo. – Dismissed) (ECF 1 and attachments).

Here, it would also be disruptive to remand without vacatur, because "remand-only disposition may unfairly deprive parties of the opportunity to obtain" appellate review of the ANILCA issue Plaintiffs present in its motion. *NRDC v. EPA*, 489 F.3d 1250, 1264 (2007). "If a district court merely remands a case to an agency, we hold that there is no final judgment to appeal." *Id.* citing *In re St. Charles Preservation Investors, Ltd*., 286 U.S. App. D.C. 312, 916 F.2d 727, 729 (D.C. Cir. 1990) (per curiam) (observing well-settled rule that "a district court order remanding a case to an agency for significant further proceedings is not final"); see also *Pueblo of Sandia v. Babbitt*, 231 F.3d 878, 881 (D.C. Cir. 2000) (holding that appellate court lacked jurisdiction to review district court order remanding to agency for further proceedings).

By contrast, whether or not an appeal is taken (or can be taken) on the resolution of partial summary judgment motions regarding ANILCA application outside Alaska, NEPA and the purposes of NFMA, FLPMA, ESA, and other public land laws are served by a new application, new scoping, and public comment on a FLPMA-based range of alternatives, mitigation measures, and interdisciplinary analyses consistent with FLPMA's statutory provisions. *See High Country Conservation Advocates v. U.S. Forest Serv.*, 67 F. Supp. 3d 1262, 1265 (D. Colo. 2014).  In cases involving NEPA analysis, where it is "not the Court's responsibility to mandate a particular outcome, NEPA's goals of deliberate, non-arbitrary decision-making would seem best served by the agencies approaching these actions with a clean slate." *Id*.  The present case warrants vacatur so the NEPA process can start anew.

In addition, the doctrine of unclean hands also "closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief." *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814-15. Berlaimont Estates and Defendants do not have clean hands.  Throughout the process, Berlaimont Estates agents and attorneys have been violating the Memorandum of Understanding and pressuring the Forest Service to conform its analysis and decisions to the developers' legal theories. *See e.g.* Ex. 8-11, *accord* ECF 18 (exhibits).

The incomplete AR contains the Memorandum of Understanding, which imposes has clear limits on the Berlaimont Estates' communications with the Forest Service and NEPA contractors.

---

| | |
|---|---|
| FS Agreement No. | 09-MU-11021507-007 |
| Cooperator Agreement No. | |
| | 1/28/2009 |

5. Once the NEPA process has started (when the scoping letter is sent out), contact by the Proponent with the contractor or the Forest Service will be limited to matters of budget or scheduling (see F.3 and F.4).

FS-000679.  The AR, and documents released by the Forest Service pursuant to FOIA requests and litigation but not in the AR, confirm an overwhelming number of letters and emails between the proponent and the contractor and agency officials at the Forest Service, and at the Department of Agriculture.

In a March 19, 2018, an email string involving a National Forest Planner stated he does "not want to deal with someone with a past history of harassing our staff with threats of personal liability." Ex.10 at 3. That someone was Andy Hensler, who was serving as an attorney for Berlaimont Estates. Ex. 11 (20160713_Contact Information - Berlaimont.pdf).

Although allegations involving undue influence and bias span all claims (ECF¶¶ 124-136, 175-186), contractor documents and documents obtained through FOIA are not part of the incomplete record.  Even the limited record and Plaintiff's proffers to ECF 18 and the present motion confirm prohibited "contact by the Proponent" that is sufficient to establish that Berlaimont Estates and the Forest Service are unable to provide an equitable basis for deviating from the presumptive APA remedy of setting aside the agency actions, aka vacatur. FS-000679.

## VI.    CONCLUSION

The D.C District Court is not bound by any D.C. Circuit precedent interpreting ANILCA. Plaintiff respectfully requests the Court resolve the legal issues related to applicability of ANILCA outside of Alaska via partial summary judgment, and set aside the NEPA analysis, FROD, and errata sheet, and require the Forest Service to consider any Berlaimont Estates' request pursuant to FLPMA, and a clean administrative slate.

**RESPECTFULLY SUBMITTED JULY 7, 2023**

*s/ Travis E. Stills*

Travis E. Stills
D.C. Bar # CO0101
Energy & Conservation Law
227 E. 14th St. Ste 201
Durango, CO 81301
(970) 375-9231
stills@eclawoffice.org

Matthew Sandler
D.C. Bar # CO0105
Rocky Mountain Wild
1536 Wynkoop St. Suite 900
Denver, CO 80202
303-579-5162
Matt@rockymountainwild.org

Peter Hart
D.C. Bar #CO0111
Wilderness Workshop
PO Box 1442/520 S. 3rd St, Suite 27
Carbondale, CO 81623
(970) 963-3977 x12
peter@wildernessworkshop.org

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on July 7, 2023 I served a copy of this filing on all parties using the CM/ECF system, unless otherwise noted below.

*s/Travis E. Stills*

**Travis E. Stills**
