# Exhibit A

| 96TH CONGRESS<br>*1st Session* | SENATE | REPORT<br>No. 96-413 |
|---|---|---|

# ALASKA NATIONAL INTEREST LANDS

## REPORT

OF THE

## COMMITTEE ON ENERGY AND NATURAL RESOURCES UNITED STATES SENATE

together with

### ADDITIONAL VIEWS

TO ACCOMPANY

## H.R. 39



November 14 (legislative day, November 5), 1979.—Ordered to be printed

U.S. GOVERNMENT PRINTING OFFICE

53-448 O                    WASHINGTON : 1979

COMMITTEE ON ENERGY AND NATURAL RESOURCES

HENRY M. JACKSON, Washington, *Chairman*

| | |
|---|---|
| FRANK CHURCH, Idaho | MARK O. HATFIELD, Oregon |
| J. BENNETT JOHNSTON, Louisiana | JAMES A. McCLURE, Idaho |
| DALE BUMPERS, Arkansas | LOWELL P. WEICKER, Jr., Connecticut |
| WENDELL H. FORD, Kentucky | PETE V. DOMENICI, New Mexico |
| JOHN A. DURKIN, New Hampshire | TED STEVENS, Alaska |
| HOWARD M. METZENBAUM, Ohio | HENRY BELLMON, Oklahoma |
| SPARK M. MATSUNAGA, Hawaii | MALCOLM WALLOP, Wyoming |
| JOHN MELCHER, Montana | |
| PAUL E. TSONGAS, Massachusetts | |
| BILL BRADLEY, New Jersey | |

DANIEL A. DREYFUS, *Staff Director*
D. MICHAEL HARVEY, *Chief Counsel*
STEVEN G. HICKOK, *Staff Director for the Minority*

(II)

# CONTENTS

|  | Page |
|---|---|
| H.R. 39, as reported | 1 |
| I. Purpose of the measure | 126 |
| II. Summary of major provisions | 127 |
| III. Background and need | 129 |
| IV. Legislative history | 134 |
| V. Committee recommendation and tabulation of votes | 135 |
| VI. Committee amendments | 136 |
| VII. Section-by-section analysis | 266 |
| VIII. Cost and budgetary considerations | 334 |
| IX. Regulatory impact evaluation | 344 |
| X. Executive communications | 345 |
| XI. Additional views | 369 |
| XII. Changes in existing law | 448 |

(III)

247

under existing law. He is given advisory responsibility for other types of systems.

The amendment clarifies the procedures to be followed where existing law does not authorize a transportation or utility system and provides a statutory standard for the decisions on such applications.

As in S. 9, the amendment provides for consolidated applications for each type of system covered by the title; however, the time allowed for preparation of such applications is shortened to 6 months.

Different procedural steps for agency, presidential and congressional action are clearly set forth for two categories of applications: (1) applications for which there is applicable law to govern the approval of the transportation or utility system and which do not involve wilderness areas; and (2) applications which involve wilderness areas or for which there is no applicable law.

For applications in the first category, the procedures are as follows:
 1. Filing of a consolidated application form with each appropriate Federal agency;
 2. Preparation of a final joint environmental impact statement by the Federal agencies within 1 year;
 3. Decision to approve or disapprove relevant portions of the application by each Federal agency within 4 months of final EIS;
 4. Appeal to President if one or more agencies disapprove application;
 5. Presidential decision within 4 months of appeal;
 6. Judicial review of Presidential denial.

Procedures for applications in the second category are as follows:
 1. Filing of a consolidated application form with each appropriate Federal agency;
 2. Preparation of a final joint environmental impact statement by the Federal agencies within 1 year;
 3. Recommendation for approval or disapproval submitted to the President by each Federal agency within 4 months of final EIS;
 4. Presidential decision within 4 months of recommended agency decision;
 5. Judicial review of Presidential denial;
 6. President's recommendation for approval submitted to the Congress;
 7. If Congress adopts a joint resolution of approval within 120 days under expedited procedures, the application is approved; if not, it is disapproved.

The Committee also adopted an expedited judicial review procedure for any challenge to an environmental impact statement developed under these procedures, or other administrative actions pursuant to this title.

SPECIAL ACCESS AND ACCESS TO INHOLDINGS

The Committee modified and combined into one section, (1110), the provisions relating to special access and access to inholdings.

The Committee amendment guarantees access subject to reasonable regulation by the Secretary on conservation system units, National Recreation Areas and National Conservation Areas, for traditional or

248

customary activities such as subsistence and sport hunting, fishing, berrypicking, and travel between villages.

The Committee recommends that traditional uses be allowed to continue in those areas where such activities are allowed. This is not a wilderness type pre-existing use test. Rather, if uses were generally occurring in the area prior to its designation, those uses shall be allowed to continue and no proof of pre-existing use will be required.

The transportation modes covered by this section are float and ski planes, snowmachines, motor boats, and dogsleds. The adverse environmental impacts associated with these transportation modes are not as significant as for roads, pipelines, railroads. etc. both because no permanent facilities are required and because the transportation vehicles cannot carry into the country large numbers of individuals. Existing law does not guarantee this form of access into Parks. Wildlife Refuges, Wild Rivers, or Wildernesses, although in all cases the law does permit provision of such access in the land manager's discretion. Even in wilderness, access by airplane and motorized boat may be permitted at pre-existing levels of intensity.

In order to prevent the land manager from using his discretion to unnecessarily limit such access, the Committee amendment provides that such access shall not be prohibited unless the Secretary finds after holding a hearing in the area that it would be detrimental to the resource values of the unit.

The subsection on access to inholdings, provides that, where a State or private interest in land is surrounded by one or more conservation system units, the National Petroleum Reserve in Alaska, or public lands designated as wilderness study or managed to maintain the wilderness character or potential thereof, the Secretary shall grant the owner of the private interest such rights as may be necessary to assure adequate access for economic and other purposes.

The Committee enacted this provision in recognition of the fact that restrictions placed on public access on or across many federal land areas in Alaska may interfere with the ability of private inholders to exercise their right to use their lands. The Committee believes that owners of inholdings should not have their ability to enjoy their land reduced simply because restrictions are placed on general public access to the land surrounding their inholdings. This provision directs the Secretary to grant the owner of an inholding such rights as are necessary to assure adequate access to the inholding, and is intended to assure a permanent right of access to the concerned land across, through or over these Federal lands by such State or private owners or occupiers and their successors in interest. The Committee recognizes that such rights may include the right to traverse the Federal land with aircraft, motor boats, or land vehicles, and to use such parts of the Federal lands as are necessary to construct safe routes for such vehicles.

The Committee adopted a specific standard regarding access which is designed to include inholders and other landowners where lands are effectively surrounded by a unit or units established by this Act. The Committee finds that in certain instances, there will be a need for access to be effected across such units and expects the Secretary to be reasonable and fair in his judgments regarding access in these situations.

249

The most obvious situations involve those of physical barriers which would prevent feasible access except across a unit. Such barriers can include rugged mountain terrain, extensive marsh areas, shallow water depths, and presence of ice for large periods of the year. The Committee does not intend to limit the application of the term "effectively surrounded" to only those situations. Rather, the Committee expects the Secretary to judge these situations on a case-by-case basis and to work with the inholder to come to a reasonable solution which will assure that adequate and feasible access for economic and other purposes can be realized.

The Committee adopted a standard providing for adequate and feasible access for economic and other purposes. The Committee believes that routes of access to inholdings should be practicable in an economic sense. Otherwise, an inholder could be denied any economic benefit resulting from land ownership. However, we do not believe that the access route which is chosen must be, in all instances, the most economically feasible alternative. Rather, this subsection provides the guarantee of an adequate and feasible alternative for economic and other purposes; that is, a route which will permit economic access to, and the use of, such lands while also seeking to ameliorate adverse impacts on the area or conservation system unit involved. In this regard, the Committee expects the Secretary to regulate such access in order to protect the natural and other values for which the units were established.

The Committee understands that the common law guarantees owners of inholdings access to their land, and that rights of access might also be derived from other statutory provisions, including other provisions of this title, or from constitutional grants. This provision is intended to be an independent grant supplementary to all other rights of access, and shall not be construed to limit or be limited by any right of access granted by the common law, other statutory provisions, or the Constitution.

The Committee discussed whether the establishment of conservation system units in Alaska would interfere with the mission of the United States Armed Forces in Alaska. The Committee understands that extensive military overflights of Alaska occur as part of the role and mission of the Alaska Command. It is not the intent of the Committee that these overflights be prevented. In general, the Committee has adopted a policy that the use of airplanes is to be continued, and the Committee feels that this policy should apply to military overflights as well as civilian operations.

The Committee also understands that the Alaska Command engages in military maneuvers on Federal lands such as the Jack Frost military exercise. These maneuvers are important to the mission of the military in Alaska, and the Committee does not feel that the establishment of conservation system units in Alaska will endanger these operations. Much of these operations occur on land which will remain under the jurisdiction of the Bureau of Land Management, and this legislation does not affect the ability of the military to utilize such lands. On other areas, the Committee expects the Secretary to cooperate with the Alaska Command to determine what activities can be permitted under appropriate regulation without endangering the resources of the units.

govern the areas covered by the legislation and that the provisions of existing law govern the other federal lands in the State of Alaska. The section becomes effective upon the relinquishment of specified State selections made on November 15, 1978.

*Section 1324: Access*

This section is designed to remove the uncertainties surrounding the status of the rights of the owners of non-Federal lands to gain access to such lands across Federal lands. It has been the Committee's understanding that such owners had the right of access to their lands subject to reasonable regulation by either, the Secretary of Agriculture in the case of national forests, or by the Secretary of the Interior in the case of public lands managed by the Bureau of Land Management under the Federal Land Policy and Management Act of 1976. However, a recent District Court decision in Utah (*Utah* v. *Andrus* et al., C79-0037, October 1, 1979, D. C. Utah) has cast some doubt over the status of these rights. Furthermore, the Attorney General is currently reviewing the issue because of differing interpretations of the law by the Departments of Agriculture and the Interior.

The Agriculture Department believes that non-Federal land owners have the right of access to national forest lands subject to reasonable rules and regulations. They find nothing in the Organic Act of 1897 (16 U.S.C. 473-478, 479-482, 551) or the Wilderness Act which precludes such access. In fact, they interpret Section 5(a) of the Wilderness Act (16 U.S.C. 1131-1136) as mandating access to non-Federal in holdings within national forest wilderness.

The Interior Department on the other hand, interprets Section 5(c) of the Wilderness Act as expressly authorizing denial of access to such inholders in wilderness areas. Based on that interpretation, Interior then concludes that the provisions for wilderness review of public lands organized by BLM in section 603(c) of the Federal Land Policy and Management Act also authorized denial of access across public lands subject to wilderness review.

The Committee amendment is designed to resolve any lingering legal questions by making it clear that non-Federal landowners have a right of access. National Forests and public land, subject, of course, to reasonable rules and regulations.

### TITLE XIV—AMENDMENTS TO THE ALASKA NATIVE CLAIMS SETTLEMENT ACT AND RELATED PROVISIONS

*Section 1401: Stock Alienation*

This section is intended to allow Native Corporations the option of giving their shareholders and Corporations additional protection after 1992 when stock can be alienated. The section is also designed to limit the possibility of take over of Native Corporations by outside interests. This is accomplished by allowing the Corporations the option of amending their bylaws to provide for a right of first refusal before the culmination of a sale or other transfer of the stock and also to limit voting in Native Corporations to Alaska Natives or their direct descendants. In addition, this section allows Alaska Native members of professional organizations to alienate their stock in cases where holding Native stock may interfere with their ability to conduct their business.