**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

WILDERNESS WORKSHOP, *et al.*,

                      Plaintiffs,

        v.

MICHAEL BOREN[1], *et al.*,

                      Defendants.

Case No. 23-cv-678 (JMC)

---

## MEMORANDUM OPINION AND ORDER

Section 3210(a) of the Alaska National Interest Lands Conservation Act (ANILCA) requires the Secretary of Agriculture to "provide such access to nonfederally owned land within the boundaries of the National Forest System as the Secretary deems adequate to secure to the owner the reasonable use and enjoyment thereof." 16 U.S.C. § 3210(a). The Forest Service interprets that provision to apply throughout the United States, not only in Alaska. Based on that understanding, it granted a developer permission to build a road through a national forest in Colorado. The question teed up by the cross-motions for partial summary judgment is whether the statute does, in fact, apply nationwide. Joining seemingly every other federal court to decide this question, the Court holds that it does. The Court therefore **GRANTS** the Government's and developer's motions for partial summary judgment and **DENIES** the motion for partial summary judgment filed by the environmental groups that brought this lawsuit.[2]

---

[1] Under Secretary Boren has been substituted for his predecessor in office, as have the other officials sued in their official capacities. *See* Fed. R. Civ. P. 25(d).

[2] Unless otherwise indicated, the formatting of citations has been modified throughout this opinion, for example, by omitting internal quotation marks, emphases, citations, and alterations and by altering capitalization. All pincites to documents filed on the docket in this case are to the automatically generated ECF Page ID number that appears at the top of each page.

## I.    BACKGROUND

Berlaimont Estates owns a 680-acre parcel of land in Eagle County, Colorado. *See* ECF 37-18 at 4. The company intends to build 19 "luxury homes" on the parcel. ECF 37-10 at 379, 382. To realize that aim, Berlaimont says it needs to build a new road. *See* ECF 30 at 10. Although there are some roads that reach Berlaimont's plot, they are "lower maintenance, native surface roads, requiring high clearance off-road vehicles to travel." ECF 37-18 at 4. Those roads do not, however, "reach the developable portion" of Berlaimont's property, and—because they cannot be snowplowed—would not provide year-round access anyways. *Id.* at 7, 12.

But building the road Berlaimont needs is not so simple. That's because Berlaimont's property is "entirely surrounded" by the White River National Forest. ECF 37-18 at 4. The company therefore needs the Forest Service's approval to build its road. Berlaimont applied for that approval and, after years of back and forth, the Forest Service granted it. *See id.* at 5–7.

Throughout the approval process, the Forest Service received "[a]pproximately 1,000 comment letters[,] . . . [a]ll but a few" of which were "in strong opposition" to Berlaimont's development. ECF 37-18 at 11. Much of the opposition centered on the "long-term impacts to wildlife habitat and recreation" that would result from approval of the road and the resulting construction of new homes. *Id.* And in granting Berlaimont approval to build the road, the supervisor of the White River National Forest acknowledged that the project would "have adverse impacts to forest resources and wildlife." *Id.* But, the supervisor concluded, a federal statute—section 3210(a) of ANILCA—required him to grant Berlaimont "access adequate to secure reasonable use of [its] private property." *Id.*

After the Forest Service issued its approval, two environmental organizations—Wilderness Workshop and Rocky Mountain Wild—filed this lawsuit. *See* ECF 1; ECF 37-18 at 37

(Forest Service's decision is dated March 10, 2023). The organizations alleged that the Forest Service's approval was unlawful for a slew of reasons and asked the Court to set the decision aside. *See* ECF 15-1 at 52–70. The complaint named several government officials as defendants, along with the Department of Agriculture and the Forest Service. *See id.* ¶ 1. Berlaimont then sought and was granted leave to intervene to defend the case alongside the Government. *See* ECF 14. The Court denied the Government's subsequent request to transfer the case to the District of Colorado. *See Wilderness Workshop v. Harrell*, 676 F. Supp. 3d 1, 3 (D.D.C. 2023).

With the table set for the case to proceed in this Court, both sides agreed that the Court should first decide a legal question that would resolve one portion of the first claim in the organizations' complaint. *See* ECF 25 at 2. In that claim, the organizations allege that the Forest Service's decision was contrary to law because it relied on a misunderstanding of section 3210(a). *See* ECF 15-1 ¶¶ 188–90. That section, the environmental groups say, only applies to land in Alaska. *See id.* ¶ 190. The Government and Berlaimont, unsurprisingly, say the provision applies throughout the United States. *See* ECF 35 at 6; ECF 36 at 7. Following the parties' lead, the Court set a briefing schedule for cross-motions for partial summary judgment on that issue.

## II.     LEGAL STANDARD

To prevail on a motion for partial summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In APA cases such as this one, involving cross-motions for summary judgment, the district judge sits as an appellate tribunal. The entire case on review is a question of law." *Gilbert v. Wilson*, 292 F. Supp. 3d 426, 433 (D.D.C. 2018).

## III.     ANALYSIS

The only issue before the Court at this stage is a narrow one: Does section 3210(a) apply to "nonfederally owned land within the boundaries of the National Forest System" throughout the

United States, or does it only apply to that land if it is within the boundaries of the National Forest System in Alaska? 16 U.S.C. § 3210(a). The answer to that question will resolve a portion—but not the entirety—of count one of the environmental organizations' complaint. The claim that the Forest Service acted contrary to law by applying section 3210(a) to Berlaimont's request turns on the geographical reach of the statute. As the Government rightly concedes, *see* ECF 36 at 9, the organizations also claim in count one that, even if the statute applies, the Government erred in approving Berlaimont's request, *see* ECF 15-1 ¶ 192. That aspect of count one is not the subject of the pending cross-motions.

Ultimately, the Court concludes that section 3210(a) applies to "nonfederally owned land" throughout the United States, not just in Alaska. That conclusion is dictated by the text and context of the provision. It is also consistent with the consensus view of other federal courts—a consensus from which the environmental groups have not cited a single departing decision. Before turning to the statutory interpretation question, however, the Court briefly explains why at least one of the organizations has standing to bring this lawsuit.

### A. Wilderness Workshop has standing to bring this claim.

Neither the Government nor Berlaimont has contested the organizations' standing to bring their claims. *See* ECF 36 at 16. Federal courts, however, have "an independent obligation to assure that standing exists." *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009). Fulfilling that obligation, the Court is satisfied at this stage that at least one of the groups—Wilderness Workshop—has standing. The Court need not, and therefore does not, consider whether the other organization also has standing. *See Biden v. Nebraska*, 600 U.S. 477, 489 (2023).

Wilderness Workshop is a "membership organization with more than 700 members, including many in the Eagle Valley" where Berlaimont plans to build its development. ECF 29-1 ¶ 4. At least one of those members would "have standing to sue in their own right." *Ctr. for*

*Sustainable Econ. v. Jewell*, 779 F.3d 588, 596 (D.C. Cir. 2015). Bill Heicher, for example, is a member who "observ[es] wildlife in the Eagle Valley." ECF 29-3 ¶ 9. Heicher's "desire to . . . observe [] animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose[s] of standing." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562–63 (1992). That interest is threatened by Berlaimont's development, which will "severely jeopardize[]" wildlife in the area. ECF 29-1 ¶ 20(e). "The proposed paved access road would," for instance, "sever a critical migration route for the second largest migrating deer herd in Colorado." *Id.* ¶ 20(g). And the sand and salt mix that will be used in the winter "to keep the paved road safe" will "attract[] animals to the road," leading to deadly collisions. ECF 29-3 ¶ 20. Heicher's "definite plans to continue enjoying the wildlife and landscapes" in the area—where he lives—are sufficiently "concrete" to render this threatened injury "actual or imminent." *Id.* ¶¶ 2, 9, 11; *Lujan*, 504 U.S. at 564.

Heicher's injury is fairly traceable to the Forest Service's alleged misapplication of the law in allowing Berlaimont to build the road and would be redressed by an order vacating that approval. The Forest Service's approval of Berlaimont's request was expressly premised on the agency's understanding that the statute required the Forest Service to grant Berlaimont "adequate access" to its property. ECF 37-18 at 6. And although Berlaimont's construction is the ultimate cause of Heicher's threatened aesthetic injury, it is the Forest Service's decision that "authorizes" Berlaimont to build the road. *Animal Legal Def. Fund, Inc. v. Glickman*, 154 F.3d 426, 440 (D.C. Cir. 1998). Berlaimont has made clear that it cannot develop the property absent the new road. *See, e.g.*, ECF 30 at 10 ("There is no current year-round paved snowplowed access to the developable, usable part of the [p]roperty."). So Heicher's threatened aesthetic injury is "directly traceable" to the Forest Service's decision. *Animal Legal Def. Fund, Inc.*, 154 F.3d at 440. If the Court vacates that decision because it was based on the Forest Service's misunderstanding of the law, the agency

could make a different decision when properly applying the law going forward. Nothing more is required to establish Heicher's standing. *See Sugar Cane Growers Co-op. of Fla. v. Veneman*, 289 F.3d 89, 94–95 (D.C. Cir. 2002). One of Wilderness Workshop's members therefore has "standing to sue in their own right." *Ctr. for Sustainable Econ.*, 779 F.3d at 596.

Finally, the "interests" Wilderness Workshop "seeks to protect are germane to its purpose" and "neither the claim[s] asserted nor the relief requested requires the participation" of its members in the lawsuit. *Ctr. for Sustainable Econ.*, 779 F.3d at 597. Wilderness Workshop exists to "protect the wilderness, water, and wildlife" in this area of Colorado, it has "engaged in the Berlaimont . . . access road process since the project was proposed," and it "allocate[d] significant organizational resources and staff capacity to the process." ECF 29-1 ¶¶ 4–5. Clearly the subject of this litigation—approval of the road—is "pertinent" to Wilderness Workshop's "organizational purpose." *Ctr. for Sustainable Econ.*, 779 F.3d at 597. And because the claim on which Wilderness Workshop has moved for summary judgment "turns entirely on whether" the Government "complied with its statutory obligations," and "the relief" Wilderness Workshop "seeks is invalidation of agency action[,] [n]either the claims nor the relief require the participation of" its members. *Id.* at 597–98. Wilderness Workshop has therefore sufficiently demonstrated that it has associational standing to press the claim on which it moved for summary judgment.

One final note before turning to the merits of that claim. In their opposition to the Government's and Berlaimont's cross-motions for summary judgment, the organizations argue that neither defendant has established "their own standing to seek the relief requested by their cross motions." ECF 34 at 6. That argument misunderstands standing doctrine. "[T]he party invoking federal jurisdiction . . . bear[s] the burden of demonstrating they have standing." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 430–31 (2021). But it is the organizations that "invok[ed] federal

jurisdiction," *id.*, and the Court is aware of no authority—nor have the environmental groups cited any—suggesting that a defendant haled into a federal court must somehow establish standing before defending itself. Nor in asking the Court to enter judgment in their favor on the organizations' claim have the Government or Berlaimont sought any "form of relief" that demands a showing of standing. *Id.* at 431. The Court therefore need not concern itself with the Government's or Berlaimont's standing.

**B.  Section 3210(a) applies nationwide.**

"Although [ANILCA], in general, applies to national forests in Alaska, courts have determined that" section 3210(a) of the Act—the section at issue here—"has a nation-wide effect, and is thus applicable to national forests throughout the United States." *Nat'l Parks Conservation Ass'n v. United States*, 177 F. Supp. 3d 1, 16 n.6 (D.D.C. 2016). Indeed, Berlaimont attached a table to its motion of 19 cases reaching that result, *see* ECF 30-1 at 1–2, and the Government puts the count at no less than 21, *see* ECF 31-1 at 9, 29–32. The environmental groups have not identified a single case coming out the other way. The organizations have, however, rightly pointed out that there is no D.C. Circuit or Supreme Court decision resolving the issue. The Court therefore takes up the parties' arguments as to the correct interpretation of the statute on a blank slate, albeit mindful of the judicial consensus.

**1.  The statute's plain text indicates that it has national reach.**

Section 3210(a) provides that, "[n]otwithstanding any other provision of law, . . . the Secretary [of Agriculture] shall provide such access to nonfederally owned land within the boundaries of the National Forest System as the Secretary deems adequate to secure to the owner the reasonable use and enjoyment thereof." 16 U.S.C. § 3210(a).

Nothing in the provision's plain text suggests that it only applies in Alaska. It is applicable to "nonfederally owned land within the boundaries of the National Forest System." *Id.*

"[N]onfederally owned land" is not defined in ANILCA. *See* 16 U.S.C. § 3102. "[L]and,"
however, "mean[s] lands, waters, and interests therein," *id.* § 3102(1)—none of which exist only
in Alaska—and nothing suggests "nonfederally owned" actually means "nonfederally owned in
Alaska." ANILCA does not define "National Forest System," either. *See id.* § 3102. But the word
"National" suggests the provision applies, well, nationally. *See* National, Webster's Third New
International Dictionary 1505 (1981) ("of or relating to a nation" or "of, affecting, or involving a
nation as a whole esp. as distinguished from subordinate areas"); National, Random House College
Dictionary 886 (1980) ("of, pertaining to, or maintained by a whole nation").

Even more instructive, "National Forest System" had a settled meaning by the time
Congress enacted ANILCA in 1980. *See* Alaska National Interest Lands Conservation Act, Pub.
L. No. 96-487, 94 Stat. 2371 (1980). Six years earlier, Congress defined "National Forest System"
in the Forest and Rangeland Renewable Resources Planning Act: "Congress declares that the
National Forest System consists of units of Federally owned forest, range, and related lands
throughout the United States and its territories." Pub. L. No. 93-378, § 10, 88 Stat. 476, 480 (1974).
Congress then enacted other statutes that incorporated that same definition. *See* Federal Land
Policy & Management Act of 1976, Pub. L. No. 94-579, § 211(f), 90 Stat. 2743, 2759. And the
Forest Service made use of this definition in its regulations before the enactment of ANILCA, too.
*See, e.g.*, National Forest System Land & Resource Management Planning, 44 Fed. Reg. 53928
(Sept. 17, 1979) (to be codified at 36 C.F.R. pt. 219).

When Congress made use of the term "National Forest System" in ANILCA, then, it
"employ[ed] a term of art" that brought "the old soil with it." *George v. McDonough*, 596 U.S.
740, 746 (2022). The term's meaning was settled both by Congress's enactment of a definition in
a related statute only six years before ANILCA's enactment, and by the "regulatory backdrop"

that had filled in since Congress's use of the defined term. *Id.*; *see also Jazz Pharms., Inc. v. Kennedy*, 141 F.4th 254, 263 (D.C. Cir. 2025) (explaining that "old-soil canon" applies where term is "obviously transplanted" from a "statute" or "regulation"). The term "National Forest System" was not limited only to National Forests in Alaska. It swept in land "throughout the United States and its territories." § 10, 88 Stat. at 480. Section 3210(a)'s text, then, indicates that the provision applies to "nonfederally owned land within the boundaries of the National Forest System" anywhere in the United States, not just in Alaska.

### 2.    Statutory context confirms that section 3210(a) applies nationwide.

The organizations do not make much of an argument about the text of section 3210(a) itself. Instead, they focus on the subsection's context—its relationship to subsection 3210(b) and other parts of ANILCA, to ANILCA's broader purpose, and to another federal statute that governs federal land. *See* ECF 29 at 28–31. The environmental groups are correct that the meaning of a provision's text often "depends on [its] context." *Pulsifer v. United States*, 601 U.S. 124, 140 (2024). But here, the context confirms that section 3210(a) means what it says; it does not, as the organizations would have it, silently include an "in Alaska" limit.

Consider first 3210(a)'s neighboring subsection. In (b), Congress required the Secretary of the Interior to "provide . . . access to nonfederally owned land surrounded by *public lands* managed by the Secretary." 16 U.S.C. § 3210(b) (emphasis added). "[P]ublic lands" is a defined term in ANILCA: "lands situated *in Alaska* which, after December 2, 1980, are Federal lands." *Id.* § 3102(3) (emphasis added). Subsection (b), then, only requires the Secretary of the Interior to provide access to "nonfederally owned land" in Alaska. The organizations latch onto the limited geographic scope of (b) to argue that (a) must have a similarly limited reach. *See* ECF 29 at 29. And the Ninth and Fourth Circuits have offered support for that view on the theory that the two

subsections "were meant to have the same effect, one on lands controlled by the Secretary of Agriculture, the other on lands controlled by the Secretary of the Interior." *Mont. Wilderness Ass'n v. U.S. Forest Serv.*, 655 F.2d 951, 954 (9th Cir. 1981); *see also United States v. Srnsky*, 271 F.3d 595, 602 (4th Cir. 2001).

While that intuition has some force, it is equally plausible to think Congress's clear limitation on the scope of (b) suggests the absence of the limit in (a) was no accident. "Congress knew how to limit" the scope of these access provisions—make use of the words "in Alaska," as it did in the definition of "public lands" incorporated into (b)—yet chose not to impose that limit in (a). *Nat'l Postal Pol'y Council v. Postal Regul. Comm'n*, 17 F.4th 1184, 1191 (D.C. Cir. 2021). Relying on precisely this contrast, the Tenth Circuit has remarked that the fact "(a) is not . . . constrained" in the same fashion as (b) "lend[s] some support for an interpretation applying § 3210(a) broadly to the entire 'National Forest System.'" *Rocky Mountain Wild v. Dallas*, 98 F.4th 1263, 1292 (10th Cir. 2024).

So the contrast between (a) and (b) can be interpreted to "point[] in . . . different direction[s]." *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 115 (2001). Expanding the view to consider other sections of ANILCA confirms, however, that (a) does not silently incorporate the "in Alaska" limit that is explicit in (b). Most telling is Congress's choice to expressly limit the applicability of other provisions in the Act to "National Forest System lands *in the state of Alaska.*" § 708(b)(1), 94 Stat. at 2421 (emphasis added); *see also* § 708(a)(2) (discussing "national forest system roadless areas in Alaska"); § 708(b)(2) ("National Forest lands in the State of Alaska"); § 708(b)(4), 94 Stat. at 2422 ("National Forest System lands in the State of Alaska"); § 505(a), 94 Stat. at 2405 ("national forest lands in Alaska"); § 705(c), 94 Stat. at 2420 ("national forest lands in Alaska"). If—as the organizations argue—Congress intended "National Forest System"

to mean "National Forest System in Alaska," it "was wasting its breath with superfluous language" when it repeatedly added the qualifier "in Alaska" to these provisions. *Feliciano v. Dep't of Transp.*, 605 U.S. 38, 53 (2025). Because the organizations' "interpretation" would "render superfluous" other "portion[s]" of ANILCA, the "canon against surplusage" cuts sharply against their understanding of section 3210(a). *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 386 (2013).

The Government's and Berlaimont's interpretation, by contrast, allows "National Forest System" to "carry the same meaning" throughout ANILCA. *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 85 (2017). For instance, Congress required the Secretary of Agriculture to prepare a report identifying "opportunities . . . to increase timber yields on national forest lands in Alaska" "consistent with the laws and regulations applicable to the management of the National Forest System." § 705(c), 94 Stat. at 2420 (codified at 16 U.S.C. § 539d(c)). It would be odd to think the Secretary only had to consider whether those opportunities were consistent with laws applicable to the "National Forest System in Alaska," rather than the laws applicable to all national forests. On the organizations' read, that surprising result would obtain for this section, as well as others that reference "laws applicable to the national forests," § 1322(a), 94 Stat. at 2487 (codified at 16 U.S.C. § 3209(a)), or powers "applicable to the National Forest System," § 506(a)(6), 94 Stat. at 2408. Because the Government and Berlaimont understand "National Forest System" to mean national forest lands throughout the country, their interpretation would give these provisions a more natural meaning—the Secretary of Agriculture has to act in a manner that is consistent with the laws governing the entire national forest system, not only the laws governing Alaska's national forests.

Nor does the Government's or Berlaimont's interpretation expand other provisions of ANILCA, as the organizations insist it does. *See* ECF 34 at 16–17. To make that point, the

environmental groups point to several provisions that they say would also have "broad application . . . to all public lands" if section 3210(a) is interpreted to apply outside of Alaska. *Id.* Two of these provisions, however, apply only to "public lands" or "conservation system units," both of which are defined by ANILCA to only include land "in Alaska." 16 U.S.C. § 3102(3), (4); *see* 16 U.S.C. § 3193 (repeatedly referencing "public lands" and "conservation system units"); *id.* § 3198(a) (employment preference for "position[s] within public lands" for those with experience with "public lands"); ECF 34 at 16–17 (citing these two provisions). The other two provisions the organizations cite do not exist. *See* ECF 34 at 17 (citing 16 U.S.C. § 3104). To the extent the groups were trying to cite section 3204—as the Government reasonably guesses, *see* ECF 36 at 20—that section likewise only applies to "public lands." 16 U.S.C. § 3204(a). If anything, the organizations' discussion of these provisions only highlights that Congress had no trouble limiting ANILCA's application to Alaska when it intended to do so.

The environmental groups' lead argument, however, is not really about the text of specific ANILCA provisions at all. It is instead about "ANILCA's intent [and] purpose." ECF 29 at 4. As the organizations put it, ANILCA "was adopted to address specific federal public land management issues unique to Alaska." *Id.* at 5. From that premise, the organizations reason that "it would be absurd to conclude that Congress explicitly enacted a sweeping national policy in a statute otherwise devoted to Alaskan federal lands." *Id.* at 31.

The Court has no doubt that ANILCA was passed to resolve issues related to federal land management in Alaska. Congress made that plain by including a "Congressional statement of purpose" in the law. 16 U.S.C. § 3101. The Act's "two stated goals" were to "provide 'sufficient protection for the national interest in the scenic, natural, cultural and environmental values on the public lands in Alaska'" and to "provide 'adequate opportunity for satisfaction of the economic

and social needs of the State of Alaska and its people.'" *Sturgeon v. Frost*, 577 U.S. 424, 430–31 (2016) (quoting 16 U.S.C. § 3101(d)). But that Congress was principally concerned about Alaska does not mean it did not take up other subjects in the Act. Congress regularly includes provisions in laws that address topics ancillary to the laws' principal objectives. The Government has provided several examples of this phenomena. *See* ECF 36 at 22 & n.6. Most instructive here, in the Colorado Wilderness Act—a law whose express purpose was the treatment of federal lands in Colorado—Congress included grazing guidelines "applica[ble] to all national forest wilderness areas." Mitchel P. McClaran, *Livestock in Wilderness: A Review & Forecast*, 20 Env't L. 857, 874 (1990); *see* Colorado Wilderness Act, Pub. L. No. 96-560, § 101(b), 94 Stat. 3265, 3265 (1980) (enacted purposes); § 108, 94 Stat. at 3271 (grazing provision). There is nothing improper or even all that surprising, then, about Congress tucking a provision with national applicability into a law principally concerned with Alaska.

Finally, the environmental groups are wrong to say that the Government's and Berlaimont's interpretation of section 3210(a) works an impermissible repeal by implication of the Federal Land Policy and Management Act (FLPMA). *See* ECF 29 at 32. The organizations are right that, in enacting the FLPMA in 1976, Congress sought to "untangle" an "array of laws granting rights-of-way across federal lands" and "establish" a new "statutory scheme for the management of forest lands." *United States v. Jenks*, 22 F.3d 1513, 1515 (10th Cir. 1994). But "Congress is generally free to change its mind." *Cmty.-Serv. Broad. of Mid-Am., Inc. v. FCC*, 593 F.2d 1102, 1113 (D.C. Cir. 1978). So in enacting the FLPMA, Congress did not prevent itself from legislating on the topic of access across federal land in the future. And Congress made clear that section 3210(a) was meant to supersede any prior attempts made at solving the particular access problem addressed in the provision: The statute applies "[n]otwithstanding any other

provision of law." 16 U.S.C. § 3210(a). Insofar as there is a conflict between section 3210(a) and the FLPMA, the "notwithstanding clause clearly signals" Congress's decision to "override conflicting provisions" of the FLPMA. *Cisneros v. Alpine Ridge Grp.*, 508 U.S. 10, 18 (1993).

What's more, applying section 3210(a) nationwide still leaves plenty of work for the FLPMA to do. Section 3210(a) deals with the specific problem of private land that is enclosed entirely "within the boundaries" of the National Forest System. The FLPMA's access provision, by contrast, applies whenever someone wants a "right[]-of-way over, upon, under, or through" "lands within the National Forest System," no matter if they own land that is entirely enclosed within the National Forest System. 43 U.S.C. § 1761(a). The familiar maxim that the "specific governs the general" thus applies and indicates that section 3210(a) is the on-point statute when dealing with enclosed private lands. *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012); *see id.* at 648 ("When the conduct at issue falls within the scope of *both* provisions, the specific presumptively governs."). The FLPMA's provision, by contrast, does all the work when the applicant seeking a right-of-way does not own an enclosed parcel. It also applies when someone wants to build "reservoirs, canals, ditches, flumes, . . . pipes, pipelines, tunnels," and a whole number of other things on National Forest System land. 43 U.S.C. § 1761(a)(1)–(7). That reaches far beyond the mere provision of "access" that section 3210(a) requires. In short, applying section 3210(a) outside of Alaska does not repeal the right-of-way provision in the FLPMA; the statutes simply do different things.

The environmental groups do not have the text of section 3210(a) on their side. So the organizations, understandably, turn their attention to the provision's broader context—both in ANILCA and alongside the FLPMA. But as it turns out, the context confirms what the plain text suggests: Section 3210(a) applies to the "National Forest System" throughout the United States.

14

And although the parties spilled considerable ink on ANILCA's legislative history, because section 3210(a)'s text and the statutory context "make clear" that section 3210(a) applies nationwide, there is no need to rely on legislative history here. *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 143 F.4th 518, 536 (D.C. Cir. 2025).

*    *    *

The organizations' motion for partial summary judgment, ECF 29, is **DENIED**. Berlaimont's and the Government's motions for partial summary judgment, ECF 30; ECF 31, are **GRANTED**. The Court enters judgment against the organizations on their claim in count one that the Forest Service's "[a]pplication of ANILCA to National Forest System lands outside of Alaska" was contrary to law. ECF 15-1 ¶ 190. The motions for a hearing, ECF 42; ECF 43, are **DENIED** as moot.

**SO ORDERED.**

_____<br>
JIA M. COBB<br>
United States District Judge

Date: February 24, 2026

15